UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

OGLALA SIOUX TRIBE, et al.,

     Plaintiffs,

v.

LUANN VAN HUNNIK, et al.,

     Defendants.

Case No. 5:13-cv-05020-JLV

## AMICUS BRIEF
## OF THE UNITED STATES

The United States files this amicus brief pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States" in any case pending in federal court. This litigation implicates the United States' interest in the proper interpretation and application of the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 ("ICWA"), and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, when Indian children are taken from their families and placed into a state's custody.

The United States has a "special relationship" with federally recognized Indian tribes. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 552 (1974). Congress enacted ICWA in furtherance of this "special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people." 25 U.S.C. § 1901. Congress found that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children."

*Id.* § 1901(3).  The Secretary of the Interior has issued non-binding guidelines addressing state courts' implementation of ICWA, 44 Fed. Reg. 67,584 (Nov. 26, 1979) [hereinafter DOI Guidelines], and also makes grants for the establishment and operation of Indian child and family service programs.  *See* 25 U.S.C. §§ 1931-1932; 25 C.F.R. Part 23.  The United States also has an interest in the protection of constitutionally mandated rights, including civil rights and the right to due process.

The United States, therefore, has a strong interest in ensuring that state courts and agencies consistently adhere to ICWA and the Due Process Clause when Indian children are removed from their families and tribes and taken into state custody.

## I.  LEGAL BACKGROUND

In 1978, Congress determined that federal action was necessary to address "'the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'"  *Adoptive Couple v. Baby Girl*, ___ U.S. ___, 133 S. Ct. 2552, 2557 (2013) (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)).  In particular, Congress found "that an alarmingly high percentage of Indian families [were] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies," and that the states had "often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."  25 U.S.C. § 1901(4), (5); *see also Adoptive Couple*, 133 S. Ct. at 2557.

Congress enacted ICWA to "establish[] . . . minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive

homes." 25 U.S.C. § 1902.  The statute "seeks to protect the rights of the Indian child as an

Indian and the rights of the Indian community and tribe in retaining its children in its society."

*Holyfield*, 490 U.S. at 37 (quoting H.R. Rep. No. 1386, at 23 (1978)).

ICWA's applicability turns principally on whether a child custody proceeding involves

an "Indian child," defined as "any unmarried person who is under age eighteen and . . . either (a)

[is] a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the

biological child of a member of an Indian tribe."  25 U.S.C. § 1903(4).  "At the heart of the

ICWA are its provisions concerning jurisdiction over Indian child custody proceedings," with the

statute providing that tribes have exclusive jurisdiction over some child custody proceedings and

presumptive jurisdiction over others.  *Holyfield*, 490 U.S. at 36.

Recognizing, however, that a tribe may not always "be able to take swift action to

exercise its jurisdiction . . . , Congress authorized states to take temporary emergency action."

DOI Guidelines, 44 Fed. Reg. at 67,590.  Specifically, ICWA Section 1922 provides:

> Nothing in this subchapter shall be construed to prevent the emergency removal
> of an Indian child . . . from his parent or Indian custodian or the emergency
> placement of such child in a foster home or institution, under applicable State law,
> in order to prevent imminent physical damage or harm to the child.  The State
> authority, official, or agency involved shall insure that the emergency removal or
> placement terminates immediately when such removal or placement is no longer
> necessary to prevent imminent physical damage or harm to the child and shall
> expeditiously initiate a child custody proceeding subject to the provisions of this
> subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or
> restore the child to the parent or Indian custodian, as may be appropriate.

25 U.S.C. § 1922.

ICWA also establishes minimum federal standards and requirements for "child custody

proceedings" under state law, with a "child custody proceeding" defined as including any action

for foster care placement, termination of parental rights, preadoptive placement, or adoptive

placement. *Id.* § 1903(1). Both the Indian child's parent and her tribe are entitled to notice of such proceedings; the parent, if indigent, is entitled to court-appointed counsel; and the tribe may intervene. *Id.* §§ 1911(c), 1912(a), (b). All parties to such proceedings have the right to examine all documents that are filed with the court and could form the basis for its decision. *Id.* § 1912(c). In addition to these procedural requirements, there are also important substantive requirements that apply to foster care placement proceedings. *See*, *e.g.*, *id.* § 1912(d) (requirement that party seeking foster care placement must prove that "active efforts" designed to prevent the breakup of the Indian family have been provided); *id.* § 1912(e) (requirement for expert testimony regarding potential damage to child resulting from continued custody by parent); *id.* § 1915(b) (placement requirements and hierarchy of placement preferences).

## II.  FACTUAL BACKGROUND

The Plaintiffs in this case are the Oglala and Rosebud Sioux Tribes and two tribal members who are parents of children who were removed from their custody under the South Dakota child welfare system. On March 21, 2013, Plaintiffs filed suit against Defendants – the presiding judge of the Seventh Judicial Circuit of the State of South Dakota, the State's Attorney for Pennington County, the Secretary of the South Dakota Department of Social Services, and the head of Child Protection Services for Pennington County – alleging that Defendants' practices concerning the involuntary removal of Indian children from their homes and the placement of these children into the custody of the State of South Dakota violate ICWA and the Due Process Clause. *See* Complaint (Mar. 21, 2013), Document No. 1.

Plaintiffs' allegations focus on Defendants' policies, practices, and procedures relating to "48-hour hearings." South Dakota law requires that "[n]o child may be held in temporary custody longer than forty-eight hours" (or in some cases twenty-four hours), excluding weekends

and holidays, "unless a temporary custody petition for an apparent abuse or neglect case . . . has been filed, the child is within the jurisdiction of the court and the court orders longer custody during a noticed hearing or a telephonic hearing."  S.D. Codified Laws § 26-7A-14.  South Dakota law also instructs that "[a]t the temporary custody hearing the court shall consider the evidence of the need for continued temporary custody of the child in keeping with the best interests of the child."  *Id.* § 26-7A-18.  If temporary custody of the child remains with the Department of Social Services, the court must review the child's temporary custody placement at least once every 60 days.  *Id.* § 26-7A-19(2).

On January 28, 2014, this Court denied Defendants' motion to dismiss, finding that Plaintiffs stated valid claims for relief under ICWA and the Due Process Clause.  *Oglala Sioux Tribe v. Van Hunnik*, __ F. Supp. 2d __, 2014 WL 317657 (D.S.D. Jan. 28, 2014), Document No. 69 [hereinafter MTD Order].

On July 11, 2014, Plaintiffs filed for partial summary judgment on two of their claims. First, Plaintiffs allege that Defendants are violating ICWA Section 1922 by failing to ensure that the emergency removal or placement of an Indian child terminates immediately when the removal is no longer necessary to prevent imminent harm.  *See* Plaintiffs' First Motion for Partial Summary Judgment re: Violations of 25 U.S.C. § 1922, Document No. 106 [hereinafter First SJ-1922]; Plaintiffs' Statement of Undisputed Facts re: Defendants' Violations of 25 U.S.C. § 1922. In particular, Plaintiffs allege that Defendants are conducting perfunctory 48-hour hearings that do not adequately gather or evaluate information necessary to determine whether emergency removals or placements should be terminated, and that the orders issued at the end of the 48-hour hearing do not adequately instruct state officials to return the child to the home as soon as the emergency has ended.  *Id.*

5

Second, Plaintiffs allege that Defendants are violating the Due Process Clause by preventing parents from testifying, presenting evidence, or cross-examining the state's witnesses at the 48-hour hearing. *See* Plaintiffs' Second Motion for Partial Summary Judgment: Due Process Violations, Document No. 108; Plaintiffs' Statement of Undisputed Facts re: Due Process Violations. They also allege that parents are not being provided adequate notice or the opportunity to be represented by appointed counsel and that the state courts are issuing orders to remove Indian children from their homes without basing those orders on evidence adduced in the hearing. *Id.*

### III. DISCUSSION

The legal standards applicable to the emergency removal of Indian children are straightforward. ICWA requires that state officials "insure" that Indian children are returned home (or to their tribe) as soon as the threat of imminent physical damage or harm has ended, or that state officials "expeditiously" initiate a child custody proceeding subject to all ICWA protections. 25 U.S.C. § 1922. The Due Process Clause requires that parents be given notice of the claims against them and an opportunity to challenge the state's allegations by presenting evidence and cross-examining witnesses. Otherwise, parents are denied a prompt, meaningful opportunity to challenge whether the emergency removal was proper in the first place or to demonstrate that conditions have changed so that the child can be safely and appropriately returned to the parents' custody.

A.   <u>**Requirements of ICWA Section 1922**</u>

   1.   **Section 1922 Imposes Specific Mandatory Obligations on State Officials.**

Congress's overriding concern in passing ICWA was that states were abusing their power to remove Indian children from their families and tribes. *Holyfield*, 490 U.S. at 32. Congress

6

also recognized that the unwarranted removal of Indian children and the placement of these children in non-Indian homes had significant detrimental effects on Indian children, families, and tribes. *See*, *e.g.*, S. Rep. 95-597, at 12 (1977) (describing witness testimony that "serious emotional problems often occur as a result of placing Indian children in homes which do not reflect their special cultural needs"); *see also* American Indian Policy Review Commission Final Report (May 17, 1977) (reprinted in S. Rep. 95-597, at 52 (1977)) ("Removal of Indian children from their cultural setting seriously impacts . . . long-term tribal survival and has damaging social and psychological impact on many individual Indian children."). Through ICWA, Congress placed clear limits on state power. As the Supreme Court recognized, the "inescapable [conclusion] from a reading of the entire statute" is that it is designed to "curtail state authority" in order to protect the rights of Indian families. *Holyfield*, 490 U.S. at 45 n.17. ICWA does this by recognizing tribal court jurisdiction over many child custody proceedings and by providing a suite of minimum federal standards and requirements that apply to those proceedings that occur in state courts. *See supra* pages 3-4 (describing some of ICWA's requirements).

Within this framework of constrained state authority, Congress recognized the need for states to be able to take emergency action to protect Indian children. 25 U.S.C. § 1922. Thus, Section 1922 provides for the emergency removal or placement of an Indian child "under applicable State law, in order to prevent imminent physical damage or harm to the child." *Id.* Congress, however, also imposed strict limitations on this emergency authority. In particular, ICWA instructs state officials that they "shall insure that the emergency removal or placement terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to the provisions of this subchapter, transfer the child to the jurisdiction of the

appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate."  *Id.*  As this Court has correctly concluded, this provision of Section 1922 "provides a substantive right to Indian parents."  MTD Order at 32-33.

Through Section 1922, Congress imposed significant obligations on state courts, social service agencies, and other officials.  First, these officials have an obligation to vigilantly investigate and oversee an emergency removal of an Indian child so that they can timely determine "when such removal or placement is no longer necessary."  25 U.S.C. § 1922.  Moreover, when faced with assertions that the emergency situation has ended, state officials must respond by promptly hearing, investigating, and evaluating such evidence.  *See id.*  If state officials do not take these basic steps in the days and weeks following an emergency removal, it is simply not possible for them to comply with ICWA's instruction to "insure" that the emergency removal terminates when it is no longer required.  *Id.*  Second, once the state officials determine that the emergency situation has ended, they must take quick action to "immediately" terminate the emergency removal or placement.  *Id.*  State officials also must "expeditiously" either (1) return the child to the parent, custodian, or tribe, or (2) initiate a child custody proceeding that will provide the full suite of ICWA's substantive and procedural protections.  *Id.*

In their Motion for Partial Summary Judgment, Plaintiffs assert that the 48-hour hearings at issue in this case are, almost without exception, cursory affairs, and that no testimony or evidence is permitted.  First SJ-1922, at 9-11.  To satisfy Section 1922, however, state officials ***must*** conduct an inquiry into whether the emergency removal is still necessary to prevent imminent harm to the child, and ***must*** accept and/or present evidence on this issue, either at the 48-hour hearing or at another hearing soon thereafter.  If state officials refuse to evaluate evidence that the emergency has ended and defer further judicial review of the situation for 30 or

8

60 or 90 days, they cannot fulfill ICWA's instruction to "insure" that emergency removals terminate "immediately" when no longer necessary to protect the child from harm.  ICWA Section 1922 also imposes obligations on state officials to have adequate procedures in place to ensure compliance in the days and weeks following the 48-hour hearings.  These procedures should include clear and case-specific instructions regarding when the Department of Social Services must terminate the emergency placement or initiate an ICWA child custody proceeding.  This practice would also provide parents, guardians, and tribes specific guidance regarding what is expected before a child can be returned, as well as a basis for seeking further review if the instructions are not complied with.

### 2.   State Agencies and Officials Cannot Defer Compliance with the Substantive Requirements of Section 1922.

Contrary to Defendants' assertion, Section 1922 is not a "statute of deferment," nor does it create "an exception to the important requirements of ICWA in . . . emergency situations." Memorandum of Law in Support of Defendant Judge Davis's Motion to Dismiss at 7 (May 17, 2013), Document No. 34.  The second sentence of Section 1922 immediately imposes specific ongoing obligations on state officials in emergency removals – that they "insure" that emergency removals terminate "immediately" when the emergency has ended, and that they "expeditiously" either return the child or commence a child custody proceeding.  Deferring application of Section 1922's immediate termination provision thwarts Congress's intent to strictly constrain state emergency authority to the minimum time necessary to prevent imminent physical damage or harm to the Indian child.  As the Department of the Interior notes in the DOI Guidelines, "[u]nless there is some kind of time limit on the length of an 'emergency removal' (that is, any removal not made pursuant to a finding . . . that continued parental custody would make serious

physical or emotional harm likely), the safeguards of the Act could be evaded by use of long-term emergency removals."  DOI Guidelines, 44 Fed. Reg. at 67,590.

Congress intentionally chose words like "shall insure" and "immediately" that convey the weight and urgency of these obligations.  *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661-62 (2007) (statutory terms "shall" and "insure" impose mandatory and imperative duties on agencies).  Further, one of the last amendments Congress made to ICWA specifically added the requirement of "immediate" action to avoid abusive delays.  Congress considered legislation that would have provided that emergency removal or placement could "continue[] only for a *reasonable* time."  H.R. Rep. No. 1386, at 6 (1978) (emphasis added).  But Congress amended the final bill to include a much stricter requirement for "immediate" action.  124 Cong. Rec. 38108 (1978).  The amendment "delete[d the words] 'continues only for a reasonable period of time' and insert[ed] in lieu thereof 'terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child.'"  *Id.*  As Congressman Lagomarsino explained when introducing the amendment:

> Because what is "reasonable" is open to wide-ranging interpretation and abuse, this amendment clarifies the intent of the section by requiring an emergency placement to terminate when the reason for it no longer exists, specifically, when it is no longer necessary for the prevention of imminent physical harm to the child.

*Id.*  The DOI Guidelines echo this reasoning, noting that ICWA's "legislative history clearly states that placements under such emergency procedures are to be *as short as possible*.  If the emergency ends, the placement shall end."  DOI Guidelines, 44 Fed. Reg. at 67,590 (emphasis added).

10

Contrary to Defendants' assertions, the South Dakota Supreme Court's decision in *Cheyenne River Sioux Tribe v. Davis*, 822 N.W.2d 62 (S.D. 2012), does not authorize state officials to ignore the substantive requirements of Section 1922 during emergency removals. In that case, the South Dakota Supreme Court examined whether the "full panoply" of ICWA requirements (including, for example, expert witness requirements of 25 U.S.C. § 1912(e)) apply at the emergency hearing stage and concluded that they do not. 822 N.W.2d at 64-65. But as this Court correctly concluded, the South Dakota Supreme Court did not consider the question whether Section 1922 itself imposes any substantive requirements at the early stages of an emergency removal. *See* MTD Order at 32 (also rejecting as irrelevant five other state court cases: *State ex rel. Juvenile Dep't v. Charles*, 688 P.2d 1354 (Or. App. 1984); *D.E.D. v. State of Alaska*, 704 P.2d 774, 779 (Alaska 1985); *Matter of the Welfare of J.A.S.*, 488 N.W.2d 332 (Minn. Ct. App. 1992); *In re S.B. v. Jeannie V.*, 30 Cal. Rptr. 3d 726 (Cal. App. 4th 2005); and *State ex rel. Children, Youth and Families Dep't v. Marlene C.*, 248 P.3d 863 (N.M. 2011)).

Finally, a state court cannot absolve itself of its Section 1922 obligations by simply deferring to a state agency's actions or determinations. Section 1922 applies independently to all "State authorit[ies], official[s] or agenc[ies]" and thereby imposes its obligations on each such entity, including courts. 25 U.S.C. § 1922. Therefore, state courts have an independent obligation to conduct an inquiry at the 48-hour hearing into whether the emergency removal remains necessary to prevent imminent harm to the child.

Thus, from the very start of an emergency removal, Section 1922 requires state courts, agencies, and officials to actively investigate and evaluate whether the emergency situation has ended. Given the statutory requirements for oversight and "immediate" action, this ongoing obligation cannot be deferred for weeks or months until the next scheduled hearing occurs.

**B.**     <u>Requirements of the Due Process Clause</u>

Section 1 of the Fourteenth Amendment to the United States Constitution mandates that

"[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

U.S. Const. amend. XIV, § 1.   "[D]ue process imposes constraints on governmental decisions

which deprive individuals of 'liberty' or 'property' interests . . . ."  *Mathews v. Eldridge*, 424

U.S. 319, 332 (1976).  The Supreme Court has explained that "[t]he point is straightforward: the

Due Process Clause provides that certain substantive rights – life, liberty, and property – cannot

be deprived except pursuant to constitutionally adequate procedures."  *Cleveland Bd. of Educ. v.

Loudermill*, 470 U.S. 532, 541 (1985); *see also Arnett v. Kennedy,* 416 U.S. 134, 167 (1974).

The Due Process Clause provides heightened protection against government interference with

fundamental rights and liberty interests.  *Reno v. Flores,* 507 U.S. 292, 301-02 (1993).  An

essential principle of due process is that a deprivation of life, liberty, or property "be preceded by

notice and opportunity for hearing appropriate to the nature of the case."  *Mullane v. Central

Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950).  "The deprivation by state action of a

constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional;

what is unconstitutional is the deprivation of such an interest ***without due process of law***."

*Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in the original) (citations omitted).

**1.  Parents Have a Fundamental Liberty Interest in the Care and Custody of
        Their Children.**

This case impacts some of the most fundamental interests protected by our Constitution.

"[P]erhaps the oldest of the fundamental liberty interests recognized" by the Supreme Court and

lower courts alike is the liberty interest that parents have in the care and custody of their

children.  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Santosky v. Kramer*, 455 U.S.

745, 753 (1982); *Schmidt v. Des Moines Public School*, 655 F.3d 811, 816 (8th Cir. 2011);

*Whisman v. Rinehart*, 119 F.3d 1303, 1310 (8th Cir. 1997).  Both parents and children have a

liberty interest in each other's companionship.  *See Lehr v. Robertson,* 463 U.S. 248, 258 (1983)

("[T]he relationship of love and duty in a recognized family unit is an interest in liberty entitled

to constitutional protection.").  While parents' right to the care and custody of their children "is

limited by the compelling governmental interest in the protection of minor children, particularly

in circumstances where the protection is considered necessary as against the parents themselves,"

*Manzano v. South Dakota Dep't of Soc. Servs.*, 60 F.3d 505, 510 (8th Cir. 1995) (citing *Myers v.

Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987)), the "fundamental liberty interest of natural parents

in the care, custody, and management of their child does not evaporate simply because they have

not been model parents," *Santosky,* 455 U.S. at 753.

> ## 2.  Due Process Requires the Opportunity to Be Heard Promptly When the Government Seeks to Interfere with Rights to the Care and Custody of Children.

The Due Process Clause ensures every individual subject to a deprivation of life, liberty,

or property "the opportunity to be heard at a meaningful time and in a meaningful manner."

*Mathews v. Eldridge*, 424 U.S. at 333.  The general right of custodial parents to be heard at

judicial proceedings that could deprive them of their custodial rights has long been established in

American jurisprudence.  For more than two centuries, courts have recognized the importance of

a parent's right to be heard in child custody cases.  In *Boescher v. Boescher*, 5 Ohio Dec. 184

(Ohio Ct. Com. Pl. 1804), the Ohio Court of Common Pleas held that a child's guardians have

the right to defend against the taking of their child and that children cannot be taken away from

their parents without due process.  In *Sinquefield v. Valentine*, 132 So. 81 (Miss. 1931), the

Mississippi Supreme Court found that a father must have both notice and an opportunity to be

heard at a child custody proceeding. *Id.* at 82. "The court . . . must give an opportunity to persons affected by the judgment to be heard before it is rendered . . . ." *Id.* at 83. The court further held that it "would be impossible" for the state legislature "to authorize a hearing in which a person may be deprived of the custody and society of his children and their nurture and education without notice and a hearing thereon." *Id.* As discussed below, *see infra* pages 15-17, this right to be heard applies not only to the permanent custody determinations at issue in these early cases, but also to temporary state removals of children.

To determine exactly what process is due – that is, whether particular procedures provide adequate protection of an individual's rights at a particular point in time – the Supreme Court has weighed three factors:  (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value of additional procedural safeguards; and (3) the government's interest, including the burdens that the needed additional procedural requirements would entail. *Mathews v. Eldridge*, 424 U.S. at 335. In this case, the private interest – parents' right to the care and custody of their child – is a fundamental liberty interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Lassiter v. Dep't of Soc. Servs. of Durham County*, 452 U.S. 18, 27 (1981) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). The risk of erroneous deprivation can be alleviated if parents are provided with the allegations against them and given a meaningful opportunity to present evidence and cross-examine witnesses about whether the emergency removal was, and continues to be, justified. As Congress found in enacting ICWA (*see supra* at page 6-7), the harm to Indian parents, children, and tribes from erroneous removal of Indian children is substantial and calls for significant safeguards. As to the third *Mathews* factor, the state has an interest in the welfare and best interests of the child; in

14

fact, "it shares the parent's interest in an accurate and just decision." *Lassiter*, 452 U.S. at 27. The state's interests may, however, diverge from the parents in that the state also has an interest in minimizing the expense of these proceedings. *Id.* at 28. Weighing these three factors, the state must provide a meaningful hearing "promptly after the removal," *Swipies*, 419 F.3d at 715 (citing *Whisman*, 119 F.3d at 1310-11)), as this Court has already found. *See* MTD Order at 38.

### 3. Even in Emergency or Temporary Circumstances, Due Process Requirements Apply.

The interest that parents have in the custody of their children is not to be lightly interfered with, even following an emergency situation. While an emergency proceeding such as the 48-hour hearing may not permanently deprive parents of their custody rights, even a temporary deprivation of physical custody requires a prompt and meaningful hearing. *Swipies*, 419 F.3d at 715; *Whisman*, 119 F.3d at 1310; *see also Eidson v. State of Tennessee Dep't of Soc. Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) ("Even a temporary deprivation of physical custody requires a hearing within a reasonable time."); *Morrell v. Mock*, 270 F.3d 1090, 1098 (7th Cir. 2001) ("[E]ven though the interference with the mother's custody in this case was to be temporary, [the court] cannot ignore the not insubstantial risk that once physical custody is erroneously transferred, it may never be regained."). For example, in *Swipies*, the Eighth Circuit held that due process was clearly violated in a case where a parent was not provided with an evidentiary hearing until seventeen days after his child was removed. 419 F.3d at 715. The court noted, "[I]f seven days is too long for a car owner to wait for a post-deprivation hearing after his or her car has been towed and impounded . . . , as a matter of law, a parent should not have to wait seventeen days after his or her child has been removed for a hearing." *Id.* Similarly, in

*Whisman*, the Eighth Circuit found that a seventeen-day delay in providing parents with a due process hearing was "not a prompt hearing."  *Whisman*, 119 F.3d at 1310.

Other courts have come to the same conclusion.  For example, in *Weller v. Department of Social Services,* 901 F.2d 387 (4th Cir. 1990), a father argued that the city department of social services violated his due process rights by transferring custody of his child to the child's grandparent after the father was accused of physically abusing the child.  *Id.* at 390.  While the *Weller* court noted that there may be "'extra-ordinary situations' where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed," and the state "has the burden to initiate prompt judicial proceedings to ratify its emergency action." *Id.* at 393, 396 (quoting *Hooks v. Hooks*, 771 F.2d 935, 942 (6th Cir. 1985)).  The *Weller* court also expressed an additional concern about the lack of a timely post-deprivation hearing because the child involved was taken out of the jurisdiction before an adequate hearing was conducted.  *Id.* at 396.  Related issues are at stake here, where Indian children are often being placed with non-Indian families, and thus may be removed from the Indian child's family, community, and tribe by both distance and culture.

State courts have also recognized the due process right of a parent to be heard during temporary emergency custody proceedings.  In *In re Custody of Lori*, 827 N.E.2d 716 (Mass. 2005), the Massachusetts Supreme Judicial Court held that a five-month wait for an evidentiary hearing violated the mother's due process rights, and stated that "a prompt, postdeprivation evidentiary hearing should have been held within seventy-two hours of the child's removal."  *Id.* at 721.  In *Smith v. Crider*, 932 So. 2d 393 (Fla. Dist. Ct. App. 2006), the court recognized that there may be "extraordinary circumstances" when a change of custody order can be issued

16

without notice to the opposing party, but that "an opportunity to be heard should be provided as soon thereafter as possible." *Id.* at 398-99 (quoting *Wilson v. Roseberry,* 669 So. 2d 1152, 1154 (Fla. Dist. Ct. App. 1996)).  The *Smith* court noted that "failure to provide notice and an opportunity to be heard promptly after the entry of an order when an emergency is presented, deprives the opposing party of his or her right to procedural due process." *Id.* at 398; *see also Wilson,* 669 So. 2d at 1154 (noting that "even where the trial court is authorized to enter an emergency *ex parte* [custody] modification order, in our view the court should thereafter afford the custodial parent prompt notice and opportunity to be heard").

There is a particular burden on state officials to ensure that parents are given a meaningful opportunity to be heard at the 48-hour hearing, because parents are unlikely to be familiar with the state's processes or understand the consequences of the hearing.  The Second Circuit recognized this burden in *Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir 1977), where a mother challenged the legality of the removal of her children.  The Second Circuit wrote that

> the state cannot constitutionally "sit back and wait" for the parent to institute judicial proceedings . . . .  The burden of initiating judicial review must be shouldered by the government.  We deal here with an uneven situation in which the government has a far greater familiarity with the legal procedures available for testing its action.  In such a case, the state cannot be allowed to take action depriving individuals of a most basic and essential liberty interest which those uneducated and uninformed in legal intricacies may allow to go unchallenged for a long period of time.

*Id.* at 828.

### 4.  Due Process Requires Notice and an Opportunity to Be Heard.

South Dakota law provides parents with a right to a hearing within 48 hours of removal. S.D. Codified Laws § 26-7A-14.  However, to meet the requirements of due process, the opportunity to be heard must not only be held at a meaningful time; it must be conducted in a

meaningful *manner*.  The 48-hour hearing cannot be treated as an informal or insignificant proceeding, because it results in judicial findings that can lead to removal of a child from her parents for several months.  Providing due process to parents at the 48-hour hearing requires ensuring that they have notice of the allegations and a meaningful opportunity to be heard regarding the basis for the emergency removal and the continued need for state custody of their children.

The "hearing required by due process is one appropriate to the case."  *Doe v. Staples*, 706 F.2d 985, 989 (6th Cir. 1983).  While there are not bright-line rules as to exactly how the hearing must be conducted, as a general matter, an adequate hearing following the removal of children minimally requires access to the material on which the charge was based.  *Syrovatka v. Erlich*, 608 F.2d 307, 310 (8th Cir. 1979) (parents must be provided notice of the hearing, which includes the time and place, a clear statement of the purpose of the proceedings and the possible consequences, the factual basis, and statement of the legal standard authorizing termination).  It also should include an opportunity to present witnesses and evidence on the parents' behalf.  *See*, *e.g.*, *Doe*, 706 F.2d at 990 (finding that even a parent who did not have legal custody must be afforded a post-removal hearing that includes "a full opportunity . . . to present witnesses and evidence on their behalf"); *see also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.").

South Dakota law provides that, at the temporary custody hearing, "the court shall consider the evidence of the need for continued temporary custody of the child in keeping with the best interests of the child."  S.D. Codified Laws § 26-7A-18.  Thus, South Dakota law presupposes that the court should accept and examine information relevant to the need for

continued state custody.  As discussed in South Dakota's Guidelines for Judicial Process in Child Abuse and Neglect Cases [hereinafter South Dakota Guidelines], the purpose of the 48-hour hearing is to

> decide whether the child can be safely returned home and when.  The decision should be based on a competent assessment of the risks and dangers to the child. The Court should evaluate the current and future danger to the child and what can be done to eliminate the danger.

South Dakota Guidelines (Ex. 4 to Complaint) at 33.  Further, the South Dakota Guidelines state that any child placement decision made at the 48-hour hearing "is [to be] based on careful consideration of the circumstances of the case" and should "involve[] substantial time and resources."  *Id*. at 41-42.  The guidelines expressly call for consideration of multiple factors, including contacts with the parents since the initial placement, previous abuse or neglect issues, current placement information, and information about any absent parent or other relatives.  *Id.* at 37-38.

The South Dakota Guidelines make clear that judges should be gathering information from the parties and hearing from witnesses at the 48-hour hearing.  They counsel that "[t]o ensure careful and informed judicial decisions, the Court should make it possible for witnesses to testify at the 48 Hour Hearing" and that it is "critical" that parents are "made a part of the court case" at that stage, if possible.  *Id.* at 44-45.  They further note that the hearing can be continued "if additional information or witnesses are needed."  *Id.* at 36.  Thus, the South Dakota courts' written procedures indicate that the 48-hour hearing should include meaningful consideration of evidence and witness testimony.

If, as Plaintiffs claim, parents are not allowed to present testimony or documents at the 48-hour hearing, only the state's evidence (*e.g.*, affidavits submitted by the state) is considered.

19

If parents are not allowed to challenge the evidence or cross-examine witnesses, the court cannot know whether the child can be safely returned – or whether the child was properly removed in the first place.  Such a one-sided proceeding would not comport with the requirements of the Due Process Clause, particularly if there is no opportunity for the parents to put their own information in front of the court for weeks or months.

### 5. The State Can Easily Bear the Burden of Providing Due Process Promptly After an Emergency Removal.

Providing parents with adequate notice and a meaningful opportunity to present evidence and cross-examine witnesses at the 48-hour hearing or soon thereafter would impose little additional cost and would avoid the substantial harms that parents may suffer from an erroneous deprivation of the fundamental right to custody of their children.  Providing parents a copy of the documents relevant to the proceeding would cost virtually nothing.  Allowing parents to challenge the evidence that the state is offering would, similarly, cost very little, as the state is already putting forward the evidence.  Allowing parents to offer their own witnesses and other evidence would, in many cases, add only a modicum of time to the proceedings.  Moreover, because state officials are already required by ICWA to evaluate whether the need for the emergency removal is over, these witnesses and evidence should already be familiar to the state.

Other states have not found it unduly burdensome to make basic inquiries at hearings similar to a 48-hour hearing.  For example, in Oregon, a child or ward of the state may not be held in detention or shelter care for more than 24 hours except by court order made pursuant to a hearing.  Or. Rev. Stat. § 419B.185.  This "Shelter Hearing" is specifically defined as an evidentiary hearing:  The parent, child, or ward "shall be given the opportunity to present evidence to the court . . . that the child can be returned home without further danger of suffering

physical injury or emotional harm." *Id.* §419B.185(1).  Further, at the Shelter Hearing, the court may receive testimony, reports, and other evidence without regard to whether the evidence is admissible under state law, "if the evidence is relevant to the determinations and findings" required at the Shelter Hearing.  *Id.* § 419B.185(1)(g).

In Minnesota, the initial hearing must take place within 72 hours after the child is taken into custody.  Minn. Stat. § 260C.178.  Minnesota law is very clear that "[t]he court may not order or continue the foster care placement of the child unless the court makes explicit, individualized findings that continued custody of the child by the parent or guardian would be contrary to the welfare of the child and that placement is in the best interest of the child." *Id.* § 260C.178(f).

As discussed above at pages 18-19, the South Dakota Guidelines for 48-hour hearings demonstrate that the burden of providing such procedural protections is one that the state should have already assumed. *See generally* South Dakota Guidelines.  Those guidelines acknowledge that the hearing may "involve[] substantial time and resources," but nonetheless requires "careful consideration of the circumstances of the case" in light of the importance of the decision. *Id*. at 41-42.  To the extent that there is some burden associated with providing parents with more process at these hearings, the Eighth Circuit has made clear that a claim of "administrative inconvenience" cannot justify a significant delay in holding a meaningful hearing. *Whisman*, 119 F.3d at 1310.

Given the important liberty interest at stake, state officials must provide adequate procedural protections to parents promptly (at the 48-hour hearing or another hearing soon thereafter), including notice of the claims against them, an opportunity to present evidence and cross-examine witnesses, and a decision that is based on the evidence presented.

## IV.  CONCLUSION

ICWA imposes a specific obligation on state officials, including state courts and departments of social services, to actively investigate and oversee emergency removals of Indian children to "insure" that the removal ends as soon as possible, and that Indian children are "expeditiously" returned to their parents or their tribe, or that the state commences a child custody proceeding subject to all of ICWA's protections.  This obligation applies to initial hearings such as the 48-hour hearings at issue here.  Moreover, due process requires that, when the state takes emergency custody of a child, the parents must be provided with notice and a prompt and meaningful opportunity to be heard.  These obligations are vital federal protections for Indian children, their parents, and tribes, and help protect against the unwarranted removal of Indian children from their homes and culture.

Respectfully Submitted,                                      Date:  August 14, 2014

BRENDAN V. JOHNSON
*United States Attorney*
District of South Dakota
PO Box 2638
Sioux Falls, SD 57101-2638


MOLLY J. MORAN                                      SAM HIRSCH
*Acting Assistant Attorney General*                *Acting Assistant Attorney General*
Civil Rights Division                              Environment and Natural Resources Division

Eve L. Hill                                        Amber Blaha (DC #471008)
*Deputy Assistant Attorney General*                Ragu-Jara Gregg (DC #495645)
                                                   *Attorneys*
____/S/ Verlin Deerinwater_____               U.S. Department of Justice
Verlin Deerinwater (OK Bar #011874)                Environment and Natural Resources Division
*Attorney*                                         P.O. Box 7415, Ben Franklin Station
U.S. Department of Justice                         Washington, D.C. 20044-7415
Civil Rights Division                              202-514-3473 (phone)
601 D Street NW                                    202-514-4231 (fax)
Room 5928                                          Ragu-Jara.Gregg@usdoj.gov
Washington, DC 20004
(202) 514-6260 (phone)
(202) 514-6273 (fax)
verlin.deerinwater@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that on August 14, 2014, a true and correct copy of the foregoing was served upon the following person(s), by placing the same in the service indicated, addressed as follows:

    ☐  US mail
    ☐  FedEx
    ☒  ECF
    ☐  hand delivered
    ☐  faxed


        /S/ Verlin Deerinwater      

24