STEPHEN L. PEVAR
American Civil Liberties Union Foundation
330 Main Street, First Floor
Hartford, Connecticut 06106
(860) 570-9830

DANA L. HANNA
Hanna Law Office, P.C.
816 Sixth St.
P.O. Box 3080
Rapid City, South Dakota 57709
(605) 791-1832

RACHEL E. GOODMAN
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor.
New York, NY 10004
(212) 549-2500

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| OGLALA SIOUX TRIBE, et al, | Case No. 5:13-cv-05020-JLV |
| Plaintiffs, | PLAINTIFFS' REPLY BRIEF RE: |
| vs. | DEFENDANTS' VIOLATIONS |
| LUANN VAN HUNNIK, et al, | OF 25 U.S.C. § 1922 |
| Defendants. | |

## INTRODUCTION

The Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901 *et seq.* ("ICWA"), was designed by Congress to address an intractable and distressing facet of Indian family life: the penchant of state employees for removing Indian children from their homes based on a standard that is far too lax and culturally biased to protect the legitimate interests of the

children, parents, and Indian tribes involved in those proceedings.  *See Oglala Sioux Tribe v. Van Hunnik*, 993 F. Supp. 2d 1017, 1034 (D.S.D. 2014) ("Congress's purpose in enacting ICWA was to curb the alarmingly high rate of removal of Indian children from Indian parents.").  These removals, Congress found, were "often unwarranted."  25 U.S.C. § 1901(4).  A central reason the state removed so many Indian children from their homes, Congress further found, was because state judges and social workers applied white, middle-class values in deciding whether abuse, neglect, or abandonment had occurred.  *See* H.R. Rep. No. 95-1386, at 10-11 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7533 (citing testimony alleging widespread cultural bias by state child welfare workers in Indian custody determinations, and stating that "[t]he abusive actions of social workers would largely be nullified if more judges were themselves knowledgeable about Indian life and required a sharper definition of the standards of child abuse and neglect.")  *See also* Amicus Brief of the United States ("DOJ Br.") (Docket 122-1) at 6 ("Congress's overriding concern in passing ICWA was that states were abusing their power to remove Indian children from their families and tribes.") (citing *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)); Barbara Ann Atwood, *Children, Tribes, and States: Adoption and Custody Conflicts over American Indian Children* 160 (2010) ("Testimony before Congress also indicated that state child welfare officials were insensitive to traditional Indian approaches to child rearing . . . [and applied] majoritarian middle-class values" in assessing whether an Indian family was fit to raise a child.).

      ICWA places numerous curbs on state discretion.  Some of these curbs are set forth in § 1922 of the Act.  Section 1922 requires state officials who remove an Indian child from the home to "insure that the emergency removal or placement terminates

2

immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child." 25 U.S.C. § 1922.  In *Oglala Sioux Tribe*, this Court recognized that § 1922 plays a critical role in Congress's remedial plan, and the Court interpreted § 1922 consistent with its plain language, and with ICWA's overall purpose.  *See* 993 F. Supp. 2d at 1033-35.  Section 1922, the Court held, imposes two duties on Defendants in their temporary custody ("48-hour") hearings.  First, during the 48-hour hearing, state officials must prove that the emergency that prompted the child's removal from the home continues to exist, and second, if the state meets that burden, then at the conclusion of the hearing the court must order the custodial state agency to return the child to his or her home as soon as the emergency terminates.  *Oglala Sioux Tribe*, 993 F. Supp. 2d at 1035.  Thus, as this Court recognized, § 1922 was intended by Congress to ensure that Indian children will be removed from their homes only in narrow circumstances, and must be returned as soon as possible.  The amicus brief submitted by the Department of Justice fully supports this Court's construction of § 1922.  *See* DOJ Br. at 6-11.

Until now, Defendants contended that § 1922 was a statute of deferment, authorizing them to ignore ICWA's protections until two months later in their custody proceedings when they would hold the advisory hearing.  *See* Mem. of Law in Supp. of Judge Davis's Mot. to Dismiss (Docket 34) at 7, 8 (arguing that § 1922 "creates an exception to the important requirements of ICWA in these emergency situations" and "South Dakota statutory law is the source of the procedures governing emergency custody proceedings, not ICWA.").  Only five months ago, Judge Davis confirmed his belief that § 1922 is a "statute of deferment."  *See* Judge Davis' Response to Request for

3

Admission No. 32, attached to Declaration of Peter W. Beauchamp in Supp. of Pls.' Motion for Partial Summ. J. ("Beauchamp Decl.") (Docket 111) Ex. 3.[1] As recently as June 23, 2014, Judge Davis advised an attorney in a 48-hour hearing that "ICWA doesn't apply to a 48-hour hearing." *See* Tr. of Case No. A14-444 (June 23, 2014).[2]

In response to Plaintiffs' motion for partial summary judgment, however, Defendants make two stunning announcements. First, Defendants admit for the first time that they must perform during their 48-hour hearings the two duties identified by this Court. Second, Defendants claim that they have been faithfully performing both of those duties all along in their 48-hour hearings. *See* Defs.' Resp. [to] Pls.' Mot. for Summ. J. Re: 25 U.S.C. § 1922 (hereinafter "Defs.' 1922 Br.") at 2-3 (admitting that Defendants must perform § 1922's "twin duties" and claiming that those duties have been "met" in their 48-hour hearings). As shown below, there is no support in the record for Defendants' sudden claim of consistently and unfailingly performing duties during their 48-hour hearings that until today they strenuously contended were deferred by § 1922 until two months later.

## DEFENDANTS VIOLATE § 1922 DURING THEIR 48-HOUR HEARINGS

The first duty imposed on Defendants by § 1922 is to prove during each 48-hour hearing that continued custody of the child by the state is "necessary to prevent imminent physical damage or harm to the child." 25 U.S.C. § 1922. Defendants must demonstrate that the emergency that necessitated the child's removal from the home "[continues to]

---

[1] As the briefs filed by Plaintiffs and the Department of Justice make clear, under no circumstances can § 1922 be construed as a "statute of deferment." True, some ICWA protections apply only in subsequent hearings, but that timing is mandated in the statutory provisions that created those protections, not § 1922. Section 1922 does not defer *anything*. Thus, Judge Davis's assertion is not correct even in part.

[2] *See* Beauchamp Decl. Ex. 1 (containing fifty-seven 48-hour hearing transcripts in chronological order, including the transcript in Case No. A14-444) at 501.

4

exist at the time of the 48-hour hearing." *Oglala Sioux Tribe*, 993 F. Supp. 2d at 1035. *See also* DOJ Br. at 11 ("state courts have an independent obligation [under § 1922] to conduct an inquiry at the 48-hour hearing into whether the emergency removal remains necessary to prevent imminent harm to the child.").

As explained in detail in Plaintiffs' companion brief filed today on Plaintiffs' due process claims, Judge Davis does not conduct *any* inquiry during his 48-hour hearings into whether an emergency removal remains necessary. Indeed, parents are not even allowed by Judge Davis to testify on the subject. Nor are they permitted to cross-examine witnesses, including the state employee who signed the affidavit accusing the parents of mistreating their children. No testimony is permitted during Judge Davis's 48-hour hearings whatsoever. *See* Defs.' Statement of Material Facts Re: 25 U.S.C. § 1922 ("Defs.' 1922 SMF") (Docket 130) at 5 (Defendants "[a]dmit that no oral testimony is taken at the 48-hour hearing.") Indeed, of the more than 120 hearing transcriptions produced in discovery, Defendants can point to just four in which the subject of imminent physical damage or harm was raised even inadvertently during that proceeding. *See* Defs.' 1922 Br. at 3.[3]

Given the absence of testimony on the subject of imminent harm, Defendants are forced to defend Judge Davis's long-standing practice of basing his custody determinations exclusively on documents submitted to him *prior* to the hearing by state employees. *See* Defs.' 1922 Br. at 3 (arguing that "the police report and ICWA affidavit are sufficient evidence for the trial court to order continued custody"); *see also id*. at 4

---

[3] Plaintiffs disagree that the state's burden of proof was satisfied in any of those four hearings, but resolving this factual issue is unnecessary. Defendants cannot dispute the fact that in more than 96 percent of Defendants' 48-hour hearings held since January 2010, the subject of whether the child would risk imminent physical damage or harm if returned to the home was not discussed. Plaintiffs have thus satisfied their burden of proof on this material fact for summary judgment purposes.

("The ICWA affidavit and police report (if available) are evidence of the need for continued emergency placement," and the court need not consider anything else).

Defendants make the following statement in their brief: "Defendants disagree that evidence of the ongoing emergency is not received and considered by the trial court during 48-hour hearings, but agree that the evidence is not presented in accordance with the ordinary rules of evidence." *See id.* at 3. That is an understatement. The only "rule of evidence" Defendants follow is this one: ICWA affidavits and police reports are *always* sufficient proof of imminent physical harm or injury and nothing else need be considered. Defendants see nothing wrong with–and plan to continue their practice of–ordering the removal of Indian children based entirely on documents filed by state employees prior to the 48-hour hearing.

The shortcomings of Defendants' practice are obvious. First, Judge Davis is basing his removal decisions on evidence gathered prior to the hearing rather than determining if the emergency continues to exist at the time of the hearing. Second, Judge Davis is basing his decisions entirely on evidence submitted by the state, denying parents an opportunity to present evidence on their own behalf or to challenge the state's evidence. Thus, the risk of an erroneous determination regarding whether the emergency has ceased to exist is enormously high, given that Judge Davis does not seek the most current information from the state, and seeks no information from the parents.

Defendants claim that "[i]f a parent requests an evidentiary hearing, at or after the 48-hour hearing, one can be held ten days after notice of such proceeding is provided to the parent and the Tribe." *Id.* at 4. But Defendants have it backwards. Section 1922 already guarantees parents that the 48-hour hearing will be an evidentiary hearing, and

6

thus parents do not have to request that one be convened later.  As the Department of Justice has explained, "state courts have an independent obligation to conduct an inquiry *at the 48-hour hearing* into whether the emergency removal remains necessary to prevent imminent harm to the child."  DOJ Br. at 11 (emphasis added).[4]  Defendants cannot satisfy their § 1922 obligation by merely submitting documents to the court that the parents are not allowed to challenge (and, with respect to the police report, cannot view without a court order, *see* SDCL § 26-7A-29).  Defendants' practice to "sit back and wait" for parents to request a hearing that Defendants already have a duty to conduct violates § 1922.  *See Whisman v. Rinehart*, 119 F.3d 1303, 1311 (8th Cir. 1997) (condemning a similar "sit back and wait" practice in child custody proceedings).

Judge Davis has no justification, even under state law, for holding truncated 48-hour hearings that never permit the introduction of testimonial evidence.  SDCL § 27-7A-15 authorizes 48-hour hearings to be "extended by order of the court," and the Guidelines promulgated by the South Dakota Unified Judicial System recommend that the court "make it possible for witnesses to testify" during a 48-hour hearing and urge courts to continue the hearing "if additional information or witnesses are needed."  The Guidelines contemplate that a 48-hour hearing "involves substantial time and resources," far different than the ones conducted by Judge Davis.  *See* South Dakota Unified Judicial System, South Dakota Guidelines for Judicial Process in Child Abuse and Neglect Cases 36, 41-42, 45 (2014) ("Guidelines"), *available at* http://ujs.sd.gov/uploads/pubs/SDGuidelinesAandNProceedings.pdf.  Thus, Judge Davis has the authority to conduct an evidentiary hearing, but he *chooses* not to conduct one.

---

[4] Not once in their brief do Defendants acknowledge the brief filed by the Department of Justice.

Judge Davis's 48-hour hearings are sham proceedings. It has been his practice for years now to base custody determinations entirely on the ICWA affidavit and the police report (if available), both of which he receives prior to the hearing. No wonder the state prevails 100 percent of the time in Judge Davis's 48-hour hearings.[5] Indeed, in a number of hearings, including Case A10-50, Judge Davis announced his intention to remove Indian children from their homes even before he asked the parents a single question other than their names, and in Case A10-270, Judge Davis did not even make that inquiry before announcing that he would be signing an order in favor of the state. *See* Beauchamp Decl. Ex. 1., Case Nos. A10-50 and A10-270. Each of these hearings, judging from the length of the transcripts, likely took less than three minutes to complete.

Defendants seem comforted by the fact that, on a few occasions anyway, parents "were allowed to comment and ask questions of the court." Defs.' 1922 Br. at 7. However, extending such a courtesy does not substitute for providing parents with the rights guaranteed them by § 1922 to an evidentiary hearing. In Case A10-1191, as explained in Plaintiffs' opening brief, a father asked Judge Davis why he was being denied custody of his son, only to be told that Judge Davis "honestly" did not know. Thus, the father may have been allowed to ask a question, but he was still denied his federal rights.

Similarly, Defendants seem reassured by the fact that state law (SDCL § 26-7A-13) appears to impose a burden of proof in 48-hour hearings similar to the burden imposed by § 1922 and that, in *Cheyenne River Sioux Tribe v. Davis*, 822 N.W.2d 62, 65-

---

[5] Defendants concede that "Judge Davis did order continued custody in all of the cases over which he presided." *See* Defs.' 1922 SMF at 2.

66 (S.D. 2012), according to Defendants, the court ratified the practices of Judge Davis that are challenged here. *See* Defs.' 1922 Br. at 20 ("The South Dakota Supreme Court in *Davis* agreed that the ICWA affidavit of DSS, and the police report, provide sufficient evidence for the need for continued custody under applicable state law."). Whether SDCL § 26-7A-13 imposes the same burden of proof as § 1922 is a question that this Court need not resolve. In the first place, *Davis* did not consider the application of § 1922 to 48-hour hearings. *See Oglala Sioux Tribe*, 993 F. Supp. 2d at 1034. Moreover, even if *Davis* had offered an opinion on that federal question, this Court would not be bound by its determination. *See Lawrence County v. Lead-Deadwood School Dist. No. 40-1*, 469 U.S. 256 (1985) (rejecting an interpretation of federal law made by the South Dakota Supreme Court); *Olcott v. The Supervisors*, 83 U.S. 678, 683 (1872). In any event, perhaps Judge Davis's practices comply with state law, but they certainly do not comply with federal law.

   Defendants point out that nearly all parents appearing in a 48-hour hearing lack counsel. Defs.' 1922 Br. at 9. But *Congress* made the decision to impose two duties on state officials at emergency hearings regardless of the presence of counsel. Therefore, the absence of counsel cannot be used as an excuse to ignore the requirements of § 1922. Further, nothing prevents Defendants from appointing counsel for the parents and, if need be, briefly postponing the hearing to permit counsel to become acquainted with the case. In any event, counsel or no counsel, Defendants have a federal duty to ensure that parents receive the rights to which they are entitled under § 1922, and they are not fulfilling that duty.

As this Court and the Department of Justice have made clear, Defendants have a duty under § 1922 to determine during their 48-hour hearings whether an emergency continues to exist, *see Oglala Sioux Tribe*, 993 F. Supp. 2d at 1035, that is, "whether the emergency removal remains necessary to prevent imminent harm to the child." DOJ Br. at 11. The facts are not in genuine dispute: Defendants have a long-standing and unyielding practice of denying Indian parents the opportunity to present evidence or to cross-examine witnesses, and to base custody determinations on documents submitted by the state prior to the hearing. Accordingly, Plaintiffs are entitled to judgment as a matter of law on their claim that Defendants consistently violate Plaintiffs' rights under §1922 during the 48-hour hearing.

## DEFENDANT DAVIS VIOLATES § 1922 BY FAILING TO ORDER DSS TO RETURN INDIAN CHILDREN TO THEIR HOMES AS SOON AS THE EMPERGENCY HAS TERMINATED

State employees who have been granted emergency custody of Indian children by a state court "shall" return those children to their homes when removal "is no longer necessary." 25 U.S.C. § 1922. This Court has held, consistent with the purpose of ICWA, that whenever a state court issues an order granting the South Dakota Department of Social Services ("DSS") continued custody of an Indian child, the state court must order DSS to return the child as soon as the emergency has terminated. *Oglala Sioux Tribe*, 993 F. Supp. 2d at 1035. The Department of Justice concurs with that construction of § 1922. *See* DOJ Br. at 7-8.

Defendants concede that Judge Davis's practice is to *authorize* DSS to perform that task, and that he has never ordered DSS to do so. *See* Defs.' 1922 SMF at 21-22 (admitting that DSS has never been ordered to return Indian children when the

emergency has terminated, either by written order or by oral instruction).   Plaintiffs have filed with this Court fifty-seven Temporary Custody Orders ("TCOs") issued by Judge Davis and other judges on the Seventh Judicial Circuit.  All of them vest complete discretion with DSS on when to return an Indian child to the home.

Given this record, Defendants are compelled to make an untenable argument.  Defendants claim that this Court should overlook the fact that Judge Davis's TCOs vest complete discretion with DSS, and should instead have faith that state employees "collectively insure that the need for emergency removal and placement terminates immediately."  Defs.' 1922 Br. at 4.  According to Defendants, "DSS has voluminous protocols which dictate how such determinations are made."  *Id*. at 5.

Defendants' argument is inconsistent with the plain language of § 1922 and with ICWA's purpose.  ICWA was specifically enacted to prevent state employees from having the vast discretion that Judge Davis continues to grant them to determine when to return Indian children to their families.  *See* DOJ Br. at 9-10 (explaining that as initially drafted, § 1922 would have allowed state agencies to determine when it was "reasonable" to return an Indian child to the home, but Congress amended the final bill and inserted the much stricter standard it currently contains).[6]

DSS may have (and by now, should have) "voluminous protocols" implementing this thirty-six-year-old law.  But Congress has limited Judge Davis's discretion regarding his removal orders.  Congress requires that Judge Davis *shall* order DSS to return Indian

---

[6] This amendment occurred shortly after the Director of the ACLU's Children's Rights Project, Rena Uviller, appeared before a House committee and testified that although the ACLU "heartily endorses" the bill, the standard by which state agencies could remove Indian children in emergency situations was "much too lax."  Ms. Uviller recommended a standard of "imminent threat of serious physical harm," which is akin to the standard that was finally adopted.  *See* Indian Child Welfare Act of 1978: Hearings on S. 1214 Before the Subcomm. on Indian Affairs and Pub. Lands of the House Comm. on Interior and Insular Affairs, 95th Cong. 83-85 (1978).

children to their homes when the emergency has ended.  Judge Davis's decision to ignore that duty violates Plaintiffs' federal rights.

Defendants make the following assertion:  "If the court's [reunification] directive is not followed, the parties can bring the matter before the court."  Defs.' 1922 SMF at 22.  But there is no "directive" to enforce.  The only thing Judge Davis does is authorize DSS to return the children.  This leaves parents with no enforceable standard, and it leaves DSS with precisely the discretion that Congress sought to eliminate.

 As discussed in Plaintiffs' opening brief, there is a critical difference between ordering that an activity must occur and merely authorizing that activity to occur.  *See Andrus v. Allard*, 444 U.S. 51, 62 n.17 (1979); *Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 287 (8th Cir. 1986); *Shopen v. Bone*, 328 F.2d 655, 659 (8th Cir. 1964).  Not once has Judge Davis ordered DSS to comply with § 1922's reunification standard, and judging from the brief he filed, he has no intention of ever doing so.  Plaintiffs are therefore entitled to summary judgment on this issue.

## EACH NAMED DEFENDANT IS A "POLICY MAKER"

Judge Davis has the authority to allow parents in his 48-hour hearings to present evidence and to cross-examine witnesses.  He does not deny that fact.  Indeed, as noted earlier, the Judicial Guidelines recommend that he conduct an evidentiary hearing and confirm that he has the authority to continue the hearing so as to facilitate the introduction of evidence.  Similarly, beginning tomorrow, Judge Davis can order (rather than merely authorize) DSS to return Indian children to their homes when the emergency ceases.  Judge Davis has chosen not engage in any of those practices, but he has the authority to undertake all of them.

Thus, Judge Davis is a "policy maker" for purposes of liability under 42 U.S.C. § 1983 with respect to the practices challenged in this lawsuit. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Judge Davis "is one who 'speak[s] with final policymaking authority . . . concerning the action alleged to have caused the particular constitutional or statutory violation at issue,' that is one with 'the power to make official policy on a particular issue.'" *Oglala Sioux Tribe*, 993 F. Suppl. 2d at 1029 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

Defendants contend that "Plaintiffs have failed to present any evidence of an official policy" set by Judge Davis. Defs.' 1922 Br. at 14. That claim lacks merit. "An 'official policy' involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy." *Oglala Sioux Tribe*, 993 F. Supp. 2d at 1029 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). Plaintiffs have filed with the Court twenty-nine transcripts of hearings by Judge Davis (and twenty-eight transcripts from other judges on the Seventh Judicial Circuit) conducted during a span of four years, each one of which employed the *identical* practices challenged in this lawsuit. This "custom or usage" is actionable under § 1983. *See Monell*, 436 U.S. at 690-91 (holding that government officials "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval" by any legislative body); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970) (same). "[A] longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity" and which violates a plaintiff's federal rights is actionable under § 1983. *Jett*, 491 U.S. at 737 (quoting *Pembaur*, 475 U.S. at 485

(White, J., concurring)).  *See also Ware v. Jackson Cnty., Mo.*, 150 F.3d 873, 885 (8th Cir. 1998) (holding that official policy for purposes of § 1983 liability may arise "from actions that are so pervasive that they become 'custom or usage' with the force of law.").

Initially, Judge Davis told this Court that he was "compelled by oath" to follow each of the practices challenged in this lawsuit.  *See Oglala Sioux Tribe*, 993 F. Supp. 2d at 1029.  However, the Court found that none of the practices challenged by Plaintiffs is mandated by state law.  *Id*.  Faced with this reality, Judge Davis has developed a new defense and now contends that although he is "an initial decision maker, . . . he is not a final policymaker" because his decisions are subject to appellate review.  *See* Defs.' 1922 Br. at 13.  This new defense fares no better than the old one.

No case supports Defendants' contention that a judge's practice is not an "official policy" merely because it is subject to appellate review.  Indeed, *Pulliam v. Allen*, 466 U.S. 522 (1984), holds otherwise.  The issue in *Pulliam* was whether a state magistrate's "practice to require bond for nonincarcerable offenses" was unconstitutional.  *Id.* at 526.  Although the magistrate's practice was subject to appellate review, the Court rejected the notion that the plaintiffs must show that "no alternative avenue of review was available" before obtaining relief under § 1983.  *Id*. at 536.  The Court expressly held that state judges whose practices violate federal law may be sued as any other policy maker, noting that "every Member of Congress who spoke to the issue assumed that judges would be liable under § 1983." *Id*. at 540 (citation omitted).

Similarly, in *Tesmer v. Granholm*, 114 F. Supp. 2d 603 (E.D. Mich. 2000), the court held that state judges were subject to suit in a § 1983 action challenging their practice of denying appellate counsel to indigent criminal defendants.  The legislative

14

history of § 1983, the court noted, establishes "Congress' intent to reach unconstitutional actions by all state actors, including judges." *Id*. at 617.  *See also Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("The very purpose of § 1983 was to interpose the federal courts between the States and the people . . . to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'") (quoting *Ex parte Virginia*, 100 U.S. 339, 346 (1879)).

It is true, as Defendants note, that where there is an "incomplete delegation of authority," the actor is not a policy maker.  *See* Defs.' 1922 Br. at 14, citing *Ware*, 150 F.3d at 885.  But *Ware* did not hold–nor has any case held–that the availability of judicial (or appellate) review constitutes an incomplete delegation of authority.  Indeed, the Eighth Circuit in *Ware* expressly found that a prison administrator was a "policy maker" despite the fact that his decisions "were subject to review and at times were reviewed" by supervisors.  *Id*. at 886.  *Ware* and *Pulliam* entirely support Plaintiffs' contentions.

As discussed above, Judge Davis has made a deliberate choice among competing options (1) to deny parents an opportunity to present evidence during his 48-hour hearings, (2) to deny parents an opportunity to cross-examine the state's witnesses, (3) to base his TCOs entirely on documents filed by state employees prior to the hearing, and (4) to issue TCOs that merely authorize but do not require DSS to comply with 25 U.S.C. § 1922.  Indeed, Judge Davis has even chosen to continue these practices despite what this Court said about them nine months ago.  These "deliberate choice[s] to follow a course of action made from among various alternatives" are policies, practices, or

customs that expose Judge Davis to liability under § 1983 as a policy maker. *See Oglala Sioux Tribe*, 993 F. Supp. 2d at 1029.[7]

Similarly, as discussed in Plaintiffs' opening brief, Defendants Vargo, Van Hunnik, and Valenti are policy makers, and they have acquiesced in Judge Davis's decision to ignore § 1922 in 48-hour hearings. *See Coleman v. Watt*, 40 F.3d 255, 261-62 (8th Cir. 1994) (holding that where executive officials acquiesce in a practice initiated by a court, the practice becomes an official policy, practice, and custom of the executive branch for purposes of federal liability). Here, Defendants Vargo, Van Hunnik, and Valenti have "by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure'" of Judge Davis exposed themselves to liability along with him. *See Jett*, 491 U.S. at 737 (quoting *Pembaur*, 475 U.S. at 485 (White, J, concurring)). *See also Oglala Sioux Tribe*, 993 F. Supp. 2d at 1031-32 (noting that Plaintiffs alleged that Defendant Vargo was a policy maker for all the reasons now proven by facts in the record to be true).

In each 48-hour hearing, Defendant Vargo has the authority to call witnesses to the stand, including the DSS employee who signed the ICWA affidavit. Defendant Vargo, however, never does so, thereby acquiescing in Judge Davis's practice of not permitting testimony in 48-hour hearings. Not one 48-hour hearing transcript indicates any effort by Defendant Vargo or his subordinates to introduce testimony related to the state's burden of proof under § 1922. Moreover, Defendant Vargo has admitted that at the time this lawsuit was filed (and, indeed, until May 2014), he did not provide parents

---

[7] Defendants contend that the longstanding practices challenged in this lawsuit are immune from this Court's review because they are *stare decisis*. *See* Defs.' 1922 Br. at 5. If that argument were valid, state court judges would still be enforcing racial segregation in public schools. Merely because Judge Davis has been violating ICWA for a long time gives him no license to continue. Defendants cite no case that supports their claim.

with a copy of the Petition for Temporary Custody. *See* Beauchamp Decl. Ex. 5 at 3 (citing Vargo Ans. to Interrog. No. 2). Keeping parents in the dark about the nature of the proceedings against them is completely consistent with Judge Davis's practice of allowing only the state (through Defendant Vargo) to introduce evidence.

      Similarly, one need only examine the ICWA affidavits on file with this Court to discover that Defendants Van Hunnik and Valenti have acquiesced in Judge Davis's practice of ignoring the standard imposed by § 1922. The majority of these affidavits are silent on the issue of whether the children involved in 48-hour hearings will likely suffer imminent physical damage or harm if returned home, and instead describe *only* what caused the child to be removed in the first instance. The following ICWA affidavits submitted during Judge Davis's hearings are illustrative: A10-50 (Jan. 11, 2010) (ICWA affidavit refers to a domestic violence dispute but offers no opinion on whether such an incident is likely to recur); A10-270 (Feb. 25, 2010) (ICWA affidavit states that mother was intoxicated when the children had been removed but does not state whether father is able to care for the children or whether mother is now able to care for them); A10-358 (March 8, 2010) (ICWA affidavit cites mother's drug use but offers no opinion on whether such use is likely to continue); A10-544 (May 3, 2010) (ICWA affidavit states only that child was removed because mother was intoxicated but offers no opinion on whether child would be at risk if returned home); A10-955 (Aug. 19, 2010) (ICWA affidavit states that mother had been arrested but offers no opinion on whether mother or father are unlikely to provide a safe home in the future, and transcript shows that mother was present at the hearing); A10-1064 (Sept. 24, 2010) (ICWA affidavit states only that child was found unsupervised but offers no opinion on whether parents are unlikely to

provide a safe home in the future).[8] As stated in Plaintiffs' opening brief, Plaintiffs are not challenging the state's decision to remove the children initially. Rather, Plaintiffs are challenging the standard Defendants use in their 48-hour hearings to determine whether to keep the children separated from the family. This standard has resulted in continued state custody in 100 percent of Judge Davis's cases even though many of the ICWA affidavits on which he has relied do not address the subject of whether the emergency that caused the initial removal has ceased to exist.

Defendants state in their brief that "Dana Hanna, on behalf of his tribal clients, frequently argues at the 48-hour hearing that if the parent is no longer intoxicated, no longer incarcerated, or no longer harboring suicidal ideations, then the imminent harm has passed, and the Indian child(ren) should be restored to their parent or guardian." Defs.' 1922 Br. at 8. That erroneous description of Mr. Hanna's argument is highly revealing. What Mr. Hanna (and what Plaintiffs) are contending is *not* that every parent who attends a hearing and is coherent and unincarcerated therefore must regain custody of their children, but rather, that § 1922 imposes a burden *on the state* to demonstrate at the 48-hour hearing that the emergency that precipitated the child's removal from the home *continues to exist*, and that if the state fails to meet that burden, the parents have a right to take their children home. Defendants' current practice is exactly the opposite: they presume that every Indian parent who was intoxicated, or who was incarcerated, or who did harbor suicidal ideations at the time the children were removed, is ineligible to have their children returned. Defendants' incorrect description of Mr. Hanna's request

---

[8] These ICWA affidavits were initially filed under seal and attached to the Beauchamp Decl. as Ex. 7 (Docket 111). Redacted copies were filed on the record later. *See* Case Nos. A10-50, A10-270, A10-258, A10-544, A10-955, and A10-1064 in Exhibit 7 to the Beauchamp Decl. (Docket 118-3) at 2-4, 8-9, 10-13, 14-16, 26-28, and 32-34, respectively.

18

illustrates that Defendants continue to misunderstand their burden under § 1922, an error for which each one of them is responsible as a policy maker.

## PLAINTIFFS ARE ENTITLED TO AN EFFECTIVE REMEDY

Defendants are violating Plaintiffs' federal statutory rights under § 1922. Therefore, Plaintiffs are entitled to an effective remedy pursuant to 42 U.S.C. § 1983. "Generally, statutes which create individual rights are presumptively enforceable by § 1983." *Oglala Sioux Tribe*, 993 F. Supp. 2d at 1035. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989); *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985); *Ex parte Young*, 209 U.S. 123 (1908); *Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 897 (8th Cir. 2000) ("Under *Young*, a party may sue a state officer for prospective relief in order to stop an ongoing violation of a federal right."); *Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d 253, 255 (8th Cir. 1995) (upholding the right of an Indian tribe to seek prospective relief against state officials under § 1983 for violating the tribe's federal rights). Because Defendant Davis is a state judge, Plaintiffs are only entitled to declaratory relief as to him, but Plaintiffs will be entitled to injunctive relief if Judge Davis fails to heed the Court's declaration of Plaintiffs' federal rights. *See* 42 U.S.C. § 1983; *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 765 (6th Cir. 2010); *Leclerc v. Webb*, 270 F. Supp. 2d 779, 793 (E.D. La. 2003); *Tesmer*, 114 F. Supp. 2d at 619-21 (issuing declaratory relief against a state judge who was violating federal law).

## CONCLUSION

The Indian Child Welfare Act was passed thirty-six years ago, but Defendants continue to ignore the twin duties imposed upon them by § 1922 of that Act. These violations of federal law must cease. Plaintiffs respectfully request summary judgment

in their favor pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 on the claims presented above.

Respectfully submitted this 30th day of September, 2014.

By:   /s/ Stephen L. Pevar
Stephen L. Pevar
Dana L. Hanna
Rachel E. Goodman

*Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2014, I electronically filed the foregoing Reply Brief with the Clerk of Court using the CM/ECF system, which sent a notice of electronic filing to the following counsel for Defendants:

| | |
|---|---|
| Sara Frankenstein | sfrankenstein@gpnalaw.com |
| Roxanne Giedd | Roxanne.giedd@state.sd.us |
| Ann F. Mines | ann.mines@state.sd.us |
| Robert L. Morris | bobmorris@westriverlaw.com |
| Nathan R. Oviatt | noviatt@goodsellquinn.com |
| J. Crisman Palmer | cpalmer@gpnalaw.com |

/s/ Stephen L. Pevar
Stephen L. Pevar