UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| OGLALA SIOUX TRIBE and ROSEBUD SIOUX TRIBE, as *parens patriae*, to protect the rights of their tribal members; MADONNA PAPPAN, and LISA YOUNG, individually and on behalf of all other persons similarly situated,<br><br>   Plaintiffs,<br><br> vs.<br><br>LUANN VAN HUNNIK; MARK VARGO; HON. JEFF DAVIS; and LYNNE A. VALENTI, in their official capacities,<br><br>   Defendants. | CIV. 13-5020-JLV<br><br><br>ORDER |

**"A cornerstone of Lakota culture can be summed up in the words family and kinship.  Family is the backbone, the foundation of our culture.  We are given substance, nurtured, and sustained by family."**[1]

*Joseph M. Marshall III, Sicangu Lakota (Rosebud)*

**"Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ."**[2]

*Congress of the United States*

---

[1] the lakota way, Penguin Group Inc., New York, 2001, p. 210.

[2] 25 U.S.C. § 1902.

**"This wholesale removal of Indian children from their homes prompted Congress to enact the [Indian Child Welfare Act], which establishes federal standards that govern state-court child custody proceedings involving Indian children."**[3]

*Supreme Court of the United States*

## INTRODUCTION

The Honorable Jeff Davis is a judge of the Seventh Judicial Circuit, part of the South Dakota Unified Judicial System.   Judge Davis is the presiding judge of the Seventh Circuit.   He administers the court system for the Circuit and sets policies and procedures in his courtroom.   His Seventh Circuit judicial colleagues follow Judge Davis' policies and procedures for the removal of Indian children from their parents' homes.

Judge Davis typically conducts hearings within 48 hours of an Indian child's removal from the parents' care.   The hearings usually last less than five minutes.[4]   The removed Indian children often spend weeks or months in foster care away from their parents, Indian custodians and Tribes.

Mark Vargo is the elected States Attorney for Pennington County, South Dakota.   His staff attorneys appear before Judge Davis and other Seventh Circuit judges in cases involving the removal of Indian children from their

---

[3]Adoptive Couple v. Baby Girl, ___ U.S. ___, 133 S. Ct. 2552, 2557 (2013) (quoting Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32 (1989) (internal quotation marks omitted).

[4]See, for example, transcripts 10-50, 10-177, 10-253, 11-480, 11-497, 12-191, 14-455 and 14-456.

parents.   Mr. Vargo has an obligation to follow federal and state law, to advocate the State's position and to seek justice at all times.[5]   These obligations are independent from the judicial function.   Mr. Vargo controls the policies and procedures followed by his staff attorneys.

Lynne A. Valenti is the Secretary of the South Dakota Department of Social Services ("DSS").   LuAnn Van Hunnik is the person in charge of DSS Child Protection Services ("CPS") for Pennington County, South Dakota.   CPS employees under policy guidance from and the supervision of Ms. Valenti and Ms. Van Hunnik prepare a petition for temporary custody and sign an Indian Child Welfare Act[6] affidavit alleging an Indian child is at risk of serious injury if the child remains in the parents' home.

The court granted *parens patriae* status to the Oglala Sioux Tribe and the Rosebud Sioux Tribe.   The court certified the individual plaintiffs, Madonna

---

[5]"The states attorney shall appear in all courts of his county and prosecute . . . on behalf of the state or his county all actions or proceedings, civil or criminal, in which the state or county is interested or a party."   SDCL § 7-16-9. "Prosecutors have a special 'duty to seek justice, not merely to convict.'" Connick v. Thompson, ____ U.S. ____, 131 S. Ct. 1350, 1362 (2011) (quoting ABA Standards for Criminal Justice 3–1.1(c) (2d ed.1980) (other citation omitted). "The prosecutor is an independent administrator of justice.   The primary responsibility of a prosecutor is to seek justice, which can only be achieved by the representation and presentation of the truth.   This responsibility includes, but is not limited to, ensuring that the guilty are held accountable, that the innocent are protected from unwarranted harm, and that the rights of all participants, particularly victims of crime, are respected."   National District Attorneys Association, *National Prosecution Standards*, Third Edition, 1-1.1 (updated 2009).

[6]25 U.S.C. § 1901 *et seq.* ("ICWA").

3

Pappan and Lisa Young, as class representatives for all similarly situated Indian parents.[7]

Plaintiffs moved for partial summary judgment on the grounds defendants violate the Indian Child Welfare Act and the Due Process Clause in the removal of Indian children from their parents or Indian custodians.   Plaintiffs seek only prospective declaratory and injunctive relief.[8]   Defendants vigorously oppose plaintiffs' motions for partial summary judgment.

The court finds that Judge Davis, States Attorney Vargo, Secretary Valenti and Ms. Van Hunnick developed and implemented policies and procedures for the removal of Indian children from their parents' custody in violation of the mandates of the Indian Child Welfare Act and in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

For the reasons stated below, plaintiffs' motions for partial summary judgment are granted.

**THE INDIAN CHILD WELFARE ACT**

Congressional findings to support the passage of ICWA included the following declarations:

> [T]hat there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

---

[7]Dockets 69 at p. 17 and 70 at pp. 14-15.

[8]Docket 1 p. 38 ¶¶ 3 & 4.

[T]hat an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

[T]hat the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901(3), (4) & (5).   The Indian Child Welfare Act "establishes minimum Federal standards and procedural safeguards to protect Indian families when faced with child custody proceedings against them in State agencies or courts."[9]

"The Indian Child Welfare Act . . . was the product of rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." Mississippi Band of Choctaw Indians, 490 U.S. at 32.   Indian tribes have an interest in the custody of Indian children "which is distinct from but on parity with the interest of the parents" and which "finds no parallel in other ethnic cultures found in the United States.   It is a relationship that many non-Indians find difficult to understand and that non-Indian courts are slow to recognize."   Id. at 52.   "[T]he purpose of the ICWA gives no reason to believe that Congress intended to rely on state law

---

[9]124 Congressional Record 38102 (1978) (remarks of Rep. Udall).

for the definition of a critical term; quite the contrary.   It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-a-vis state authorities."   Id. at 44-45.

Section 1912 of ICWA addresses the rights of Indian parents during any court proceeding.   "In any involuntary proceeding in a State court . . . the party seeking the foster care placement of . . . an Indian child shall notify the parent or Indian custodian . . . and the . . . tribe . . . of the pending proceedings . . . ." 25 U.S.C. § 1912(a).   In the event of indigency, Indian parents are entitled "to court-appointed counsel in any removal . . . proceeding."   Id. at § 1912(b). "Each party to a foster care placement . . . under State law involving an Indian child shall have the right to examine all reports and other documents filed with the court upon which any decision with respect to such action may be based." Id. at § 1912(c).   "Any party seeking to effect a foster care placement of . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break-up of the Indian family and that these efforts have proved unsuccessful."   Id. at § 1912(d).   "No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."   Id. at § 1912(e).   A

6

"foster care placement" for purposes of ICWA "mean[s] any action removing an Indian child from its parents or Indian custodian for temporary placement in a foster home or institution . . . where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated . . . ."   25 U.S.C. § 1903(1)(i).

Section 1922 of ICWA states:

> Nothing in this subchapter shall be construed to prevent the emergency removal of an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation, from his parent or Indian custodian or the emergency placement of such child in a foster home or institution, under applicable State law, in order to prevent imminent physical damage or harm to the child.   The State authority, official, or agency involved shall insure that the emergency removal or placement terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to the provisions of this subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate.

25 U.S.C. § 1922.

**THE DUE PROCESS CLAUSE**

The Due Process Clause of the Fourteenth Amendment provides "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."   U.S.C.A. Amend. XIV, section 1.   "[T]he Due Process Clause of the Fourteenth Amendment confers both substantive and procedural rights." Albright v. Oliver, 510 U.S. 266, 272 (1994) (internal references omitted).

"[T]he Amendment's Due Process Clause . . . guarantees more than fair process. . . . [it] also includes a substantive component that provides heightened protection against governmental interference with certain fundamental rights and liberty interests."   Troxel v. Granville, 530 U.S. 57, 65 (2000) (internal citations and internal quotation marks omitted).   "The Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."   Id. at 66.

## PROCEDURAL HISTORY

Plaintiffs filed this action asserting defendants' policies, practices and procedures relating to the removal of Native American children from their homes during state court 48-hour hearings[10] violate ICWA and the Due Process Clause of the Fourteenth Amendment.[11]   (Docket 1).   Defendants deny plaintiffs' claims.   (Dockets 76, 80 & 81).

Plaintiffs filed two separate motions for partial summary judgment. (Dockets 108 & 110).   Those motions will be identified as the "Section 1922

---

[10]SDCL § 26-7A-14 directs "no child may be held in temporary custody longer than forty-eight hours . . . excluding Saturdays, Sundays, and court holidays, unless a . . . petition has been filed . . . and the court orders longer custody during a noticed hearing . . . ."   These proceedings are commonly referred to as a "48-hour hearing."

[11]Plaintiffs seek relief pursuant to 42 U.S.C. § 1983.   (Docket 1 ¶ 1).   The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).   Venue is proper pursuant to 28 U.S.C. § 1391(b).   Defendants acknowledge all acts undertaken by them were done under color of state law.   (Dockets 1 ¶ 12; 76 ¶ 10; 80 ¶ 13 & 81 ¶ 12).   Each defendant is sued in their official capacity only. Id.

Claims" (Docket 110) and the "Due Process Claims" (Docket 108).   Following

extensive submissions by the parties, the motions are ripe for resolution.

## SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if

the movant can "show[] that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."   Only disputes over

facts that might affect the outcome of the case under the governing substantive

law will properly preclude summary judgment.   Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).   "[T]he mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material*

fact."   Id. at 247-48 (emphasis in original).

In determining whether summary judgment should issue, the facts and

inferences from those facts must be viewed in the light most favorable to the

nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587-88 (1986).   In order to withstand a motion for summary judgment, the

nonmoving party "must substantiate [their] allegations with 'sufficient probative

evidence [that] would permit a finding in [their] favor on more than mere

speculation, conjecture, or fantasy.' "   Moody v. St. Charles County, 23 F.3d

1410, 1412 (8th Cir. 1994) (citing Gregory v. Rogers, 974 F.2d 1006, 1010 (8th

Cir. 1992).

In assessing a motion for summary judgment, the court is to "consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact." Howard v. Columbia Public School District, 363 F.3d 797, 801 (8th Cir. 2004); see Fed. R. Civ. P. 56(e) (a party may not rely on his own pleadings in resisting a motion for summary judgment; any disputed facts must be supported by affidavit, deposition, or other sworn or certified evidence). The nonmoving party's own conclusions, without supporting evidence, are insufficient to create a genuine issue of material fact. Anderson, 477 U.S. at 256; Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

## UNDISPUTED MATERIAL FACTS

The following recitation consists of the material facts undisputed by the parties. These facts are developed from the complaint (Docket 1), defendants' answers and amended answers (Dockets 74-76, 80 & 81), plaintiffs' statement of undisputed material facts (Dockets 109), and defendants' response to plaintiffs' statement of undisputed material facts (Dockets 130 & 131). Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document. The facts material to plaintiffs' motions for partial summary judgment are as follows.

Plaintiffs Oglala Sioux Tribe and Rosebud Sioux Tribe are Indian tribes officially recognized by the United States with reservations located within the State of South Dakota.   (Docket 1 ¶ 2).   Both tribes have treaties with the federal government.   Id.   Plaintiffs Madonna Pappan and Lisa Young reside in Pennington County, South Dakota, and are members of the Oglala Sioux Tribe and the Standing Rock Sioux Tribe, respectively.   Id. ¶ 5.

Defendant Lynne A. Valenti is the Secretary of the South Dakota Department of Social Services ("DSS").[12]   Id. ¶ 9.   Defendant LuAnn Van Hunnik is the person in charge of DSS Child Protection Services ("CPS") for Pennington County, South Dakota.   Id.   In state court cases involving Ms. Pappan and Ms. Young, CPS employees under their supervision prepared petitions for temporary custody and signed ICWA affidavits[13] alleging the children of these Indian parents were at risk of serious injury if the children remained at home.   Id. ¶ 51.

Defendant Mark Vargo is the duly elected States Attorney for Pennington County.   Id. ¶ 10.   Defendant Jeff Davis is the presiding judge of the Seventh Judicial Circuit Court of the State of South Dakota, and is the chief administrator of the Seventh Judicial Circuit Court.   Id. ¶ 11.

---

[12]Pursuant to Fed. R. Civ. P. 25(d), Ms. Valenti was substituted as a proper party in her official capacity effective February 24, 2014.   See Dockets 79 & 82.

[13]An ICWA affidavit used by the defendants is attached to the complaint. (Docket 1-3).

Approximately one hundred 48-hour hearings involving Indian children[14] are held each year in the Seventh Circuit Court for Pennington County.   (Docket 130 ¶ 1).   Excluding those cases where jurisdiction over a child was promptly transferred to a tribal court, in 100 percent of the 48-hour hearings conducted by Judge Davis from January 2010 to July 2014,[15] he granted motions by the States Attorney and DSS for continued custody of all Indian children involved in those hearings.   (Dockets 109 ¶ 1 & 131 ¶ 1).

Eight hundred twenty-three Indian children were involved in 48-hour hearings in Pennington County, South Dakota, during the years 2010 to 2013. (Docket 131 ¶ 2).   Of those 823 Indian children

- 87 children were discharged from DSS custody the day of the 48-Hour hearing;

- 268 children were discharged from DSS custody within 1–15 days after the 48-hour hearing[16];

- 114 children were discharged from DSS custody within 16–30 days after the 48-hour hearing;

- 44 children were discharged from DSS custody within 31–45 days after the 48-hour hearing;

---

[14]Unless otherwise indicated, all references to "child(ren)," "parent(s)," and "custodian(s)" will mean Indians as that term is defined by 25 U.S.C. § 1903(3).

[15]Unless a different time frame is specifically identified, all references are to the January 2010 to July 2014 period.

[16]Defendants identified the number of children in this category as "207." (Docket 131 ¶ 2).   Applying the percentage calculation presented by defendants [736 children remaining in DSS custody after the 48-hour hearing x 36.4% = 267.9 children], the correct number is "268."   Using the number 268 also accounts for all 823 children in the analysis.

- 50 children were discharged from DSS custody within 46–60 days after the 48-hour hearing; and

- 260 children remained in DSS court-ordered custody for more than 60 days after the 48-hour hearing.

Id.

The defendants acknowledge Seventh Circuit judges receive an ICWA affidavit prior to the 48-hour hearing, but the affidavit is not marked as a hearing exhibit.   (Docket 131 ¶ 37).   Indian parents who are present at the 48-hour hearings only began receiving a copy of the petition for temporary custody in May 2014.   (Docket 109 ¶ 10).   DSS asserts that prior to June 2012 it was the practice of DSS to provide parents attending a 48-hour hearing with a copy of the ICWA affidavit.   (Docket 131 ¶ 8).   DSS also asserts that since June 2012 it has been DSS's written policy to provide the ICWA affidavit to parents attending a 48-hour hearing.   Id.   DSS claims that if a parent did not receive the ICWA affidavit, it was an oversight and not an intentional decision by the child protection staff.   Id.

Based on the court's review of the transcripts of 48-hour hearings submitted by the parties at which at least one Indian parent or custodian appeared, disclosure of an ICWA affidavit and a petition for temporary custody to

13

a parent was not mentioned in 77 out of 78 cases.[17]   In a number of transcripts there are specific exchanges with a judge in which an Indian parent asked about the allegations against them or why their children were removed.   See transcript 10-1119 (father would like to know what the allegations were and the allegations are explained to him without any reference to either the ICWA affidavit or the petition for temporary custody); transcript 10-1320 (Judge Thorstenson indicated the documents would be given to the parents at the next hearing); transcript 11-497 (mother wanted to know what the issues were and no explanation was given); transcript 12-36 (neither mother nor the Tribe's attorney were given the ICWA affidavit or petition for temporary custody); transcript 12-571 (Tribe's attorney stated he was not given any copies of reports); transcript 13-20 (Tribe's attorney noted neither the ICWA affidavit nor the petition for temporary custody were given to the parent); and transcript 13-49 (Tribe's attorney noted neither he nor the parent were provided with documentation for

---

[17]See transcripts 10-50, 10-177, 10-253, 10-270, 10-304, 10-306, 10-358, 10-494, 10-460, 10-487,10-523, 10-649, 10-773, 10-783, 10-901, 10-955, 10-1007, 10-1064, 10-1116, 10-1119, 10-1170, 10-1191, 10-1238, 10-1320, 11-480, 11-497, 11-645, 11-1004, 11-1060, 11-1075, 12-36, 12-168, 12-191, 12-219, 12-244, 12-245, 12-302, 12-375, 12-468, 12-571, 12-648, 12-668, 12-698, 12-712, 12-749, 12-805, 12-867, 12-1152, 13-20, 13-30, 13-49, 13-53, 13-298, 13-560, 13-609, 13-616, 13-665, 13-697, 13-698, 13-731, 13-805, 13-806, 13-845, 14-47, 14-60, 14-103, 14-114, 14-144, 14-145, 14-304, 14-311, 14-443, 14-446 (3 cases), 14-455, 14-456, and 14-527.   In only one case did Judge Davis make reference to "paperwork," suggesting the ICWA affidavit may have been provided to the parents of the Indian child.   See transcript 10-773.   In another case, Judge Thorstenson referenced the ICWA affidavit and petition for temporary custody, but did not indicate the parent was given documents and did not summarize the nature of the allegations.   See transcript 12-168.

14

the hearing).   In none of these hearings did a Deputy States Attorney, DSS representative or the judge contradict the statements of the Indian parents or counsel or recess the proceedings to allow the parties to receive and review the ICWA affidavit and petition for temporary custody.

In cases not involving Judge Davis, other Seventh Circuit Court judges asked the State for a summary of the allegations which prompted law enforcement to take custody of the children.   Those cases were handled by Judge Thorstenson,[18] Judge Pfeifle[19] and Judge Mandel.[20]

In all 48-hour hearings over which he presided, Judge Davis conveyed the same information using virtually the same language.   Following confirmation that at least one Indian parent or custodian was present and confirming DSS intended to proceed on a formal basis, Judge Davis advised the Indian party:

> THE COURT:   As you know by now there have [sic] been an instance with the respective children in your families that have come to the attention of the State of South Dakota through the Department of Social Services.   That then goes to the state's attorney's office and ends up in this court.
>
> As we sit here at this point in the proceedings everyone's plan or hope is for reunification, that is a return of the children.   I have been informed though that the state intends to file a formal A&N [Abuse and Neglect] petition here, which puts things on a little more formal basis immediately.   The purpose of the temporary custody

---

[18]See transcripts 12-375; 12-468; 12-712; 12-749; 12-805; 12-867; and 12-1152.

[19]See transcripts 13-20; 13-30; 13-49; 13-53; 13-298; 13-560; 13-609; 13-616; 13-665; 13-697; 13-698; 13-731; 13-805; and 13-806.

[20]See transcripts 13-845; 14-47; 14-60; 14-103; 14-114; 14-144; 14-145; 14-304; 14-311; and 14-527.

hearing is to determine what is in the best interests of the children in the interim until this A&N petition is filed and the matter starts to proceed through the court.

You're entitled to be represented by an attorney in all stages of the proceedings against you. If you cannot afford an attorney one is appointed if you qualify for the representation. Any money spent for court-appointed fees is a bill or lien against any property that you own. The commissioners in Pennington County have a legal right and ability to foreclose or collect on the bill and get back any money spent. Court-appointed counsel fees are in the nature of a loan to you from the county. They are not a gift.

You're entitled to a full formal hearing, an adjudicatory hearing, where the allegations made by the state in the petition must be proven. If the matter is involving the Indian Child Welfare Act, that standard of proof is beyond a reasonable doubt. If the petition is filed under normal state statutes not involving the Indian Child Welfare Act, a preponderance of the evidence is the proof. You're entitled to be present in person, through your counsel, to cross-examine witnesses or ask them questions concerning testimony they give against you. You are entitled to subpoena witnesses to come in to court and testify on your behalf, that is to help you tell your side of the story. They can't be told what to say, but they can be told to be present and tell what they know about particular facts or matters that might be at issue in the lawsuit. This is not a criminal proceeding, nevertheless I always like to advise everyone that you need to be careful as to what you say. Sometimes these allegations involve direct action on your part that place the children in a potentially dangerous situation or a failure on your part to act as a parent to protect the children properly. Anything that you say or admit to throughout the proceedings that might implicate you, either in a direct action or failure to act, could and would be used against you at subsequent hearings or proceedings.

You're entitled to request a new hearing if you feel that evidence has been discovered that was not presented. You may appeal to the Supreme Court of our state any decision rendered in this court. That must be done within 30 days after entry of judgment.

If the state proves the petition by a sufficient standard of proof, the matter would go on to a dispositional hearing. If the state doesn't prove the allegations in the petition, it's dismissed, the children are

16

generally returned and life goes back to how you knew it before the
state became involved.

If the matter goes to dispositional hearing, that's governed by statute
and it goes to the ultimate care, custody and control in the best
interests of the children.   It can involve a placement back in the
family under supervised conditions, a general return, other sorts of
kinship or foster placements, any sort of out-of-home placement
where the children are properly supervised and provided for, up to
and including a termination of parental rights and placement of the
children for adoption.   So these are very serious matters and you'll
want to make certain that you know and fully understand and
exercise your rights.

Transcript 10-304.[21]

When the DSS worker advised the court they intended to proceed

informally with the parent and not file a formal abuse and neglect petition, Judge

Davis provided the following advisement:

THE COURT:   [T]he state anticipates that [it] will go informal, which
would mean that you are welcome, if you wish, to work with the
Department of Social Services for a period of time, roughly the
60-day temporary custody timeframe, and see if the issues that were
raised can be resolved, and everybody's intention is for reunification
of the family.

At any time during that 60 days that you feel things aren't going the
way you think they should or if you have additional questions or feel
that you would like to be represented by an attorney, you just need
to ask your family service specialist, the state's attorney's office or
my office and we'll kind of back the bus up, so to speak, and appoint
counsel and approach the matter a little more formally, which is a
full hearing, an adjudicatory hearing, with a petition filed and the
state having to prove those allegations in the petition.

---

[21]See also transcripts 10-50; 10-253; 10-270; 10-306; 10-358; and
10-773.

Transcript 10-1170.[22]   Judge Davis goes on to explain the formal adjudicatory and dispositional process, but there is no mention of ICWA, appointment of counsel or the burden of proof for a 48-hour hearing.   Id.   On several occasions, Judge Davis advised Indian parents there was no need for an attorney because of the option to work informally with DSS for 60 days.   See, for example, transcripts 10-901; 12-219; 14-443, 14-446.   In two cases, Judge Thorstenson advised the parents there was no need for an attorney if they wanted to work informally with DSS.   See transcripts 12-244 and 12-375. Seventh Circuit Judges Thorstenson,[23] Eklund[24] and Pfeifle[25] incorporated the option of informally working with DSS for 60 days using virtually the same language as Judge Davis.

Judge Davis and the other Seventh Circuit judges presiding over 48-hour hearings (all jointly referred to as the "Seventh Circuit judges") never advised any Indian parent or custodian they had a right to contest the state's petition for temporary custody during the 48-hour hearing.   (Docket 109 ¶ 25).   The Seventh Circuit judges never advised Indian parents they had a right to call

---

[22]See also transcripts 10-901; 10-1064; 10-1007; 10-1170; 10-1191; 11-497; 12-191; 12-219; 12-648; 12-712; 14-446; 14-455; and 14-456.

[23]See transcripts 10-1116; 12-168; 12-244; 12-302; 12-375; 12-468; 12-571; 12-749; 12-805; and 12-1152.

[24]See transcripts 12-1238; 11-480; and 11-645.

[25]See transcripts 13-20; 13-30; 13-49; 13-53; and 13-298.

witnesses at the 48-hour hearing.   Id. ¶ 23.   The Seventh Circuit judges never required the State to present sworn testimony from a live witness.   Id. ¶ 36.

Judge Davis never advised Indian parents of their right to testify at the 48-hour hearing.   (Docket 131 ¶ 19).   Judge Davis did not specifically ask parents if they wanted the opportunity to cross-examine the affiant of the ICWA affidavit during the 48-hour hearing.   (Docket 131 ¶ 28).   During the 48-hour hearings over which he presided in 2010, Judge Davis did not ask parents if they wanted the opportunity to present evidence as to whether the State had in fact undertaken active efforts to prevent a break-up of their family or whether their child could be safely returned to their home.   Id. ¶ 24.   Judge Davis admits "no oral testimony is taken at a 48-hour hearing."   (Docket 109 ¶ 21).

Parents were never advised they could request a brief continuance of the 48-hour hearing to allow the parent to retain counsel.   (Docket 109 ¶ 29).   Every time the Seventh Circuit judges agreed during a 48-hour hearing to appoint counsel for indigent parents, the judges delayed the appointment of counsel until after granting DSS custody.   Id. ¶ 32.

The Seventh Circuit judges used a standardized temporary custody order[26] which functioned as a checklist.   (Dockets 109 ¶ 40; 131 ¶ 40).   Following 48-hour hearings in which no witness testified and no documents were offered or received as evidence, the Seventh Circuit judges placed checkmarks next to findings of fact without providing any explanation regarding the basis for

---

[26]A copy of the Temporary Custody Order used by the defendants is attached to plaintiffs' complaint.   (Docket 1-7).

19

their findings.  Id.  The Seventh Circuit judges signed temporary custody orders detailing findings of fact that had never been described on the record or explained to the Indian parents present at the 48-hour hearing.   (Docket 109 ¶¶ 38 & 41; 131 ¶¶ 38 & 41).

At the conclusion of every 48-hour hearing, Judge Davis entered a temporary custody order finding that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break-up of the Indian family and that these efforts have proven unsuccessful," and "continued custody of the child(ren) by the parents or Indian custodian is likely to result in serious emotional or physical damage to the child(ren)."   (Docket 109 ¶ 42).   This language appears in the standardized temporary custody order used by all the Seventh Circuit judges when removing Indian children from their parents.

Every temporary custody order issued by the Seventh Circuit judges granting custody of Indian children to DSS at the conclusion of 48-hour hearings contained the following provision:

> The Department of Social Services is hereby authorized to return full and legal custody of the minor child(ren) to the parent(s), guardian or custodian (without further court hearing) at any time during the custody period granted by this Court, if the Department of Social Services concludes that no further child protection issues remain and that temporary custody of the child(ren) is no longer necessary.

Id. ¶ 43; see also Docket 1-7.

Judge Davis admits Indian parents have rights under both the Due Process Clause and ICWA, but he classifies 48-hour hearings as emergency

20

custody proceedings.   (Docket 130 ¶ 113; Docket 80 ¶ 43).   Judge Davis distinguishes between a petition for temporary custody presented by the State during 48-hour hearings and formal petitions for temporary custody which parents must specifically request during a 48-hour hearing.   (Docket 109 ¶ 13). Judge Davis believes 25 U.S.C. § 1922 is a statute of deferment.   (Docket 130 ¶ 4).   He argues "§ 1922 authorizes state courts to defer applying the protections contained in ICWA until proceedings that occur *after* 48-hour hearings are held." Id. (emphasis in original).

Judge Davis acknowledged in at least one 48-hour hearing that his concern was not why the children were removed from their parents' custody. (Docket 1 ¶ 53).   In at least one 48-hour hearing Judge Davis stated "I don't have what I need here today at the 48 hour hearing to make [a decision to return the children to the mother who was present]."   Id. ¶ 54.

Judge Davis admits § 1922 requires first, as a matter of procedure, State authorities " 'shall expeditiously initiate a child custody proceeding' that must comply with ICWA."   Id. ¶ 92 (citing § 1922).   And second, as a matter of substance, State officials "shall insure that the emergency removal or placement *terminates immediately* when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child."   Id. ¶ 93 (citing § 1922) (emphasis in original).   As recently as June 23, 2014, petitions for temporary custody of Indian children submitted by the States Attorney's staff to

the Seventh Circuit judges routinely failed to cite § 1922 or its mandates.
(Docket 109 ¶ 18).

## ANALYSIS

ARE DEFENDANTS POLICY MAKERS?

Plaintiffs allege Judge Davis, Mr. Vargo, Ms. Valenti, and Ms. Van Hunnik
in their official capacities "pursued policies and practices that deprive parents of
custody of hundreds of Indian children without providing those parents and
children with even rudimentary due process."  (Docket 108 at p. 6).  See also
Docket 1 at p. 38 (alleging violations of the Due Process Clause of the Fourteenth
Amendment and ICWA).   "Plaintiffs are not seeking a ruling at the present time
as to whether Judge Davis is responsible for the actions of the other judges . . . .
Plaintiffs are confining this motion . . . [to] all of his 48-hour hearings . . . and the
policies and practices of the other three named Defendants . . . ."  (Docket 108 at
p. 6 n.4) (italics removed).   Defendants claim none of them have "final
policymaking authority."  (Docket 129 at p. 19).

Plaintiffs seek to vindicate their rights through 42 U.S.C. § 1983.
"Liability . . . under 42 U.S.C. § 1983 can exist only where the challenged policy
or practice is 'made by its lawmakers or by those whose edicts or acts may fairly
be said to represent official policy.' "  Oglala Sioux Tribe v. Van Hunnik, 993 F.
Supp. 2d 1017, 1029 (D.S.D. 2014) (citing Monell v. Department of Social
Services of City of New York, 436 U.S. 658, 694 (1978)).   "A policy maker is one
who 'speak[s] with final policymaking authority . . . concerning the action alleged

to have caused the particular constitutional or statutory violation at issue,' that is one with 'the power to make official policy on a particular issue.'" Id. (citing Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989)). "[T]he . . . individual defendant . . . [must be] a 'moving force' behind the violation." Id. (citing Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987)). "[T]here must be an 'affirmative link' . . . between the policy and the particular constitutional violation alleged." Id. (citing Clay, 815 F.2d at 1170). "An 'official policy' involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy." Id. (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)).

Liability under § 1983 "attaches only where the decisionmaker possesses final authority to establish . . . policy with respect to the action ordered." Pembaur, 475 U.S. at 481. " '[O]fficial policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." Id. at 480-81. "If the decision to adopt that particular course of action is properly made by . . . authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." Id. at 481. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to . . . liability based on an exercise of that discretion. . . . The official must also be responsible for establishing final

23

government policy respecting such activity before the [entity] can be held liable. Authority to make . . . policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority . . . ." Id. at 481-83. "[W]hether an official had final policymaking authority is a question of state law." Id. at 483.

Plaintiffs claim Judge Davis initiated six policies, practices and customs for 48-hour hearings which violate the Due Process Clause and ICWA. (Docket 69 at p. 20). Those are:

1. Not allowing parents to see the ICWA petition filed against them;

2. Not allowing the parents to see the affidavit supporting the petition;

3. Not allowing the parents to cross-examine the person who signed the affidavit;

4. Not permitting the parents to present evidence;

5. Placing Indian children in foster care for a minimum of 60 days without receiving any testimony from qualified experts related to "active efforts" being made to prevent the break-up of the family; and

6. Failing to take expert testimony that continued custody of the child by the Indian parent or custodian is likely to result in serious emotional or physical damage to the child.

Id. at pp. 20-21.   Judge Davis claims his "decisions are not 'policies, practices, or customs,' they are adjudications of 25 U.S.C. § 1922, and the applicable state law procedures." (Docket 129 at p. 19).   Judge Davis argues he is "an initial decision maker, but he is not a final policy maker" for purposes of § 1983 because his decisions are subject to appellate review.   (Docket 128 at p. 13).

24

Judge Davis asserts his decisions are not final decisions and he is not "a proper defendant under § 1983." (Docket 129 at p. 19).

Plaintiffs counter that Judge Davis "created all of the practices for which [he is] being sued in this litigation, and recently changed a few of them." (Docket 136 at p. 28) (italics removed).   Plaintiffs argue Judge Davis "select[ed] the practices challenged in this lawsuit.   This is not adjudicating; that is rule making, and judges can be sued like anyone else for rules they make that violate federal law." Id. (referencing Pulliam v. Allen, 466 U.S. 522 (1984) (italics removed).

None of the complained of policies or practices are compelled by state law or § 1922.   Judge Davis cannot point to any provision of South Dakota law or ICWA which supports the six actions he created for 48-hour hearings.   There is no right of appellate review of Judge Davis' 48-hour hearing decisions because those decisions are not a final judgment subject to appellate review under South Dakota law.   SDCL § 15-26A-3.   "To be final, a judgment must finally and completely adjudicate all of the issues of fact and law involved in the case." Midcom, Inc. v. Oehlerking, 722 N.W.2d 722, 725 (S.D. 2006) (internal quotation marks and citations omitted).

Judge Davis' decisions are "final decisions" for purposes of § 1983.   He established each of the policies and procedures for conducting 48-hour hearings and Judge Davis is empowered to change them at any time.

Plaintiffs assert States Attorney Vargo, DSS Secretary Valenti and Ms. Van Hunnik acquiesced in Judge Davis' policies regarding the manner in which 48-hour hearings are conducted.   (Dockets110 at p. 12; 136 at p. 31). Defendants argue Judge Davis has not "enacted a policy, practice, or custom, [to] which the other . . . defendants . . . could acquiesce."   (Docket 128 at p. 5). Defendants' position is untenable.

Defendants Vargo, Valenti and Van Hunnik understand 48-hour hearings are intended to be evidentiary hearings.[27]   They also are aware Judge Davis does not permit Indian parents to present evidence opposing the State's petition for temporary custody.   Judge Davis prevents Indian parents from cross-examining any of the State's witnesses who would support of the petition.   Judge Davis does not require the States Attorney or DSS to call witnesses to support removal of Indian children nor does Judge Davis permit testimony as to whether a removed child is in immediate risk of harm if returned to her parents.   There is no evidence any one of these three defendants or their courtroom representatives, Deputy States Attorneys or case workers sought to change the practices established by Judge Davis.   When these defendants did not challenge Judge Davis' policies for conducting 48-hour hearings, his policies became the official policy governing their own agencies.   <u>Coleman v. Watt</u>, 40 F.3d 255, 262

---

[27]<u>See</u> the *Department of Interior Guidelines for State Courts; Indian Child Custody Proceedings,* 44 Fed. Reg. 67584-67595 (Nov. 26, 1979) and the 2007 South Dakota Unified Judicial System *South Dakota Guidelines for Judicial Process in Child Abuse and Neglect Cases* discussed at pp. 29-34 and the court's due process analysis at pp. 36-42.

(8th Cir. 1994).   "[B]y acquiescence in a longstanding practice" of Judge Davis "which constitutes the standard operating procedure" of the Seventh Circuit Court, these defendants exposed themselves to liability.   Jett, 491 U.S. at 737 (internal quotation marks omitted).

Defendants created the appearance of regularity in a highly irregular process.   Judicial and prosecutorial immunity do not extend to plaintiffs' claims for injunctive and declaratory relief under § 1983.   Pulliam, 466 U.S. at 541-42; Timmerman v. Brown, 528 F.2d 811, 814 (4th Cir. 1975); Oglala Sioux Tribe, 993 F. Supp. 2d at 1033 (citations omitted).   The defendants are policy makers for purposes of 42 U.S.C. § 1983.

### REMOVAL OF INDIAN CHILDREN FROM THEIR PARENTS, INDIAN CUSTODIANS AND TRIBES:   THE INDIAN CHILD WELFARE ACT VIOLATIONS

This case focuses on the obligations of the defendants under the Indian Child Welfare Act and its interface with South Dakota law.   In South Dakota, any "child may be taken into temporary custody by a law enforcement officer without order of the court . . . [i]f the child is abandoned or seriously endangered . . . and immediate removal of the child appears to be necessary for the child's protection . . . ."   SDCL § 26-7A-12(2).   The court is then authorized to "issue a written temporary custody directive . . . ."   SDCL § 26-7A-13.   "An apparent abused or neglected child taken into temporary custody and not released to the child's parent, guardian, or custodian may be placed in the temporary care of the Department of Social Services . . . ."   SDCL § 26-7A-14.   "[N]o child may be held

in temporary custody longer than forty-eight hours . . . excluding Saturdays, Sundays, and court holidays, unless a . . . petition has been filed . . . and the court orders longer custody during a noticed hearing . . . ."  Id.  A 48-hour hearing under South Dakota law is a temporary custody hearing included in the definition of "foster care placement" under 25 U.S.C. § 1903(1)(i) (" 'foster care placement' . . . shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement . . . where the parent or Indian custodian cannot have the child returned upon demand . . . .").

At a 48-hour hearing under South Dakota law, "the court shall consider the evidence of the need for continued temporary custody of the child in keeping with the best interests of the child." SDCL § 26-7A-18.  If the court retains the child in the custody of DSS, state law requires judicial review "every sixty days." SDCL § 26-7A-19(3).

Judge Davis argues "§ 1922 defers 'the full panoply of ICWA rights,' specifically §§ 1912(d) and (3) of ICWA, until a 'child custody proceeding,' as defined in § 1903, is held." (Docket 128 at p. 14).  Judge Davis asserts "whether analyzed under state law or § 1922, 'the imminent danger to the child' triggers the respective emergency custody statutes where it appears 'necessary' to protect the child's best interests." Id. at p. 15 (citation to earlier briefing and bracketing omitted).

Section 1922 is not a "statute of deferment."  Section 1922 mandates that state officials "insure that the emergency removal . . . terminates immediately

28

when such removal . . . is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to the provisions of [ICWA], transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate."   25 U.S.C. § 1922.   Deferring application of § 1922 would undermine the Congressional declaration that a State's emergency custody authority immediately terminates when "imminent physical damage or harm to the child" is no longer present.

The *Department of Interior Guidelines for State Courts; Indian Child Custody Proceedings* ("DOI Guidelines") were promulgated to aid in the interpretation of ICWA's provisions.   44 Fed. Reg. 67584-67595 (Nov. 26, 1979). The DOI Guidelines were updated for the first time in thirty-five years on February 19, 2015 ("DOI Revised Guidelines").[28]   See Docket 140-1.

The DOI Guidelines are not binding on the court but are an administrative interpretation of ICWA entitled to great weight.   United States v. American Trucking Associations, 310 U.S. 534, 549 (1940); Mitchell v. Burgess, 239 F.2d 484, 487 (8th Cir. 1956).   The DOI Guidelines are clear that "[p]roceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to [ICWA's] preferences [for keeping Indian children with their

---

[28]Before addressing the DOI Revised Guidelines, the court must focus on the DOI Guidelines as they existed during the pendency of this litigation before February 19, 2015.

families]."   44 Fed. Reg. at 67586.   "The entire legislative history makes it clear that [ICWA] is directed primarily at attempts to place someone other than the parent or Indian custodian in charge of raising an Indian child—whether on a permanent or temporary basis."   Id. at 67587.

Focusing on emergency removal situations, the DOI Guidelines state "[s]ince emergency action must be taken without the careful advance deliberation normally required, procedures must be established to assure that the emergency actions are quickly subjected to review. . . . The legislative history clearly states that placements under such emergency procedures are to be as short as possible.   If the emergency ends, the placement shall end."   Id. at 67590.   "Unless there is some kind of time limit on the length of an 'emergency removal' (that is, any removal not made pursuant to a finding by the court that there is clear and convincing evidence that continued parental custody would make serious physical or emotional harm likely), the safeguards of the Act could be evaded by use of long-term emergency removals."   Id.

The DOI Guidelines contemplate that "[e]ach party to a foster care placement . . . under State law involving an Indian child has the right to examine all reports or other documents filed with the court upon which any decision with respect to such action may be based.   No decision of the court shall be based on any report or other document not filed with the court."   Id. at 67592.

The DOI Revised Guidelines "expand upon the emergency procedure provisions in light of evidence that some States routinely rely upon emergency

removal and placements in a manner that bypasses implementation of ICWA."
(Docket 140-1 at p. 8).   The DOI Revised Guidelines "provide minimum Federal
standards and best practices to ensure compliance with ICWA and should be
applied in all child custody proceedings in which the Act applies."   Id. at p. 23.
These guidelines recognize and maintain the definition of "foster care placement"
to include "any action removing an Indian child from his or her parent or Indian
custodian for temporary placement in a foster home or institution . . . where the
parent or Indian custodian cannot have the child returned upon demand,
although parental rights have not been terminated . . . ."   Id. at p. 17.

The DOI Revised Guidelines require a state court to "[p]romptly hold a
hearing to hear evidence and evaluate whether the removal or placement
continues to be necessary whenever new information is received or assertions
are made that the emergency situation has ended[] and . . . [i]mmediately
terminate the emergency removal or placement once the court possesses
sufficient evidence to determine that the emergency has ended."   Id. at p. 35.
"The emergency removal or placement must terminate as soon as the imminent
physical damage or harm to the child which resulted in the emergency removal
or placement no longer exists . . . ."   Id. at p. 37.

Of significance for the present litigation, the DOI Revised Guidelines
reiterate that "[t]he court must inform each party to a foster care placement . . . of
his or her right to timely examination of all reports and other documents filed
with the court and all files upon which any decision with respect to such action

31

may be based. . . . [and] [d]ecisions of the court may be based only upon reports,

documents or testimony presented on the record." Id. at p. 41.

In 2007, the South Dakota Unified Judicial System promulgated the *South Dakota Guidelines for Judicial Process in Child Abuse and Neglect Cases.* ("SD Guidelines").[29] (Docket 1 ¶ 34). The SD Guidelines state:

> Pursuant to SDCL 26-7A-18, at the Temporary Custody 48 Hour Hearing the court shall consider evidence of the need for continued temporary custody . . . to determine whether continued temporary custody outside the home is necessary to protect the child. The purpose is to decide whether the child can be safely returned home and when. The decision should be based on a competent assessment of the risks and dangers to the child. The Court should evaluate the current and future danger to the child and what can be done to eliminate the danger.

Id. (citing SD Guidelines at p. 33). The SD Guidelines provide that "[t]he family

services specialist should be ready to detail reasonable efforts [to avoid removal

of the child] at the 48 hour hearing," including current and historical

information, such as contacts with the parents since the child's removal and

previous abuse or neglect issues. Id. ¶ 36 (citing SD Guidelines at pp. 37-38).

The SD Guidelines provide where a child is an Indian, DSS must support its

petition for temporary custody with an ICWA affidavit or by testimony from a

"qualified expert that the continued custody of the child by the parent or Indian

custodian is likely to result in serious emotional or physical damage to the child

---

[29]The SD Guidelines were updated in March 2014. Those are available at http://ujs.sd.gov/uploads/pubs/SDGuidelinesAandNProceedings.pdf. Like the DOI Guidelines, the court will focus on the SD Guidelines as they existed throughout the majority of this litigation.

(25 USC 1912(e))." Id. ¶ 37 (citing SD Guidelines at p. 46). In any 48-hour hearing involving an Indian child, the SD Guidelines state that "the Court must determine whether [DSS] has made active efforts to preserve the family (25 U.S.C.A. 1912(d))" and whether the person endangering the child has "been removed from the home so the child could remain." Id. ¶ 38 (citing SD Guidelines at p. 38).

The SD Guidelines contemplate that a 48-hour hearing is an evidentiary hearing which may be extended when necessary.

> A 48 Hour Temporary Custody Hearing involves *substantial time and resources.* . . .[The court's decision must be] based on careful consideration of the circumstances of the case. Due to constraints of time, it might not be possible for the Court to conduct a complete initial custody hearing. In these circumstances, the Court should . . . (c) Continue the 48 Hour Temporary Custody Hearing and set the time, date and place of the continued hearing.

Id. ¶ 40 (citing SD Guidelines at pp. 41-42) (emphasis in original). At the conclusion of the hearing, the court must "determine that removal of the child is or was necessary because continued presence in the home or return to the home would be contrary to the child's welfare." Id. ¶ 38 (citing SD Guidelines at p. 37). The Guidelines recommend use of a temporary custody order with the following language:

> That there is probable cause to believe that the child(ren) is/are abused or neglected, . . . . That temporary custody is the least restrictive alternative in the child(ren)'s best interest . . . . That active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break-up of the Indian family and that these efforts have proven unsuccessful. . . . That continued custody of the child

by the parents or Indian custodian is likely to result in serious emotional or physical damage to the child.

Id. ¶ 39.

The DOI Guidelines and the SD Guidelines were publically available to the Seventh Circuit judges including Judge Davis and to the other defendants.   A simple examination of these administrative materials should have convinced the defendants that their policies and procedures were not in conformity with ICWA § 1922, the DOI Guidelines or the Guidelines promulgated by the South Dakota Unified Judicial System.   Indian children, parents and tribes deserve better.

Judge Davis does not conduct any inquiry during the 48-hour hearings to determine whether emergency removal remains necessary.[30]   He permits no testimony by the Indian parents or presentation of testimony by the tribal attorney to determine whether the risk of imminent physical harm has passed. Contrary to the clear intent of ICWA, the DOI Guidelines and the SD Guidelines, all of which contemplate evidence will be presented on the record in open court, Judge Davis relies on the ICWA affidavit and petition for temporary custody which routinely are disclosed only to him and not to the Indian parents, their

---

[30]Defendants claim Indian parents were asked during the 48-hour hearings if the emergency which required removal of their children had terminated.   (Docket 131 ¶ 17).   Defendants claim "this inquiry is always made even if it is not verbalized on the record."   Id.   Defendants refer to three cases handled by Judge Thorstenson, but none by Judge Davis.   Id.   While another judge may have made such an inquiry, defendants' mere allegations unsupported by specific evidence is insufficient to withstand a motion for summary judgment.   Thomas, 483 F.3d at 527.

attorney or custodians.   These undisclosed documents are not subject to cross-examination or challenge by the presentation of contradictory evidence.

The defendants acknowledge the practice of Judge Davis is to *authorize* DSS to perform the function of determining if, or when, the imminent risk of physical harm to an Indian child has passed and to restore custody to the child's parents.   (Docket 130 at p. 3; <u>see</u> <u>also</u> Docket 1-7).   This authorization vests full discretion in DSS to make the decision if and when an Indian child may be reunited with the parents.   This abdication of judicial authority is contrary to the protections guaranteed Indian parents, children and tribes under ICWA.

The policy and practice of Judge Davis does not comply with the requirement of § 1922 to *order* restoration of custody to Indian parents when the risk of imminent physical harm no longer exists.   While Judge Davis may believe granting DSS discretion shortens the potential time period of an emergency placement, the policy ignores the mandate of § 1922 and removes the court from the decision-making process.   A competently conducted evidentiary hearing held on an expedited basis is fundamental to ICWA's purposes.   ICWA requires the state court to make the custody decision at the earliest possible moment. The court cannot delegate the authority to make the custody decision to a state agency or its employees.

Plaintiffs are entitled to judgment as a matter of law on their Indian Child Welfare Act claims.

35

<u>REMOVAL OF INDIAN CHILDREN FROM THEIR PARENTS, INDIAN
CUSTODIANS AND TRIBES: THE DUE PROCESS VIOLATIONS</u>

"The Due Process Clause of the Fourteenth Amendment protects the
fundamental right of parents to make decisions concerning the care, custody and
control of their children."   <u>Troxel</u>, 530 U.S. at 66.   Defendants agree the basic
elements of due process are required at 48-hour hearings.   (Docket 129 at p. 1).

Plaintiffs claim the defendants have violated the Due Process Clause since
January 1, 2010, in five different areas:

1. Defendants have failed to give parents adequate notice of the
   claims against them, the issues to be decided, and the State's
   burden of proof;

2. Defendants have denied parents the opportunity to present
   evidence in their defense;

3. Defendants have denied parents the opportunity to confront and
   cross-examine adverse witnesses;

4. Defendants have failed to provide indigent parents with the
   opportunity to be represented by appointed counsel; and

5. Defendants have removed Indian children from their homes
   without basing their removal orders on evidence adduced in the
   hearing, and then subsequently issued written findings that bore
   no resemblance to the facts presented at the hearing.

(Docket 108 at pp. 7-8).

"It is well settled that state law does not define the parameters of due
process for the purposes of the Fourteenth Amendment."   <u>Brown v. Daniels</u>, 290
F. App'x 467, 471 (3d Cir. 2008) (referencing <u>Cleveland Board of Education v.
Loudermill</u>, 470 U.S. 532, 541 (1985) ("[O]nce it is determined that the Due
Process Clause applies, the question remains what process is due.   The answer

36

to that question is not to be found in the [state] statute.") (citation and internal quotation marks omitted); Swipies v. Kofka, 419 F.3d 709, 716 (8th Cir. 2005) (holding that "a state statute cannot dictate what procedural protections must attend a liberty interest . . . as this is the sole province of federal law").   "Federal procedural due process guarantees prompt post-deprivation judicial review in child custody cases."   Campbell v. Burt, 141 F.3d 927, 929 (9th Cir. 1998). "When the state deprives parents and children of their right to familial integrity, even in an emergency situation, without a prior due process hearing, the state has the burden to initiate prompt judicial proceedings to provide a post deprivation hearing."   Whisman v. Rinehart, 119 F.3d 1303, 1311 (8th Cir. 1997).

"One of the core purposes of the Due Process Clause is to provide individuals with notice of claims against them."   Oglala Sioux Tribe, 993 F. Supp. 2d at 1037.   A significant component of procedural due process notice is that the "notice should include the date, time and place of the hearing; a clear statement of the purpose of the proceedings and the possible consequences to the subject thereof; the alleged factual basis for the proposed commitment; and a statement of the legal standard upon which commitment is authorized." Syrovatka v. Erlich, 608 F.2d 307, 310 (8th Cir. 1979) (quoting Alsager v. District Court of Polk County, Iowa, 406 F. Supp. 10, 25 (S.D. Iowa 1975), aff'd, 545 F.2d 1137 (8th Cir. 1976)).

"The due process clause ensures every individual subject to a deprivation 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" Oglala Sioux Tribe, 993 F. Supp. 2d at 1036 (citing Swipies, 419 F.3d at 715) (citing Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965))).  "In the context of child removal cases, the 'meaningful time' and 'meaningful manner' assurances impose a duty on the state to hold a hearing promptly after the removal."  Swipies, 419 F.3d at 715 (referencing Whisman, 119 F.3d at 1310–11).

As the court concluded in its analysis of ICWA violations, there is no procedure in the Seventh Judicial Circuit ensuring that Indian parents or custodians are given copies of the petition for temporary custody and the ICWA affidavit at 48-hour hearings.   Some Seventh Circuit judges do generally require the State to recite a summary of the allegations which form the basis for the emergency removal of Indian children.   But that practice must "yield to the requirements that the . . . parents or guardian be notified, in writing, of the specific charge or factual allegations to be considered at the hearing, and that such written notice be given at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation."  Application of Gault, 387 U.S. 1, 33 (1967).

Defendants refuse to give parents a copy of any police reports which may accompany the ICWA affidavit and petition for temporary custody.   (Docket 129 at p. 25).   Defendants argue SDCL § 26-7A-29 prohibits them from disclosing

police reports.   Id.   This interpretation of the statute directly contradicts the clear mandate of ICWA and due process which require that all documents to be considered by the court must be disclosed to the parties.   25 U.S.C. § 1912(c) and DOI Guidelines 44 Fed. Reg. at 67592.   A judge's order directing that police reports be provided to the Indian parents would satisfy SDCL § 26-7A-29.

Defendants acknowledge indigent Indian parents attending 48-hour hearings are entitled to court appointed-counsel but disagree as to when an appointment of counsel must be made.   (Docket 129 at p. 27).   The Seventh Circuit judges' practice is to appoint counsel after entry of the temporary custody order.   That is, after the court orders foster care placement for the Indian child. Defendants claim their practice of appointing counsel at the end of the 48-hour hearing is not prejudicial because if counsel is appointed, the Indian parent always retains the right to notice a further hearing at which the attorney may appear with them.   Id.   This practice defies logic because the damage is already done—Indian parents have been deprived of counsel during the course of what should have been an adversarial evidentiary hearing conducted in advance of a court order imposing out-of-home custody for an Indian child.[31]

"[I]t is the [party's] interest in personal freedom . . . which triggers the right to appointed counsel . . . ."   Lassiter v. Department of Social Services of Durham County, N. C., 452 U.S. 18, 25 (1981).   "[A] fundamental requisite of due process of law is the opportunity to be heard . . . [and] [t]he right to be heard would be

---

[31]ICWA mandates appointment of counsel for indigent Indian parents "in any removal, placement or termination proceeding."   25 U.S.C. § 1912(b).

. . . of little avail if it did not comprehend the right to be heard by counsel."
Goldberg v. Kelly, 397 U.S. 254, 267 and 270 (1970). "Since the State has an
urgent interest in the welfare of the child, it shares the parent's interest in an
accurate and just decision." Lassiter, 452 U.S. at 27. "If, as our adversary
system presupposes, accurate and just results are most likely to be obtained
through the equal contest of opposed interests, the State's interest in the child's
welfare may perhaps best be served by a hearing in which both the parent and
the State acting for the child are represented by counsel, without whom the
contest of interests may become unwholesomely unequal." Id. at 28.

Appointing counsel and continuing the 48-hour hearing for a few hours or
even a day to allow court-appointed counsel to confer with the Indian parents
and become familiar with the critical documents upon which the 48-hour
hearing is based would result in an "equal contest of oppos[ing] interests." Id. at
28. This process undoubtedly will require additional time and more county and
judicial resources but these concerns are not adequate reasons to forego rights
mandated by ICWA and fundamental due process. "A parent's interest in the
accuracy and justice in the decision . . . is . . . a commanding one." Id. at 27.

"Ordinarily, the right to present evidence is basic to a fair hearing . . . ."
Wolff v. McDonnell, 418 U.S. 539, 566 (1974). "[T]he Due Process Clause grants
the aggrieved party the opportunity to present his case and have its merits fairly
judged." Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982). The
United States Supreme Court has "frequently emphasized that the right to

40

confront and cross-examine witnesses is a fundamental aspect of procedural due process."   Jenkins v. McKeithen, 395 U.S. 411, 428 (1969) (references omitted). It is a central element of due process that a party has the "right to be confronted with all adverse evidence and to cross-examine witnesses."   Nevels v. Hanlon, 656 F.2d 372, 376 (8th Cir. 1981).   *Ex parte* communications between a Deputy States Attorney, a DSS representative and the judge, whether in the form of undisclosed affidavits and reports or oral communications, violate this fundamental right.   Id.

Defendants argue "[a]t the 48-hour hearings, parents are not prevented by Judge Davis from offering evidence or testifying."   (Docket 129 at p. 29).   This argument is contradicted by Judge Davis' own declaration that no oral testimony is permitted during the 48-hour hearings he conducts.   (Docket 130 at p. 5). Defendants cannot create a disputed material fact to defeat summary judgment by ignoring Judge Davis' own admission.   Anderson, 477 U.S. at 256.

Defendants argue the ICWA affidavit and petition for temporary custody prepared by the State and presented to the judges prior to the 48-hour hearings qualify as evidence in accord with Cheyenne River Sioux Tribe v. Davis, 822 N.W.2d 62 (S.D. 2012).   (Docket 129 at pp. 32-33).   This argument ignores the parents' due process rights to see these documents, confront them and cross-examine the document preparers.

The Due Process Clause requires a judge to base a decision solely on the evidence presented during a hearing.   "[T]he decisionmaker's [action] . . . must

rest solely on the legal rules and evidence adduced at the hearing." <u>Goldberg</u>, 397 U.S. at 271. "To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on . . . . though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." <u>Id.</u> (internal citation omitted).[32]

Judge Davis and the other defendants failed to protect Indian parents' fundamental rights to a fair hearing by not allowing them to present evidence to contradict the State's removal documents.   The defendants failed by not allowing the parents to confront and cross-examine DSS witnesses.   The defendants failed by using documents as a basis for the court's decisions which were not provided to the parents and which were not received in evidence at the 48-hour hearings.

Plaintiffs are entitled to judgment as a matter of law on their Due Process Clause claims.

<u>RELIEF</u>

"The focus of this litigation is not to redress past injuries to plaintiffs; rather, it is to prevent future violations of the Due Process Clause of the Fourteenth Amendment and ICWA."   <u>Oglala Sioux Tribe</u>, 993 F. Supp. 2d at 1028.   This litigation "is inextricably bound up with the Tribes' ability to

---

[32]See the court's description of the standardized temporary custody order which purports to make findings justifying continued state custody though no documents were received in evidence and the State presented no witnesses at the 48-hour hearing, *supra*, pp. 19-20.

maintain their integrity and 'promote the stability and security of the Indian tribes and families.'" Id. (citing 25 U.S.C. § 1902).

Defendants argue plaintiffs are not entitled to declaratory relief against Judge Davis or injunctive relief against the other defendants because plaintiffs' claims have been rectified by an agreement with Attorney Dana Hanna as counsel for the two Tribes.   (Docket 129 at p. 34).   Defendants argue "there is no longer a case or controversy for purpose of this Court's Article III jurisdiction and Plaintiffs' requested declaratory and injunctive relief should be denied on that basis."  Id.

"[A]s a general rule, voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot."  Los Angeles County v. Davis, 440 U.S. 625, 631 (1979).   But jurisdiction, properly acquired, may abate if the case becomes moot because:

> (1) it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur . . . [;] and
>
> (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

Id. (internal citations and quotation marks omitted).   "When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law."  Id.  See also Strutton v. Meade, 668 F.3d 549, 556 (8th Cir. 2012) ("Mere voluntary cessation of a challenged action does not

moot a case.   Rather a case becomes moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.") (internal quotation marks and citations omitted).

Based on the court's analysis, plaintiffs' claims have not been fully resolved.   Defendants' informal agreement with Attorney Hanna did not address or resolve a single issue raised in plaintiffs' two motions for partial summary judgment.

The fact States Attorney Vargo and DSS now represent that as of May 2014 they are providing both the petition for temporary custody and the ICWA affidavit to Indian parents at 48-hour hearings does not diminish plaintiffs' right to relief.   Judge Davis still maintains § 1922 and the due process rights discussed above do not apply at 48-hour hearings.   (Docket 130 at p. 5).

Defendants have not shown "it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 66 (1987) (italics in original).

Plaintiffs are entitled to injunctive and declaratory relief.

## ORDER

Based on the above analysis, it is hereby

ORDERED that plaintiffs' motions for partial summary judgment (Dockets 108 & 110) are granted.   A separate injunction and declaratory judgment order shall issue after submissions by the parties addressing the

appropriate remedies, those submissions to be filed with the court on or before **May 1, 2015**.

IT IS FURTHER ORDERED that the motion to defer ruling on plaintiffs' pending motion regarding 25 U.S.C. § 1922 (Docket 137) is denied as moot.

Dated March 30, 2015.

BY THE COURT:

JEFFREY L. VIKEN
CHIEF JUDGE

45