UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| OGLALA SIOUX TRIBE and ROSEBUD SIOUX TRIBE, as *parens patriae*, to protect the rights of their tribal members; MADONNA PAPPAN, and LISA YOUNG, individually and on behalf of all other persons similarly situated,<br><br>            Plaintiffs,<br><br>     vs.<br><br>LUANN VAN HUNNIK; MARK VARGO; HON. JEFF DAVIS; and LYNNE A. VALENTI, in their official capacities,<br><br>            Defendants. | CIV. 13-5020-JLV<br><br><br><br>ORDER |

## INTRODUCTION

On March 30, 2015, the court entered an order granting partial summary judgment to plaintiffs.   (Docket 150).   Defendants filed motions for reconsideration of the order granting partial summary judgment.   (Dockets 167, 169 & 170).   For the reasons stated below, the Van Hunnik and Valenti defendants' motion (Docket 167) is granted in part and denied in part.   Motions for reconsideration by Judge Davis and States Attorney Vargo (Dockets 169 & 170) are denied.

## DISCUSSION

Defendants Luann Van Hunnick and Lynne A. Valenti (the "DSS Defendants") filed a motion for reconsideration pursuant to Fed. R. Civ. P.

59(a)(2)[1] or, in the alternative, Fed. R. Civ. P. 60.   (Docket 167 at pp. 1-2).

Defendant States Attorney Vargo's motion for reconsideration is filed pursuant to

Rule 59(e) and Rule 60(b)(2).   (Docket 169).   Defendant Judge Davis' motion for

reconsideration is filed pursuant to Rule 59(a)(2)[2] and Rule 60.   (Docket 170).

Federal Rule of Civil Procedure 59(a)(2) provides that "[a]fter a nonjury

trial, the court may, on motion for a new trial, open the judgment if one has been

entered, take additional testimony, amend findings of fact and conclusions of law

or make new ones, and direct the entry of a new judgment."   Rule 59(e) provides

that "[a] motion to alter or amend a judgment must be filed no later than 28 days

after the entry of the judgment."   Rule 60 provides in material part:

> The court may correct a . . . mistake arising from oversight or
> omission whenever one is found in a judgment, order, or other part
> of the record. . . . On motion . . . the court may relieve a party . . .
> from a final judgment, order or other proceeding for the following
> reasons: . . . any other reason that justifies relief.

Fed. R. Civ. P. 60(a) and (b)(6).

"Rule 59(e) motions are motions to alter or amend a judgment, not any

nonfinal order."   Broadway v. Norris, 193 F.3d 987, 989 (8th Cir. 1999) (internal

quotation marks omitted).   Because the order of March 30, 2015, is not the

product of a nonjury trial and is not an "order from which an appeal lies" under

Rule 54(a), Rule 59(a)(2) is not an appropriate mechanism for the parties to seek

---

[1]The DSS Defendants' brief argues the application of Fed. R. Civ. P. 56(e), but makes no reference to Rule 59(a)(2).   (Docket 168).

[2]Judge Davis' brief cites to Fed. R. Civ. P. 59(e), but makes no reference to Rule 59(a)(2).   (Docket 172 at p. 3).

modification of the court's order.   "By its terms, only Rule 60(b) encompasses a motion filed in response to an order."   Broadway, 193 F.3d at 989.   "[M]otion[s] for reconsideration should be construed as . . .   Rule 60(b) motion[s]."   Id.

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence."   Hagerman v. Yukon Energy Corp., 839 F.2d 407, 414 (8th Cir. 1988).   "[A] motion for reconsideration [should not] serve as the occasion to tender new legal theories for the first time."   Id.   Defendants' motions do not seek to present any new evidence.   While Judge Davis and States Attorney Vargo make no mention of new evidence, the DSS Defendants say "[n]o newly discovered evidence was present in the motion to reconsider."   (Docket 198 at p. 2).   Because of the commonality of the defendants' motions, the court will address the motions in a fashion most useful for analysis.   All references will be to the March 30, 2015, partial summary judgment order (Docket 150) unless otherwise indicated.

## A.   CHALLENGES TO UNDISPUTED MATERIAL FACTS

The DSS Defendants submit the March 30, 2015, order contains a number of erroneous findings of material facts.   (Docket 168 at pp. 4 & 7).   Judge Davis claims the court made a factual error in finding that "no testimony is permitted at the 48-hour hearings."   (Docket 172 at p. 12).   States Attorney Vargo does not challenge the court's statement of undisputed material facts.   (Docket 169). The defendants' factual challenges are separately addressed.

3

1.   **CHILD PROTECTION SERVICES ("CPS") EMPLOYEES DO NOT PREPARE A PETITION FOR TEMPORARY CUSTODY**

In the introduction section of the order, the court stated "CPS employees under policy guidance from and the supervision of Ms. Valenti and Ms. Van Hunnik prepare a petition for temporary custody and sign an Indian Child Welfare Act[3] affidavit alleging an Indian child is at risk of serious injury if the child remains in the parents' home."   (Docket 150 at p. 3).   In the statement of undisputed material facts section of the order, the court found that "[i]n state court cases involving Ms. Pappen and Ms. Young, CPS employees under [Ms. Valenti's and Ms. Van Hunnick's] supervision prepared petitions for temporary custody and signed ICWA affidavits alleging the children of these Indian parents were at risk of serious injury if the children remained at home."   Id. at p. 11 (record reference and footnote omitted).

The DSS Defendants object to both of these statements.   (Docket 168 at p. 4).   The DSS Defendants assert "CPS employees do not prepare the petitions for temporary custody.   The State's Attorney's office prepares a Petition for Temporary Custody and temporary custody paperwork."   Id. (record references omitted).

Plaintiffs' complaint alleged that in the individual plaintiffs' state court "cases, DSS employees under the supervision of [the DSS Defendants] prepared a petition and signed an ICWA affidavit alleging that the children of these parents

---

[3]25 U. S. C. § 1901 *et seq.* ("ICWA").

were at risk of serious injury if they remained in their homes."   (Docket 1 ¶ 51).

The DSS Defendants' answer stated "Petitions for Temporary Custody in each

case was [sic] prepared by a Pennington County Deputy States Attorney.   An

ICWA Affidavit for each Plaintiff was executed by a DSS employee and such

Affidavit sets forth many things, including but not limited to, why returning a

child to a particular parent would result in serious emotional and physical

damage."   (Docket 81 ¶ 16).   States Attorney Vargo's answer "admits that in

[the individual plaintiffs'] cases, DSS employees under the supervision of [DSS

Defendants] signed an ICWA Affidavit alleging that the children of these parents

were at risk of serious injury if they remained in their homes."   (Docket 76 ¶ 12).

As part of the summary judgment submission, the DSS Defendants stated

an "Affidavit of the Department and the ICWA Affidavit is prepared by a CPS

Family Services Specialist."   (Docket 132-1 ¶ 71).   They also stated "[t]he

State's Attorney's office prepares a Petition for Temporary Custody . . . . In most

circumstances, CPS does not receive a copy of the Petition for Temporary

Custody at the time of the 48 Hour hearing, but receives a copy of the applicable

CPS file in the mail at the Rapid City office."   Id. ¶¶ 79 & 80.   A Deputy States

Attorney on States Attorney Vargo's staff testified her "office prepares the

temporary custody paperwork" and "DSS will provide me with the ICWA

Affidavits and a DSS Affidavit."   (Docket 132-26 ¶¶ 32 & 36).

In response to plaintiffs' statement of undisputed material fact, the

defendants' jointly responded that the Petition for Temporary Custody was

5

"prepared by the State's Attorney's Office.   DSS does not have a policy for distribution of a State's Attorney prepared document."   (Docket 131 ¶ 8, response).

The court finds its original description of material facts in the March 30, 2015, order contained minor misstatements on these points.   The DSS Defendants' motion for reconsideration on this ground is granted.

The court amends page three of the introduction section of the order to read as follows:

> CPS employees under policy guidance from and under the supervision of Ms. Valenti and Ms. Van Hunnik sign an Indian Child Welfare Act affidavit alleging an Indian child is at risk of serious injury if the child remains in the parents' home.

The court amends page eleven of the undisputed material facts section of the order to read as follows:

> In state court cases involving Ms. Pappen and Ms. Young, CPS employees under their supervision signed ICWA affidavits alleging the children of these Indian parents were at risk of serious injury if the children remained at home.

The court further amends the last paragraph at page eleven to include after the first sentence the following:

> A Deputy States Attorney under States Attorney Vargo's supervision prepares the petitions for temporary custody for all ICWA cases.

## 2.   THE ICWA AFFIDAVIT AND HEARING TRANSCRIPT ISSUES

The DSS Defendants object to the court's finding that in seven 48-hour hearings "parents . . . did not receive the ICWA Affidavit either because the

6

Tribe's counsel (who also represent the Plaintiffs in this action) made 'comments' in the hearing transcript that the parent allegedly did not receive the document, or that the transcript omits reference to the parent actually receiving the ICWA Affidavit."   (Docket 168 at p. 7).   The DSS Defendants claim that "[a]s to the alleged lack of notice as to why the children were removed from the custody of the parents, the parents could not claim ignorance of the situation."   Id. at p. 5. Defendants argue that "[n]o affidavits were provided indicating that ICWA Affidavits were not provided to the parents by a DSS representative. . . . there is no competent evidence in the summary judgment materials reviewed by the Court."   Id. at p. 7.   They also object to the court's conclusion that "the Deputy State's Attorney, DSS or the judge failed to contradict the alleged statements of the parents or the Tribe's counsel or recess the proceedings for the purpose of reviewing the ICWA Affidavit or Petition for Temporary Custody."   Id. (citing Docket 150 at p. 15).   The DSS Defendants claim the court improperly "weighed the evidence due to the 'omission' in the transcript and made a conclusion by omission."   Id.

The DSS Defendants miss the point of the court's findings.   The issue is not what the Indian parents knew about the reasons their children were initially removed from the parents' custody, but rather the factual basis supporting continued separation of the family.   This is the information mandated for disclosure to the parents and for consideration by the state court judges in

determining whether continued separation of the family is necessary under ICWA.   (Docket 150 at pp. 27-28).

The court acknowledged the DSS Defendants claimed to have provided the ICWA affidavit.   See id. at p. 13.   What was troubling to the court and justified the findings made on the issue was that "disclosure of an ICWA affidavit and petition for temporary custody to a parent was not mentioned in 77 out of 78 cases."   Id. at pp. 13-14.   Then in seven cases there were specific references in the transcripts to complaints by the parents or the Tribe's counsel that they had not received the documents allegedly justifying continued placement with DSS. Id. at pp. 14-15.

DSS Defendants' citations to the inadmissibility of unsworn statements for summary judgment purposes are misleading.   Both sides in this litigation submitted transcripts of 48-hour hearings for consideration in resolving plaintiffs' motions for partial summary judgment.   Those transcripts constitute the official record.   SDCL § 26-7A-35; see also Fed. R. Evid. 803(8) & 902(4).

In not one of the seven transcripts referenced in the order "did a Deputy States Attorney, DSS representative or the judge contradict the statements of the Indian parents or counsel or recess the proceedings to allow the parties to receive and review the ICWA affidavit and petition for temporary custody."   (Docket 150 at p. 15).   The official record of those proceedings speaks loudly and clearly. Silence by those individuals responsible for disclosing the ICWA affidavit and the petition for temporary custody can only be an adoption of the declaration made

8

by the parents or counsel.   The DSS Defendants' motion for reconsideration on this ground is denied.

### 3.   VALENTI AND VAN HUNNICK UNDERSTAND 48-HOUR HEARINGS ARE INTENDED TO BE EVIDENTIARY HEARINGS

The DSS Defendants object to the court's conclusion that they "understood 48-hour hearings are intended to be evidentiary hearings." (Docket 168 at p. 7) (citing Docket 150 at p. 26).   The DSS Defendants claim "[t]here [is] no competent evidence in the record that could lead to such a conclusion."   Id.

The DSS Defendants fail to acknowledge the existence of the *Department of Interior Guidelines for State Courts*; *Indian Child Custody Proceedings*, 44 Fed. Reg. 67584-67595 (Nov. 26, 1979) ("DOI Guidelines") and the 2007 South Dakota Unified Judicial System *South Dakota Guidelines for Judicial Process in Child Abuse and Neglect Cases* ("SD Guidelines") referenced in the footnote accompanying the court's statement.   See Docket 150 at p. 26 n.27.   Instead of claiming these administrative guidelines need not be followed, the DSS Defendants' summary judgment brief points out a mistake made by plaintiffs in citing to the SD Guidelines and ignores the remainder of plaintiffs' argument regarding the DOI Guidelines and the SD Guidelines.   Compare Docket 129 at p. 12 and Docket 108 at pp. 15 & 28.

The defendants' argument is frivolous.   The DOI Guidelines are "an administrative interpretation of ICWA entitled to great weight."   (Docket 150 at

p. 29) (references omitted).   The SD Guidelines include the ICWA affidavit form submitted in this case and also specifically incorporate as an appendix the DOI Guidelines.[4]   The DSS Defendants are bound to know and understand the law applicable to ICWA proceedings, a fundamental competence lacking in this case.

The DSS Defendants' reliance on <u>Cheyenne River Sioux Tribe v. Davis</u>, 822 N.W.2d 62 (S.D. 2012) is misplaced.   In <u>Cheyenne River Sioux Tribe</u> it is obvious that the South Dakota Supreme Court assumed the ICWA affidavit, police reports and the petition for temporary custody were all given to Native American parents appearing at 48-hour hearings.   "Based upon State's petition, the police report and an ICWA affidavit from a DSS specialist, the court granted temporary custody of the children to DSS for sixty days."   <u>Id.</u> at p. 63.

<u>Cheyenne River Sioux Tribe</u> is not state court precedent governing the factual or legal issues presented for summary judgment in this case.   The South Dakota Supreme Court in <u>Cheyenne River Sioux Tribe</u> focused on the first sentence of 25 U.S.C. § 1922 while the issues before this court require application of the second sentence.   The DSS Defendants' motion for reconsideration on this ground is denied.

### 4.   TESTIMONY PERMITTED AT THE 48-HOUR HEARINGS

Judge Davis claims this court made a finding "that Judge Davis stated no testimony is permitted at the 48-hour hearing."   (Docket 172 at p. 12)

---

[4]http://ujs. sd.gov/uploads/pubs/SDGuidelinesAandNProceedings.pdf at pp. 111-12 and 139-58.

(referencing Docket 150 at p. 41).   Judge Davis' objection is a misstatement of the record.   The court's order accepted "Judge Davis' own declaration that no <u>oral</u> testimony is permitted during the 48-hour hearings he conducts."   (Docket 150 at p 41) (emphasis added).   Judge Davis' motion for reconsideration on this ground is denied.

**B.    CHALLENGES TO THE COURT'S LEGAL CONCLUSIONS**

Defendants' challenges to the court's legal conclusions are little more than a repeat of losing arguments made in earlier filings.   Nothing raised by defendants points out "a manifest error of law" requiring reconsideration.

**1.    JUDGE DAVIS IS A POLICY MAKER**

Judge Davis objects to the court's conclusion of law that he is a policy maker.   (Dockets 172 at p. 3).   He argues that "[u]nder South Dakota state law, there appear to be at least four means for the South Dakota Supreme Court to review and ratify or reject 'procedures' used by a circuit court judge during a temporary custody hearing."   <u>Id.</u>   Judge Davis asserts "[n]o court has concluded that a constitutionally elected state court judge is a 'final policymaker' under <u>Monell v. Dept. of Soc. Serv's of City of New York</u>, 436 U.S. 658, 694 (1978)."   <u>Id.</u> at p. 4.   Rather, Judge Davis argues the South Dakota Supreme Court is the final policy maker.   <u>Id.</u> at p. 6.

Were the court to adopt Judge Davis' rationale, the United States Supreme Court would be the only final policy maker based on its authority to review a state court decision through a writ of certiorari.   The Supreme Court considers a

11

writ of certiorari if "a state court of last resort has decided an important federal question in a way that conflicts with the decision of another state court of last resort or of a United States court of appeals . . . [or] a state court . . . has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court."   Sup. Ct. R. 10(b) & (c).

Judge Davis' argument that plaintiffs have alternative paths of recourse with the South Dakota Supreme Court is without merit under Pulliam v. Allen, 466 U.S. 522 (1984).   "Congress enacted § 1983 . . . to provide an independent avenue for protection of federal constitutional rights. . . . We remain steadfast in our conclusion, nevertheless, that Congress intended § 1983 to be an independent protection for federal rights and find nothing to suggest that Congress intended to expand the common-law doctrine of judicial immunity to insulate state judges completely from federal collateral review."   Id. at pp. 540-41.   As summarized in Tesmer v. Granholm, "*Pulliam's* emphasis on the fact that § 1983 was intended to be an independent protection for federal rights undermines Defendants' claim that an indigent defendant's only recourse is to appeal the denial of appellate counsel and, when those appeals are exhausted, file a petition for writ of habeas corpus."   Tesmer v. Granholm, 114 F. Supp. 2d 603, 617 (E.D. Mich. 2000), *rev'd on other grounds*, 333 F.3d 683 (6th Cir.2003), *rev'd on standing grounds*, 543 U.S. 125 (2004) (federal court's declaratory judgment that a state judicial practice was unconstitutional constituted a

declaratory decree within the meaning of § 1983 because its effect was to prohibit state court judges from engaging in the unconstitutional practice).   The United States Supreme Court subsequently endorsed the ruling in Pulliam.   See Mireles v. Waco, 502 U.S. 9, 10 n.1 (1991) ("The Court . . . has recognized that a judge is not absolutely immune . . . from a suit for prospective injunctive relief . . . ." (referencing Pulliam, 466 U.S. at 536-43)).

Judge Davis' declaration that "[n]o court has concluded that a constitutionally elected state court judge is a 'final policymaker' under Monell" is disingenuous.   (Docket 172 at p. 4).   The court's order cited Monell for the proposition that Judge Davis' six practices identified by the court were policies which "may fairly be said to represent official policy."   (Docket 150 at p. 22) (citing Oglala Sioux Tribe v. Van Hunnick, 993 F. Supp. 2d 1017, 1029 (D.S.D. 2014) (citing Monell, 436 U.S. at 694).   The Supreme Court's directive in Pulliam as it relates to the action of a judge was not premised on the "final policy maker" mandate of Monell.   Rather, as the court's March 30, 2015, order found, "Judge Davis' decisions are 'final decisions' for purposes of § 1983.   He established each of the policies and procedures for conducting 48-hour hearings and Judge Davis is empowered to change them at any time."   (Docket 150 at p. 25).   This rule-making function subjected Judge Davis to § 1983 jurisdiction for declaratory and injunctive relief purposes.   Id. (referencing Pulliam, 466 U.S. 522).   See also Eggar v. City of Livingston, 40 F.3d 312, 317 (9th Cir. 1994) ("a state judge does not enjoy judicial immunity from unconstitutional behavior

13

when the facts are sufficient to grant a party declaratory or injunctive relief
against a judge.") (referencing <u>Pulliam</u>, 446 U.S. at 541-42).

This conclusion is supported by <u>Smith v. Pezzetti</u>, No. 03-74213, 2005 WL
5421316 (E.D. Mich. April 4, 2005).   In that case, the district court issued a
declaratory judgment on plaintiffs' § 1983 claims against two Michigan County
Circuit Court Judges.   <u>Smith</u>, 2005 WL 5421316 *17.   Those judges issued
separate procedural orders removing plaintiffs' adoptive children from their
custody without notice pending a further hearing on other parties' challenges to
a final adoption decree.   The defendant judges argued their decisions were not
final because further state court proceedings would necessarily occur.   <u>Id.</u> at
2005 WL 5421316 *12.   The district court found "Plaintiffs had no opportunity
to be heard in both . . . County Courts before their legal status as parents were
stripped from them, and their children were removed from them."   <u>Id.</u>
at 2005 WL 5421316 *13.   The court then "granted partial summary
judgment/declaratory relief on [plaintiffs'] claim under 42 U.S.C. § 1983 against
Judges Pezzetti and [Robertson] . . . . The Court finds that there is no genuine
issue of material fact that: (1) there was a violation of the Smith Plaintiffs' right to
due process secured by the Constitution and laws of the United States, and (2)
that the alleged deprivation was committed by a person or persons acting under
color of state law, to wit Judges Pezzetti and Robertson . . . ."   <u>Id.</u> at 2005 WL
5421316 *14.

"The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.' " Mitchum v. Foster, 407 U.S. 225, 242 (1972) (citing Ex parte Virginia, 100 U.S. 339, 346 (1879)). "In carrying out that purpose, Congress plainly authorized the federal courts to issue injunctions in § 1983 actions, by expressly authorizing a 'suit in equity' as one of the means of redress. And this Court long ago recognized that federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights." Id. (referencing Ex parte Young, 209 U.S. 123 (1908)).

Judge Davis' motion for reconsideration is denied.

## 2. DSS DEFENDANTS ARE POLICY MAKERS

The DSS Defendants object to the court's conclusion that they are policy makers. (Docket 168 at pp. 11-13). They argue "Plaintiffs asserted no evidence or legal argument with 'relevant materials' to address whether Ms. Valenti or Ms. Van Hunnik were 'final policy makers.' " Id. at p. 12.

The plaintiffs' statement of undisputed material facts contained the following declaration:

> [A]lthough the ICWA affidavits prepared by DSS employees and submitted in 48-hour hearings often discussed the events that led up to the child being removed from the home, they almost never discussed in any meaningful or comprehensive

15

> manner whether the child would likely suffer injury if
> returned to the home.

(Docket 107 ¶ 38).   The DSS Defendants' response to this statement did not challenge its content, but rather said "[t]he Department's training requires an analysis on 'imminent danger' based on not only immediate harm, but also the foreseeability or recurrent danger.   During the 48-hour hearing, the court is determining whether emergency custody should continue.   These decisions are based on the record evidence."   (Docket 130 ¶ 38).

The DSS Defendants acknowledge the court must resolve as a matter of law whether the defendants are final policy makers.   (Docket 168 at p. 12). Without restating the analysis conducted, the order of March 30, 2015, properly reaches the conclusion that the DSS Defendants are final policy makers under Monell.

The DSS Defendants object to the court's conclusion that their acquiescence in Judge Davis' policies for conducting 48-hour hearings made his policies their own.   (Docket 168 at p. 14).   The DSS Defendants' argue Judge Davis is not a subordinate to them such that they could ratify his policies.   Id. at pp. 14-15.   Judge Davis clearly was not a subordinate to these defendants. But contrary to the DSS Defendants' argument, Coleman v. Watt[5] stands for the proposition that a separate, non-subordinate entity, such as the Department of Social Services, may be held liable by adopting the policies of a judge.   See

---

[5]40 F.3d 255 (8th Cir. 1994).

16

Coleman, 40 F.3d at 262 (plaintiff must prove "the chief of police or some other policymaker adopted Judge Watt's order as an official policy . . . .") (emphasis added).

This court concluded "[w]hen these defendants did not challenge Judge Davis' policies for conducting 48-hour hearings, his policies became the official policy governing their own agencies."   (Docket 150 at p. 26) (referencing Coleman, 40 F.3d at 262).   The adoption of Judge Davis' policies as the policies of the Department of Social Services occurred " 'by acquiescence in a longstanding practice' of Judge Davis . . . ."   Id. at p. 27 (citing Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989) (internal quotation marks omitted).

The DSS Defendants' argument also fails because the state has an official policy—the SD Guidelines.   These defendants did not object to the court's consideration of the Guidelines, only to the interpretation of how the SD Guidelines apply in this case.   (Docket 129 at pp. 12-13).   Despite the comprehensive SD Guidelines, discussed in detail at pages 29-34 of the March 30, 2015, order, the DSS Defendants ignored the SD Guidelines and adopted the policies of Judge Davis as their own.   The policies of Judge Davis and the policies of the DSS Defendants were the "moving force" behind the violation of plaintiffs' constitutional and federal rights.   Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987).

The DSS Defendants' motion for reconsideration is denied.

17

### 3.     STATES ATTORNEY VARGO IS A POLICY MAKER

States Attorney Vargo argues the court failed to identify the entity for which he was a final policy maker.   (Docket 174 at p. 5).   This argument is frivolous at best.   The court specifically identified States Attorney Vargo as "the elected States Attorney for Pennington County, South Dakota. . . . [and that] Mr. Vargo controls the policies and procedures followed by his staff attorneys." (Docket 150 at pp. 2-3).   As the Pennington County States Attorney, Mr. Vargo "appear[s] in all courts in his county and prosecute[s] . . . on behalf of the state or his county . . ." all civil proceedings.   Id. at p. 3 n.5 (citing SDCL § 7-16-9).

States Attorney Vargo claims he should not be a named defendant but rather Pennington County should be the named defendant.   (Docket 174 at pp. 6-7).   This argument ignores the long-standing precedent that in § 1983 cases seeking prospective declaratory judgment and injunctive relief, it is the individually named prosecutor who is called upon to defend the policies of his office.   See Supreme Court of Virginia v. Consumers Union of U. S., Inc., 446 U.S. 719, 736 (1980) (Prosecutors "are natural targets for § 1983 injunctive suits since they are the state officers who are threatening to enforce and who are enforcing the law."); Bolin v. Story, 225 F.3d 1234, 1242 (11th Cir. 2000) ("prosecutors are not immune from claims for injunctive relief . . . ."); Miller v. Mitchell, 598 F.3d 139, 155 (3d Cir. 2010) (preliminary injunction issued against district attorney).

18

States Attorney Vargo argues neither he nor "his courtroom deputies . . . [have] the authority to stop Judge Davis's conduct, regardless of whether or not it was a violation of plaintiffs' constitutional rights."   (Docket 174 at p. 8 (citing Granda v. City of St. Louis, No. 4:04-CV-1689-MLM, 2006 WL 1026978 at *8 (E.D. Mo. Apr. 13, 2006) (citing Russell v. Hennepin County, 420 F.3d 841, 849 (8th Cir.2005)).   Granda concluded that "mere awareness" by the mayor or a judge of the actions of another judge "does not create a custom or policy of the City."   Id.

Granda is far removed from the facts in the present case.   States Attorney Vargo and his courtroom deputies are actively involved in every 48-hour hearing occurring in the courtrooms of the Seventh Judicial Circuit.   Mr. Vargo has an independent "obligation to follow federal and state law . . . and to seek justice at all times."  (Docket 150 at p. 3).   This includes his obligation to comply with the Indian Child Welfare Act.

States Attorney Vargo objects to the court's use of Coleman[6]  to hold him responsible through his acquiescence in the policies of Judge Davis.   (Docket 174 at p. 9).   This argument is without merit as the Coleman court acknowledged one of the plaintiff's unresolved "evidentiary hurdles" was the factual issue of "the role of municipal officials in adopting Judge Watt's order as official policy."   Coleman, 40 F.3d at 262.   That evidentiary hurdle is not present here.

---

[6]Coleman involved a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Coleman, 40 F.3d at 258.

19

States Attorney Vargo asserts that the issue of whether the defendants'
decisions caused the deprivation of constitutional rights alleged by plaintiffs is a
jury question.   (Docket 174 at p. 11).   A careful review of the pleadings reveals
this argument is without merit.   Plaintiffs' complaint invokes the equity
jurisdiction of the court seeking a declaratory judgment and an injunction
against the defendants.   (Docket 1 at p. 38 ¶¶ 3 & 4).   See Northgate Homes,
Inc. v. City of Dayton, 126 F.3d 1095, 1099 (8th Cir. 1997).   Even if defendants
had been entitled to a jury trial on plaintiffs' declaratory judgment claim, none of
the defendants' answers demanded a jury trial.   (Dockets 76, 80 & 81).   Nor did
any defendant file a demand for jury trial within 14 days of the service of the last
pleading.   Fed. R. Civ. P. 38(b)(1).   When a demand for jury trial is not properly
made all issues are to be resolved by the court.   Fed. R. Civ. P. 39(b).

States Attorney Vargo's motion for reconsideration on these grounds is
denied.   His other grounds for reconsideration are the same as those advanced
by Judge Davis and the DSS Defendants.   For the same reasons articulated
above, States Attorney Vargo's motion for reconsideration on those grounds is
denied.

### 4.   THE DSS DEFENDANTS ARE NOT SUBJECT TO PROSPECTIVE INJUNCTIVE RELIEF

The DSS Defendants argue the March 30, 2015, order will not support
"an injunction against [the DSS Defendants] for prospective injunctive relief to
prevent future violations of federal law."   (Docket 168 at p. 15).   The court

concluded that notwithstanding the DSS Defendants' change in procedures following the commencement of this litigation, those actions do not encompass all of the issues addressed in the March 30, 2015, order.   Furthermore, "[d]efendants have not shown 'it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'"   (Docket 150 at p. 44) (citing <u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.</u>, 484 U. S. 49, 66 (1987) (italics in original).

The extent to which the DSS Defendants are subject to prospective injunctive relief will be resolved during the remedy phase of these proceedings. The DSS Defendants' motion for reconsideration on this ground is denied.

## ORDER

Based on the above analysis, it is

ORDERED that the DSS Defendants' motion for reconsideration (Docket 167) is granted in part and denied in part consistent with this order.

IT IS FURTHER ORDERED that defendant State Attorney Vargo's motion for reconsideration (Docket 169) is denied.

IT IS FURTHER ORDERED that defendant Judge Davis' motion for reconsideration (Docket 170) is denied.

IT IS FURTHER ORDERED that the March 30, 2015, order (Docket 150) is amended consistent with the modification noted at page six of this order.

      IT IS FURTHER ORDERED that a separate injunction and declaratory judgment order shall issue after a hearing at which the parties present their positions on injunctive relief.

      Dated February 19, 2016.

                    BY THE COURT:

                    _____
                    JEFFREY L. VIKEN
                    CHIEF JUDGE