IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| OGLALA SIOUX TRIBE and ROSEBUD SIOUX TRIBE, as *parens patriae*, to protect the rights of their tribal members; and, MADONNA PAPPAN, and LISA YOUNG, individually and on behalf of all other persons similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> LISA FLEMING; MARK VARGO; HON. CRAIG PFEIFLE; and LYNNE A. VALENTI , in their official capacities. <br><br> Defendants. | Civ. No. 5:13-cv-05020-JLV <br><br> AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

Congress passed the Indian Child Welfare Act of 1978 (ICWA) in part because officials in South Dakota and other states were removing scores of Indian children from their homes based on insufficient evidence, and in perfunctory and inadequate hearings, in violation of federal law.  At the time the original complaint was filed, despite the added protections of ICWA, officials in Pennington County, South Dakota were removing scores of Indian children from their homes based on insufficient evidence, and in perfunctory and inadequate hearings, in violation of federal law.

Attached to this complaint as "Exhibit 1" is the transcript of one such Pennington County hearing.  This hearing, involving Plaintiff Madonna Pappan, her husband, and their two children, lasted little more than sixty *seconds*.  The court did not permit the Pappans to see the petition that had been filed against them by state officials.  When Mr.

Pappan asked what he was permitted to discuss, the court changed the subject and, a few seconds later, terminated the hearing.   The court immediately entered an order (attached as "Exhibit 2") which found that "active efforts have been made to provide remedial services and rehabilitative programs" to the Pappans, and that taking the Pappan children away from their parents "is the least restrictive alternative available," even though no evidence was introduced during the hearing on those issues. The order stripped the Pappans of custody over their children for at least sixty days and gave that custody to the officials who had filed the secret petition.   As discussed below, Plaintiffs Rochelle Walking Eagle and Lisa Young, like many other Indian parents in Pennington County, were treated similarly during their hearings, and their children were removed from their custody.  This lawsuit seeks a speedy end to such a disgraceful process.

This action is brought by the Oglala Sioux Tribe and the Rosebud Sioux Tribe, federally recognized Indian tribes with reservations in South Dakota, and by two Indian parents, individually and as representatives of a class of all Indian parents residing in Pennington County.  Defendants are various state officials who routinely removed Indian children from their families in a manner that violated federal law.

This lawsuit challenges  policies, practices, and customs of the Defendants that result in: (1) the removal of Indian children from their homes without affording them, their parents, or their tribe a timely and adequate hearing as required by the Due Process Clause, (2) the removal of Indian children from their homes without affording them, their parents, or their tribe a timely and adequate hearing as required by the Indian Child Welfare Act, and (3) the continued retention of Indian Children in state custody after Defendants' initial custody ("48-hour") hearings in a manner that violates federal law.

This lawsuit was filed on March 23, 2013. Plaintiffs now seek to amend the original complaint (Docket 1) so as to add two claims that were unknown to Plaintiffs at the time suit was filed. The Court has already resolved by partial summary judgment many of the claims contained in the original complaint. This amended complaint preserves all of those initial claims, that is, the adoption of this amended complaint will not alter in any respect Plaintiffs' initial claims or the rulings of the Court with respect to those claims.

## JURISDICTION AND VENUE

1.   This action arises under the Fourteenth Amendment to the Constitution and the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901 *et seq.* (ICWA), and seeks relief pursuant to 42 U.S.C. §1983.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).  Venue is properly found in this District pursuant to 28 U.S.C. §1391(b), in that all parties reside, and plaintiffs' claims arose, within the District.

## THE TRIBAL PLAINTIFFS

2.   Plaintiffs Oglala Sioux Tribe and Rosebud Sioux Tribe are Indian tribes officially recognized as such by the United States, with reservations located within the state of South Dakota.  Both tribes have treaties with the federal government.

3.   The Tribes bring this action as *parens patriae* to vindicate rights afforded to their members by the Due Process Clause of the Fourteenth Amendment and by ICWA.  The Tribes and their members have a close affiliation, indeed kinship, with respect to the rights and interests at stake in this litigation.  The future and well-being of the Tribes is inextricably linked to the health, welfare, and family integrity of their members.  *See State of Alaska, Dep't of Health and Social Services v. Native Village of Curyung*, 151 P.3d 388, 402 (Alaska 2006) (recognizing that Indian tribes have a right to bring suit "as

*parens patriae* to prevent future violations" of ICWA).  *See also Native Village of Venetie IRA Council v. Alaska*, 155 F.3d 1150, 1152 (9th Cir. 1998) (same); *State v. Native Village of Tanana*, 249 P.3d 734, 736 (Alaska 2011) (same).  *See also Santosky v. Kramer*, 455 U.S. 745, 766 (1982) (recognizing "a *parens patriae* interest is preserving and promoting" the welfare of children and families).

4.  The Tribes also seek to vindicate their own rights under ICWA.  ICWA was enacted in large measure to protect the survival of Indian tribes. *See* 25 U.S.C. § 1901(3) (recognizing that nothing "is more vital to the continued existence and integrity of Indian tribes than their children.")  *See also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 50-52 (1989).  Indeed, the rights that tribes have under ICWA cannot be defeated or waived by tribal members. *Id*. at 34, 52-53.  As discussed below, the policies, practices, and customs of Defendants at issue in this litigation undermined, if not eviscerated, rights afforded these tribes by the Indian Child Welfare Act.

## THE INDIVIDUAL PLAINTIFFS

5.  Named plaintiffs Madonna Pappan and Lisa Young reside in Pennington County, South Dakota and are members of the Oglala Sioux Tribe and the Standing Rock Sioux Tribe, respectively.  They bring this action on their own behalf and on behalf of all other members of federally recognized Indian tribes, present and future, whose rights to family integrity at the time the original complaint was filed were being unlawfully infringed upon by the Defendants.  The named plaintiffs are not seeking to interfere with, or overturn decisions in, their own cases but rather are seeking to expose and challenge systemic policies, practices, and customs of the Defendants that violate federal law.

6.   Each named plaintiff has two children who were taken into custody by the Defendants or their agents on the grounds that these children were allegedly abused or neglected by their parents, and remained in state custody for months before finally being returned home.  Both mothers suffered, and watched their children suffer, extreme emotional and psychological trauma as a result of this forced separation.  They bring this action in an effort to protect themselves and other Indian parents and children from experiencing the irreparable and grievous injuries that they and their children suffered.

## THE PLAINTIFF CLASS

7.   The named plaintiffs bring this action on their own behalf and on behalf of all other members of federally recognized Indian tribes who reside in Pennington County, South Dakota and who, like the plaintiffs, are parents or custodians of Indian children.

8.   Class certification is sought pursuant to F.R.Civ.P. 23(a), (b)(2).  Class certification is appropriate because the members of the class are so numerous that joinder of all persons is impracticable; there are questions of fact and law common to the class; the representative parties' claims are typical of the claims of the class; and the named plaintiffs will fairly and adequately represent the interests of the class.  In addition, the defendants have acted or refused to act on grounds generally applicable to all members of the class, thereby making appropriate final declaratory and injunctive relief to the class as a whole, and the questions of law or fact common to members of the class predominate over any questions affecting individual members. *See Doe v. Staples*, 706 F.2d 985, 986 (6th Cir. 1983) (certifying a class, as here, of parents who challenged a state's practice of removing children from their homes in a manner inconsistent with the Due Process

Clause); *Nicholson v. Williams*, 205 F.R.D. 92 (E.D.N.Y. 2001) (similar); *People United for Children, Inc. v. City of New York*, 214 F.R.D. 252 (S.D.N.Y. 2003) (similar).

## **DEFENDANTS**

9.     Defendant Lynne A. Valenti is the Secretary of the South Dakota Department of Social Services (DSS), who succeeded Kim Malsam Rysdon, who was Secretary at the time suit was filed.  In that capacity, she is the person in charge of the day-to-day operation of DSS, including Child Protection Services (CPS).  DSS/CPS is the state agency that routinely submits affidavits in temporary custody proceedings seeking the removal of Indian children from their homes, is the agency to which custody is often granted of said children by state courts, and is then the agency responsible for placing those children in foster care settings.  Defendant  Lisa Fleming is the person in charge of CPS for Pennington County, South Dakota, who succeeded LuAnn Van Hunnik, the Regional Manager at the time suit was filed.

10.    Defendant Mark Vargo is the duly elected State's Attorney for Pennington County.  In that capacity, said Defendant (and his subordinates) represent the state, including DSS, in all abuse and neglect proceedings and in other proceedings to acquire temporary custody of children under state law.

11.     Defendant Craig Pfeifle is the presiding judge of the Seventh Judicial Circuit Court of the state of South Dakota, and in that capacity, is the chief administrator of said Court, who succeeded Jeff Davis, the presiding judge at the time suit was filed.  He and the other judges of the Seventh Judicial Circuit routinely consider Petitions for Temporary Custody filed by state officials involving members of the Plaintiff Tribes and members of

the Plaintiff class, and at the time the original complaint was filed routinely entered orders granting those petitions in a manner that violated federal law.

12.   At the time the original complaint was filed, all of the acts set forth herein were undertaken by the Defendants under color of state law.  All of the Defendants are sued in their official capacities only.  Each Defendant is a "policy maker" with respect to the policies challenged in this lawsuit.

## **FACTUAL ALLEGATIONS**

13.   Custody of one's child is one of the most precious of all rights, and "perhaps the oldest of the fundamental liberties recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  "The bonds between a parent and child are, in a word, sacrosanct" and protected by federal law. *Swipies v. Kofka*, 419 F.3d 709, 715 (8th Cir. 2005).

14.   The right of parents and children to maintain their relationship without unnecessary interference by the state is a constitutionally protected liberty interest. *Stanley v. Illinois*, 405 U.S. 645, 649-58 (1972).  "Both parents and children have a liberty interest in the care and companionship of each other." *Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997).

15.   Every constitutionally protected liberty (or property) interest is protected against loss by the Due Process Clause. *See Board of Pardons v. Allen*, 482 U.S. 369, 371, 381 (1987).  That Clause requires the state to afford certain procedural safeguards whenever it seeks to limit or withhold a liberty or property interest. *See Boddie v. Connecticut*, 401 U.S. 371 (1971); *Swipies*, 419 F.3d at 713-14; *Whisman*, 119 F.3d at 1309.

16.   The Due Process Clause guarantees, among other things, "the opportunity to be heard at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  *See Swipies*, 419 F.3d at 715.

17.   Normally, procedural safeguards guaranteed by the Due Process Clause, including the right to notice and hearing, must be afforded by the government prior to a deprivation of a liberty or property interest. *See Boddie*, 401 U.S. at 379.   When a genuine emergency exists and *pre*-deprivation notice and hearing are impossible, the state must provide those safeguards with reasonable promptness *post*-deprivation. *See Goss v. Lopez*, 419 U.S. 565, 581-84 (1975); *Coleman v. Watt*, 40 F.3d 255, 260-61 (8th Cir. 1994).

18.   Because maintaining one's family integrity is a liberty interest, whenever state officials involuntarily remove a child from his or her home without a pre-deprivation hearing, the state must provide a prompt and adequate post-deprivation hearing. *See Swipies*, 419 F.3d at 715; *Whisman*, 119 F.3d at 1310 ("Even if defendants had a right to take temporary custody of [the child], defendants had a corresponding obligation to afford [the parents] an adequate post-deprivation hearing."); *Whisman*, at 1311 ("Of even more concern is the failure [of defendants] to provide [the child] his right to a prompt post-deprivation hearing; he clearly was not in a position to secure that right for himself."); *K.D. v. County of Crow Wing*, 434 F.3d 1051, 1056 n.6 (8th Cir. 2006) ("Once a child is removed from parental custody without a court order, the state bears the burden to initiate prompt judicial proceedings to a provide post deprivation hearing.")

19.   Different interests protected by the Due Process Clause require different process.  *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("Once it is determined that due process

applies, the question remains what process is due.")  Determining what process is due in any given situation requires a balancing of the following three interests:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the functions involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  *See Coleman*, 40 F.3d at 260-61.

20.   The Eighth Circuit applied the *Mathews* balancing test in *Coleman* to determine what post-deprivation process was due to the owner of a car that had been impounded under exigent circumstances by local officials.  The owner was given a hearing seven days after the impoundment, a delay the owner claimed violated his rights.  The Eighth Circuit agreed with the owner (1) that automobiles "occupy a central place in the lives of most Americans;" (2) that "a more expeditious hearing would significantly reduce the harm suffered" by owners wrongly deprived of their vehicles; and (3) that the only interest the state has in delaying the hearing is the inconvenience of gathering the facts sooner, given that the hearing "must be provided in any event." *Coleman*, 40 F.3d at 260-61.  Applying the *Mathews* test, the court held that a seven-day delay was unconstitutional.

21.   In *Swipies*, the Eighth Circuit applied the rationale of *Coleman* to the very situation at issue here: the removal of children from their families.  As in *Coleman*, the court found that the private interest at stake is significant; the risk of an erroneous deprivation and its attendant unnecessary injury is high when adequate process is not provided in a timely manner; and providing a speedy hearing is a minimal burden because the state must eventually provide such a hearing anyway.  The court held:

> To put the matter otherwise, if seven days is too long for a car owner to wait for a post-deprivation hearing after his or her car has been towed and impounded, *Coleman v. Watt*, 40 F.3d 255, 260-61 (8th Cir. 1994), as a matter of law, *a parent should not have to wait seventeen days after his or her child has been removed for a hearing*.

*Swipies*, 419 F.3d at 715 (emphasis added).

22.   Removing a child from his or her home is among the most drastic actions that a state can take against a liberty interest, and therefore the delay in providing an adequate hearing "should ordinarily be measured in hours and days, as opposed to weeks." *Brown v. Daniels*, 128 Fed.Appx. 910, 915 (3d Cir. 2005).

23.   The private interests affected by the forceful removal of children from their parents could hardly be more profound.   Numerous studies have reported the traumatic and often permanently scarring effect of removing children from their homes. *See, e.g.*, Paul Chill, "Burden of Proof Begone: The Pernicious Effect of Emergency Removal in Child Protective Proceedings," 4 *Family Court Review* 457 (2003) ("Removals can be terrifying experiences for children and families. . . .Children are thrust into alien environments, separated from parents, siblings, and all else familiar, with little if any idea of why they have been taken there."). Feelings of terror, grief, and abandonment are typical, and a child's forced separation from parents at the hands of a stranger can adversely affect his or her capacity to form attachments in the future and to trust authority. *See id.* at 458.

24.   "The decision to remove a [child] from the family home is always serious and the resulting disruptions can often be traumatic for both parent and child." *Rivera v. Marcus*, 696 F.2d 1016, 1017 (2d Cir. 1982).   Children should be separated from their parents by the state only in exigent circumstances when there is an imminent risk of serious injury. *See generally Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2002); *Nicholson v. Williams*, 203 F. Supp.2d 153, 198-99 (E.D.N.Y. 2002) (citing expert testimony that even

a short breach in the familial bond caused by involuntary separation of the child from his or her home will likely be detrimental to the child's well-being, cause distress and despair, and result in feelings of self-blame that could last a lifetime); *B.S. v. Somerset County*, 704 F.3d 270, 272 (3d Cir. 2013) (recognizing that removing a child from the home is a "drastic" action that has "profound ramifications for the integrity of the family unit and for each member of it.").

25.   This is especially true for Indian children, most of whom are placed by the Defendants in non-Indian settings after removal from their families, and thus will suffer both a cultural as well as a familial separation.  Indeed, one reason Congress passed ICWA was to protect Indian children from experiencing those injuries if at all possible.

26.   Yet, as explained more fully below, for at least three years before the original complaint was filed, the Defendants  pursued a policy, practice, and custom of separating Indian children from their parents without providing them with a prompt and adequate post-deprivation hearing.  In fact, Indian parents in Pennington County whose children were removed by state officials usually waited a minimum of sixty days (and often ninety days) before receiving a hearing that complied with the Due Process Clause.

27.   South Dakota has established a process for the removal of children from their homes in exigent circumstances. *See* SDCL Chap. 26-7A.  In South Dakota, a child may be taken into state custody by a law enforcement or court services officer without a court order when there is an "imminent danger to the child's life or safety" and there is insufficient time to apply for a court order. SDCL § 26-7A-12(4).

28.   Alternatively, a court may order temporary custody of a child upon application by a state's attorney, social worker of DSS, or law enforcement officer, if there is good cause

to believe that "[t]here exists an imminent danger to the child's life or safety and immediate removal of the child from the child's parents, guardian, or custodian appears to be necessary for the protection of the child." *Id.* § 26-7A-13(1)(b).

29.  No child may be held in custody longer than 48 hours (except weekends) "unless a temporary custody petition for an apparent abuse or neglect case or other petition has been filed." *Id.* § 26-7A-14.  The court must convene a hearing within 48 hours after the child is taken into custody (except weekends) "unless extended by the court." *Id.* § 26-7A-15.

30.  Whoever takes a child into state custody must immediately inform the child's parents or custodians, orally or in writing, that they have "the right to a prompt hearing by the court to determine whether temporary custody should be continued." *Id.* § 26-7A-15.  If the child is an Indian child, an effort must also be made to notify the child's tribe. *Id.*

31.  South Dakota amended its laws after the passage of ICWA to require that in any custody proceeding involving an Indian child, the state's attorney must provide notice to "the parent or Indian custodian and the Indian child's tribe, if known, of the pending proceedings and of their right of intervention." *Id.* § 26-7A-15.1(1).  The notice "shall be written in clear and understandable language and shall include" a copy of the petition for temporary custody and a statement of the rights of the parents, custodians, and tribe. *Id.* § 26-7A-15.1(4).  The notice must state that the tribe has a right "to be granted up to twenty days from the receipt of the notice to prepare for the proceeding." *Id.* § 26-7A-15.1(4)(d)(iii).

32.  No foster care placement proceeding may be held "until at least ten days after receipt" of notice by both the parents and the child's Indian tribe, and both the parents and the

tribe have a right to request an additional ten days. *Id.* § 26-7A-15.1(3).  (ICWA, too, prohibits a foster care placement hearing from occurring until ten days after service of formal notice to the parents and the child's tribe. 25 U.S.C. § 1912(e)).

33.   The purpose of South Dakota's temporary custody (or "48-hour") hearing is "to determine whether temporary custody should be continued" or whether the child may safely be returned to the parents. S.D.C.L. § 26-7A-15.

34.   The 48-hour hearing is expected to be an evidentiary hearing. *See id.* § 26-7A-18 ("At the temporary custody hearing the court shall consider the evidence of the need for continued temporary custody of the child in keeping with the best interests of the child."). The court's duty to conduct an evidentiary hearing at the time this suit was filed was explained in the "South Dakota Guidelines for Judicial Process in Child Abuse and Neglect Cases," promulgated by the South Dakota Unified Judicial System ("Guidelines") in 2007 (available at sdjudicial.com/courtinfo/childabuse.aspx).   The Guidelines stated:

> Pursuant to SDCL 26-7A-18, at the 48 Hour Temporary Custody Hearing the court *shall consider evidence* of the need for continued temporary custody . . . to determine whether continued custody outside the home is necessary to protect the child.  The purpose is to decide whether the child can be safely returned home and when.  The decision should be based on a *competent assessment* of the risks and dangers to the child.  The Court should *evaluate the current and future danger* to the child *and what can be done to eliminate the danger*.

Guidelines, at 33 (emphasis added).

35.   No court can reasonably make a "competent assessment of risk," evaluate "current and future danger to the child," and determine "what can be done to eliminate the danger" without hearing the relevant facts and offering the parents a meaningful opportunity to present evidence and contest the allegations against them.

36.   The Guidelines anticipate that the court will hear evidence from the family services specialist assigned by DSS to the case.   The Guidelines state: "The family services specialist should be ready to detail reasonable efforts [to avoid removal of the child] at the 48 hour hearing," including "historical and current information" such as contacts with the parents since the child's removal and previous abuse or neglect issues. *Id*. at 37-38.

37.   The Guidelines state that where the child is Indian, DSS must support its Petition for Temporary Custody either with an "ICWA Affidavit" or by oral testimony from a "'qualified expert that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child (25 USC 1912(e))." Guidelines, at 46.   Attached to the Guidelines is a model ICWA affidavit ("Form 6"), a copy of which is attached to this complaint as "Exhibit 3."

38.   The Guidelines also state that, in any 48-hour hearing involving an Indian child, "the Court must determine whether the agency has made active efforts to preserve the family (25 U.S.C.A. 1912(d))" and whether the person endangering the child has "been removed from the home so the child could remain." Guidelines, at 38.   Moreover, at the conclusion of the hearing, the court must determine that removal of the child is or was necessary because continued presence in the home or return to the home would be contrary to the child's welfare. *Id*. at 37.

39.   The fact that South Dakota law anticipates that the 48-hour hearing will be an evidentiary hearing is reflected by the model "Temporary Custody Order" attached to the Guidelines as  "Form 7," a copy of which is attached hereto as "Exhibit 4."   The model order recommends that the court make the following findings:

> That there is probable cause to believe that the child(ren) is/are abused or neglected, . . . .That temporary custody is the least restrictive

alternative in the child(ren)'s best interest. . . . That active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break-up of the Indian family and that these efforts have proven unsuccessful. . . .That continued custody of the child by the parents or Indian custodian is likely to result in serious emotional or physical damage to the child.

40.    The Guidelines recognize that gathering all the evidence required by the 48-hour hearing could be so time-consuming that the court may need to continue the hearing:

A 48 Hour Temporary Custody Hearing *involves substantial time and resources*. . . .[The court's decision must be] based on careful consideration of the circumstances of the case. Due to constraints of time, it might not be possible for the Court to conduct a complete initial custody hearing. In these circumstances, the Court should . . . (c) Continue the 48 Hour Temporary Custody Hearing and set the time, date and place of the continued hearing.

Guidelines, at 41-42 (emphasis added).

41.    Under South Dakota law, the court has at least three options at the conclusion of the 48-hour hearing. First, the court may order that the child be returned to the family. Second, the court may direct that DSS file a formal petition alleging abuse or neglect. Third, the court may order that custody of the child be continued without the filing of a formal petition "under the terms and conditions for duration and placement that the court requires, including placement of temporary custody of the child with the Department of Social Services, in foster care or shelter." SDCL § 26-7A-19(2). If the court selects the third option, "the court shall review the child's temporary custody placement at least once every sixty days." *Id*. South Dakota allows a child to "be held in temporary custody until released by order of the court." *Id*. § 26-7A-16.

42.    As discussed below, at the time the original complaint was filed, Defendants' hearings *never* involved the "substantial time and resources" contemplated by the Guidelines (as Ms. Pappan's sixty-second hearing illustrates), *never* allowed for any witness testimony,

*never* allowed the parents to see the petition filed against them, *never* allowed the parents to see the affidavit filed in support of that petition, *never* allowed the parents to comment on whether continued custody was the least restrictive alternative, *never* allowed the parents to comment on whether the state had engaged in active efforts to prevent a break-up of the family, and *never* allowed the parents to obtain counsel and resume the hearing in a timely manner.   Similarly, the Defendants also failed to afford Indian tribes the safeguards to which they are entitled.

43.   Certain aspects of Defendants' 48-hour hearings were determined by the South Dakota Supreme Court to comply with state law and with ICWA. *See Cheyenne River Sioux Tribe v. Davis*, 2012 S.D. 69 (2012).  However, the court did not address the due process issues raised here.  Moreover, the court's interpretation of ICWA is not binding on federal courts.   A federal court is not bound by what a state court has decided on a federal claim. *See Olcott v. The Supervisors*, 83 U.S. 678, 683 (1872); *Lawrence County v. Lead-Deadwood School Dist. No. 40-1*, 469 U.S. 256 (1985) (rejecting an interpretation of federal law made by the South Dakota Supreme Court).

44.    It is federal law—not state law—that determines what process is due whenever the state removes children from their families. *See Swipies*, 419 F.3d at 716 ("a state statute cannot dictate what procedural protections must attend a liberty interest—even a state-created one—as this is the sole province of federal law." (citation omitted.)).  Any state law that conflicts with federal law is invalid under the Supremacy Clause of the Constitution. *See Lawrence County*, 469 U.S. at 703; *Ross v. Arkansas State Police*, 479 U.S. 1 (1986).

45.   At the time the original complaint was filed, nothing in state law prevented the Defendants from including within their 48-hour hearing *all* the procedural safeguards required by federal law, or from continuing that hearing for several days and to *then* meet federal requirements.   Rather, the Defendants had chosen not to provide a meaningful hearing at a meaningful time.

46.   Likewise, at the time the original complaint was filed, nothing in state law prevented former Defendants Van Hunnik and Malsam-Rysdon, and Defendant Vargo, from training their staff to request that the court afford Indian parents the procedural safeguards required by federal law at each 48-hour hearing, and from giving parents a copy of the documents that these Defendants filed with the court.   Rather, these Defendants had chosen not to do so.

47.   At the time the original complaint was filed, former Defendants Van Hunnik and Malsam-Rysdon, and Defendant Vargo, may have contended that the practice of refusing to afford an adequate hearing until sixty days (or longer) after Plaintiffs' liberty interests had been breached was the fault of former Defendant Judge Davis and the other judges on the Seventh Circuit.   However, even if the judiciary initiated this practice, the other Defendants ratified and adopted it, and it became the official policy, practice, and custom of all the Defendants. *See Coleman*, 40 F.3d at 262 (holding that where executive officials voluntarily adopt a practice initiated by a court, the practice becomes an official policy, practice, and custom of the executive branch for purposes of federal liability). For instance, rather than request a prompt due process hearing for Indian parents, these Defendants almost always requested that the court grant DSS custody of Indian children

for a minimum of sixty days before affording the parents a proper hearing.  Thus, these Defendants did not even try to comply with the Due Process Clause.

48.    DSS is required to ensure that Indian families subjected to temporary custody hearings, as well as the tribes in which these families are members, receive the procedural protections guaranteed them by federal law. Defendants Vargo, Malsam-Rysdon (now Valenti), and Van Hunnik (now Fleming) must train their staff accordingly.  At the time the original complaint was filed, these Defendants were failing to do so, exhibiting deliberate indifference to the rights of Indian parents and Indian tribes, causing them to suffer irreparable injury. *See City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989); *Whisman*, 119 F.3d at 1311 (noting that plaintiffs' claims were, like the claims here, "based upon failure to properly train and supervise as well as creating, encouraging and following the unconstitutional custom and practice of detaining children for thirty [here: *sixty to ninety*] days without a due process hearing.").

49.    At the time the original complaint was filed, the policy, practice, and custom of the Defendants of not providing constitutionally adequate notice and hearing promptly after the removal of Indian children from their homes had injured the named Plaintiffs, and was continuing to injure all Indian parents.

50.    The named plaintiffs were victims of Defendants' policies, practices, and customs described above and had their children removed in court proceedings that violated federal law.

51.    DSS employees under the supervision of former Defendants Malsam-Rysdon and Van Hunnik prepared a petition and signed an ICWA affidavit alleging that the children of the named plaintiffs were at risk of serious injury if they remained in their homes.  At

their respective hearings, the parents were (a) not allowed to see the petition, (b) not allowed to see the affidavit, (c) not allowed to cross-examine the person who submitted the affidavit, (d) not allowed to offer any evidence contesting the allegations, (e) not allowed to offer any evidence as to whether the state had made active efforts to prevent the break-up of the family, and (f) not allowed to offer any evidence regarding whether removal of their children was the least restrictive alternative.  The only "evidence" mentioned at the hearing were hearsay statements from the state's attorney.

52.   Nevertheless, at the conclusion of their 48-hour hearings, the court removed Plaintiffs' children from their respective homes for a minimum of sixty days.  In addition, in both cases the court issued virtually identical findings adverse to the parents regarding issues that were not addressed in these hearings, such as a finding that DSS had made active efforts to prevent the breakup of the family and that removal of the children from the home was the least drastic alternative available.

53.   Attached as "Exhibit 5" is another transcript that illustrates Defendants' unconstitutional practices at the time the original complaint was filed.  As the transcript shows, the court (*per* former Defendant Davis) was asked by the intervener Oglala Sioux Tribe (through its counsel Dana Hanna) if the Tribe could "advise the Court as to the basic facts of taking [the] children."  The court denied the request, stating: "It's a 48 hour hearing, Mr. Hanna, and I'm not going to go into why the children were removed.  That's not my concern at this point." (Exhibit 5 at 8.)

54.   Next, Mr. Hanna asked former Defendant Judge Davis to return the children to the mother because no evidence had been submitted to support any other result.  Judge Davis

denied the motion, stating: "I don't have what I need here today at the 48 hour hearing to make [that decision]." (*Id.* at 10.)

55. Given that former Defendant Judge Davis (by his own admission) lacked sufficient information to determine if the allegations against the mother were valid, the court should have set the matter for a speedy evidentiary hearing.  This is precisely what Mr. Hanna requested. *See id.* at 12 (requesting the continuation of the hearing until "a week from now or within the reasonably near future to [determine] whether there's any factual basis at all for taking these children.").  The court not only denied the motion but decided all issues *against* the mother and removed the children from the home for a minimum of sixty days.

56. Thus, former Defendant Judge Davis prevented anyone from introducing the evidence upon which he could have made an informed decision.  He rendered the allegations submitted by the state's attorney and DSS irrefutable.

57. The practice of these Defendants at the time the original complaint was filed, then, was to allow DSS to wield virtually unlimited authority to remove Indian children from their families.  Any evidence that might have contradicted the allegations in the state's petition was barred from the 48-hour proceeding.

58. At the time the original complaint was filed, the Defendants' 48-hour hearings were more akin to an *ex parte* proceeding than an adversarial hearing.  The parents were not permitted to discuss the allegations during the hearing, and those allegations were presumed true by the court.  Similarly, the tribe was not permitted to intervene in any meaningful way because all the relevant documents were kept a secret, and no one was permitted to call witnesses or cross-examine the DSS worker who signed the affidavit.

59.   At the time the original complaint was filed, the Defendants' 48-hour hearings usually resulted in the forced removal of Indian children from their homes for a minimum of sixty days (and most often ninety days) before the parents and their children were afforded a post-deprivation hearing at which they could present evidence and contest the allegations against them.  This is what happened to former Plaintiff Walking Eagle, and Plaintiffs Pappan, and Young.

60.   Moreover at the time the original complaint was filed, Defendants' 48-hour hearings typically resulted in the placement of Indian children in non-Indian homes or private institutions operated by non-Indians, as was the case with the children of former Plaintiff Walking Eagle, and Plaintiffs Pappan, and Young.  Therefore, the Oglala and Rosebud Sioux Tribes, as well as every Indian parent living in Pennington County with Indian children, had and still have a fundamental interest in seeking to halt the continuation of the policies, practices, and customs challenged in this lawsuit.

61.   It took a minimum of sixty days before Plaintiffs Pappan and Young were permitted to retain custody of their children.  Both women have a good faith and reasonable belief that had the court afforded them a due process hearing soon after the 48-hour hearing, there is substantial likelihood the court would have ordered DSS to return their children.  Indeed, at the 60-day hearing for former Plaintiff Walking Eagle, the court dismissed the charges against her, rejected the claims of DSS of abuse and neglect, and ordered DSS to return her children forthwith.

## CLAIM I:  VIOLATION OF THE DUE PROCESS CLAUSE

62.   Whenever state officials forcibly remove a child from his or her family, the state is required by the Due Process Clause to provide a meaningful post-deprivation hearing at a

meaningful time. *Newton v. Burgin*, 363 F. Supp. 782 (W.D.N.C. 1973) (three-judge court), *aff'd mem.*, 414 U.S. 1139 (1974); *Swipies v. Kofka*, 419 F.3d 709 (8th Cir. 2005); *Whisman v. Rinehart*, 119 F.3d 1303 (8th Cir. 1997).

63.   At the time the original complaint was filed, the 48-hour hearings that Defendants convened following the involuntary removal of Indian children from their homes were not meaningful hearings for purposes of the Due Process Clause.

64.   Therefore, Defendants must hold a constitutionally adequate hearing soon after their 48-hour hearings. *See Martin v. Texas Dep't of Protective and Regulatory Services*, 405 F. Supp.2d 775, 790 (S.D. Tex. 2005) (noting that the state's early hearing may not have passed constitutional scrutiny but defect was cured when state provided an adequate hearing ten days later).

65.   At the time the original complaint was filed, the policy, practice, and custom of the Defendants was to wait at least sixty days (and more often ninety days) before providing parents whose children had been removed from their custody with adequate notice, an opportunity to present evidence on their behalf, an opportunity to contest the allegations, and a written decision based on competent evidence.   As a matter of law, such an exorbitant delay violates the Due Process Clause. *See Swipies*, 419 F.3d at 715; *Whisman*, 119 F.3d at 1309; *Coleman*, 40 F.3d at 260-61; *Doe v. Staples*, 706 F.2d 985, 990-91 (6th Cir. 1983); *Weller v. Dep't of Social Services*, 901 F.2d 387, 393 (4th Cir. 1990). *See also Heartland Academy Community Church v. Waddle*, 427 F.3d 525, 535 (8th Cir. 2005).

66.   At the time the original complaint was filed, Plaintiffs were unaware of a single 48-hour hearing that did not accept the allegations made by DSS and order the removal of Indian children from their homes, even though the parents had not been afforded adequate notice

and an opportunity to contest those allegations.  These hearings were, as Justice Sabers stated in a related context, a "rubber stamping formality." *See In re D.M.*, 677 N.W.2d 578, 582 (S.D. 2004) (Sabers, J., dissenting).

67.   The first *Mathews* factor considers the private interests at stake in the deprivation. Here, as noted earlier, the private interests in maintaining family integrity are particularly substantial.

68.   The second *Mathews* factor considers whether the process employed by the state increases the risk of an erroneous deprivation and whether additional process might reduce that risk.  At the time the original complaint was filed, the process employed by the Defendants *drastically* increased the risk of an erroneous deprivation because the Defendants withheld from parents the very procedures that have long been recognized as fundamental to due process of law.

69.   At the time the original complaint was filed, Defendants' practices could hardly have been more unfair *and* unreliable.  At Defendants' 48-hour hearings, the state was permitted to speak on the issues to be decided but not the parents.  Providing parents with rudimentary due process, including notice and an opportunity to contest the charges, will obviously reduce the risk of an erroneous deprivation. *See Swipies*, 419 F.3d at 715; *Coleman*, 40 F.3d at 260-61; *Rivera v. Marcus*, 696 F.2d 1016, 1027-28 (2d Cir. 1972) (commenting that where, as here, parents were provided with no opportunity at an early stage to explain their fitness and contest allegations of having neglected their children, the risk of an erroneous deprivation was unacceptably high); *Johnson v. City of New York*, 2003 WL 1826122 at *13 (S.D.N.Y. 2003) (similar).

70.     The third *Mathews* factor considers whether the state would be unnecessarily burdened by having to provide additional procedures.   Defendants eventually provided a constitutionally adequate post-deprivation hearing to parents whose children had been removed from the home, and thus providing an earlier hearing would have little if any additional burden.  *See Rivera*, 696 F.2d at 1028 (finding fault with a system similar to the one at issue here, given that procedures "are already in place" by which a prompt hearing could have been provided to the parents); *Swipies*, 419 F.3d at 715; *Coleman*, 40 F.3d at 260-61.

71.     The mere fact that the Defendants might have to expedite their trial preparations was no reason to deny Indian families time-honored procedural safeguards against unnecessary injury. *See County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) (holding that county officials must provide arrestees with a probable cause hearing within 48 hours of arrest despite the administrative burden necessary to meet that short deadline).

72.     Normally, parents should be afforded an adequate post-deprivation hearing within seven days after the removal of their children.  *See Coleman*, 40 F.3d at 260-61 (holding that a seven-day delay in providing a hearing to car owners following the impoundment of their cars by state officials violated the Due Process Clause); *Swipies*, 419 F.3d at 715 (citing *Coleman* in holding that a seventeen-day delay in providing a hearing to parents following the removal of their children by a state agency clearly violates the Due Process Clause); *Brown v. Daniels*, 128 Fed.Appx. 910, 915 (3d Cir. 2005) (holding that the delay in providing an adequate hearing following the removal of children from the home "should ordinarily be measured in hours and days, as opposed to weeks.").  For reasons explained in the next section, in order to fulfill the congressional purposes of the Indian

Child Welfare Act, Indian parents and Indian tribes are entitled to a few additional days to prepare for the due process hearing, but without question, the policy, practice, and custom of Defendants at the time this suit was filed to delay the hearing for a minimum of sixty days violated the Fourteenth Amendment.

73.   At the time the original complaint was filed, Defendants' policy, practice, and custom of denying Indian parents, as Plaintiffs Pappan and Young were denied, a meaningful hearing at a meaningful time following the removal of their children violated rights guaranteed to them by the Fourteenth Amendment and  caused Indian parents to suffer irreparable injury.  Redress is sought pursuant to 42 U.S.C. § 1983.

## CLAIM II:  VIOLATIONS OF THE INDIAN CHILD WELFARE ACT

74.   The Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901 *et seq*., is a remedial statute. The Act was passed in response to the removal of large numbers of American Indian children from their homes by state agencies under dubious circumstances and without adequate procedural guarantees.

75.   After years of hearings and studies, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, *often unwarranted*, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(4) (emphasis added).

76.   Congress also found "that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." *Id*. §1901(5).

77.   These removals were disastrous not only for many Indian families but also for their tribes, which were losing their future generations.  The wholesale separation of Indian children from their families "is perhaps the most tragic and destructive aspect of American Indian life today," resulting in a crisis "of massive proportions." H.R. Rep. No. 95-1386 p. 9 (1978).

78.   Another reason ICWA was passed was to enforce the federal government's trust obligations to Indians and tribes. *See* 25 U.S.C. § 1901(3) (explaining that "the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe.").

79.   In enacting ICWA, Congress declared "that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." *Id*. § 1902.

80.  The stated purpose of the Act is "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." *Id*.  Congress recognized that nothing "is more vital to the continued existence and integrity of Indian tribes than their children." *Id*. § 1901(3).

81.   ICWA was enacted "to prevent states from improperly removing Indian children from their parents, extended families, and tribes." *Cohen's Handbook of Federal Indian Law* (Nell Jessup Newton ed., 2005) at 820.

82.  The Oglala Sioux Tribe and the Rosebud Sioux Tribe are among the intended beneficiaries of ICWA and have enforceable rights under ICWA. *See Holyfield*, 490 U.S.

at 52 (recognizing that Indian tribes have an interest in the custody of Indian children "which is distinct from but on parity with the interest of the parents" and which "finds no parallel in other cultures found in the United States. It is a relationship that many non-Indians find difficult to understand and that non-Indian courts are slow to recognize.").

83.   In fact, many of the safeguards set forth in ICWA apply only to Indian tribes. *See, e.g.*, 25 U.S.C. §§  1911(a) (right to exclusive jurisdiction over children domiciled on the reservation); 1911(c) (right of intervention in state court proceedings); 1912(a) (right to notice in involuntary proceedings in state court); 1912(c) (right to examine documents filed with state courts); 1914 (right to petition to invalidate a state court order); and 1915(e) (right to request the record of any Indian child's state court placement).

84.   Because ICWA is a remedial statute passed for the benefit of Indians and tribes, it "'must be liberally construed with all doubts resolved in favor of the Indians.' *Preston v. Heckler*, 734 F.2d 1359, 1369 (9th Cir. 1984); *accord Bryan v. Itasca County, Minn.*, 426 U.S. 373, 392 (1976)." *In re Esther*, 248 P.3d 863, 869 (N.M. 2011).  *See also In re J.S.B.*, 691 N.W.2d 611, 619 (S.D. 2005) (holding that these rules of construction apply to ICWA and stating that, given ICWA, "it is to the benefit of Indian children to remain within their families and only after 'active efforts' to reunite those families have proven unsuccessful should the children be removed.").

85.   ICWA creates a set of procedures that were expressly intended to supplant state procedures whenever the two are in conflict.  As the Supreme Court explained in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 44-45 (1989):

> [T]he purpose of the ICWA gives no reason to believe that Congress intended to rely on state law for the definition of a critical term; quite the contrary.  It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that

Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities.

86.   Among other things, ICWA confers rights and protections on Indian parents and children in any "foster care placement," 25 U.S.C. § 1912, as well as on Indian tribes, including "a right to intervene at any point in [a foster care] proceeding." *Id*. § 1913(c).

87.   A "foster care placement" for purpose of ICWA, is "any action removing an Indian child from its parents or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." *Id*. § 1903(1)(i).

88.   Thus, the 48-hour hearing conducted by the Defendants is a "foster care placement" under ICWA whenever the court, at the conclusion of the hearing, issues an order removing an Indian child from its parents or Indian custodian.

89.   The fact that the 48-hour hearing is a "foster care placement" for purposes of ICWA is acknowledged in the Green Book.   The Green Book contains a model Temporary Custody Order, *see* Green Book at 113-14 (a copy of which is attached as "Exhibit 4"), and it includes ICWA-related findings that the court must make.   The Green Book explains: "In ICWA cases, if the child(ren) remain in foster care, these additional findings must be added to avoid a challenge of the validity *of the foster care placement*." *See* Green Book at 114 n. 6 (emphasis added).

90.   Accordingly, the Defendants must ensure that the Indian parents, Indian children, and Indian tribes involved in their 48-hour hearings are afforded all of the procedural protections that ICWA mandates in foster care placements.

91.   At the time the original complaint was filed, the policies, practices, and customs of the Defendants violated three provisions of ICWA--§§ 1922, 1912(d), and 1912(e)--and were inconsistent with the Act's purpose.

**1.  Defendants were violating § 1922**

92.    Section 1922 imposes two duties—one procedural, one substantive—on state officials when they remove an Indian child from the home in an emergency.  First, as a matter of procedure, state authorities "shall expeditiously initiate a child custody proceeding" that must comply with ICWA.

93.   Second, as a matter of substance, state officials "shall insure that the emergency removal or placement *terminates immediately* when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child." (Emphasis added.)

94.   The substantive duty imposed by § 1922 is consistent with the overarching purpose of ICWA, as it guarantees that whenever state authorities remove Indian children from their homes, the separation will be for the shortest time reasonably possible, and that state officials will monitor this process to insure that the removal "terminates immediately" after the causes for the removal have been rectified.

95.   At the time the original complaint was filed, Defendants routinely violated their substantive duties under § 1922.  *Never* during Defendants' 48-hour hearings was there an inquiry into whether the cause of the removal has been rectified, nor did the court direct DSS to pursue that inquiry after the hearing.  Yet, this is precisely what the 48-hour must do in order to comply with ICWA.  It is at the 48-hour hear that the court must hear evidence as to whether removal of the child "is no longer necessary to prevent imminent

physical damage or harm to the child." *Id*  If the state does not meet that burden of proof, the child must be returned to the family.

96.  Attached as "Exhibit 6" is a decision issued in Plaintiff Lisa Young's case by former Seventh Circuit Judge Thorstenson (who left the bench in January 2013).  As the decision reflects, rather than view § 1922 as imposing federal restrictions in 48-hour hearings, Judge Thorstenson interpreted § 1922 as authorizing state courts to *ignore* ICWA until much later in the custody process.  *See id*. at 3 (citing § 1922 for the proposition that "48-hour hearings are conducted under state statute, . . . and ICWA, including its notice requirements, is not implicated at the 48-hour hearing.").  As Judge Thorstenson stated when counsel for the Oglala Sioux Tribe sought compliance with ICWA during Ms. Young's 48-hour hearing: "you have brought this issue up on numerous occasions, [and the court has consistently held] that ICWA does not apply to emergency hearings." *Id.* at 11.  Indeed, as a result of § 1922, according to Judge Thorstenson, "state law prevails in the 48-hour hearing" and "the Tribe does not have a fundamental right to fairness under ICWA" at that hearing. *Id.* at 5-6.

97.  Similarly at the time the original complaint was filed, former Defendants Malsam-Rysdon and Van Hunnik had not trained or directed their staff to insure that sufficient efforts were made by DSS to reunite the family following 48-hour hearings and determine whether separating the family remained necessary.  Indeed, Plaintiffs Pappan and Young assert that had DSS complied with § 1922, their children would have been returned to their homes much sooner than they were. Plaintiffs further allege that Defendant Valenti, even as recently as August 2016, had not instructed DSS staff to

employ the standard set forth in § 1922 in determining when to return an Indian child to the home.

98.   Defendants' policy, practice, and custom of ignoring their substantive duties under § 1922 violates federal law and is causing Indian parents to suffer irreparable injury by keeping Indian children in foster care longer than necessary.

**2.   Defendants are violating § 1912(d)**

99.   Section 1912(d) of ICWA provides:

> Any party seeking to effect a foster care placement of . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break-up of the Indian family and that these efforts have proved unsuccessful.

100.   At the time the original complaint was filed, by policy, practice, and custom, the Defendants *never* complied with §1912(d) in any meaningful manner at 48-hour hearings. Although ICWA affidavits filed by Defendant Vargo and his staff in connection with 48-hour hearings usually contained averments regarding efforts made by DSS to provide remedial services and rehabilitative programs to the family, parents were not permitted to see those averments, were not permitted to contest them, and were not permitted to make any statements or offer any evidence on those subjects.  Yet at the conclusion of the 48-hour hearing, the court *always* made findings adverse to the parents on the § 1912(d) inquiry. *See, e.g.,* Exhibit 2 (Temporary Custody Order for Plaintiff Pappan); Exhibit 7 (Temporary Custody Order for Plaintiff Young).

101.   At the time the original complaint was filed, former Defendants Van Hunnik and Malsam-Rysdon, and Defendant Vargo, never sought to introduce sufficient evidence, and the court never received sufficient evidence, at 48-hour hearings to comply with §

1912(d).  Yet the court used the Model Order and rendered "active efforts" findings against the parents in virtually every case.

102.      At the time the original complaint was filed, Defendants' policy, practice, and custom regarding the interpretation of, and application of, § 1912(d) violated federal law and caused Indian parents, such as Plaintiffs Pappan and Young, to suffer irreparable injury.

### 3.  Defendants are violating § 1912(e)

103.      Section 1912(e) of ICWA provides:

> No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

104.      At the time the original complaint was filed, by policy, practice, and custom, the Defendants *never* complied with §1912(e) in any meaningful manner at 48-hour hearings. Although ICWA affidavits filed by Defendants Vargo and his staff in connection with 48-hour hearings usually contained averments that continued custody in the home is likely to result in serious emotional or physical damage to the child, parents were not permitted to see those averments, were not permitted to contest them, and were not permitted to make any statements or offer any evidence on those subjects.  Yet at the conclusion of the 48-hour hearing, the court *always* made findings adverse to the parents on the § 1912(e) inquiry.  *See, e.g.,* Exhibits 2 and 7 (Temporary Custody Orders for Plaintiffs Pappan and Young, respectively).

105.      At the time the original complaint was filed no evidence of damage to the child was ever submitted into the record except by DSS under the cloak of secrecy, protected

from rebuttal.  Even though nothing barred the Defendants from providing Indian parents prior to or even during the hearing with a copy of the documents filed against them, the Defendants never did.

106.     At the time the original complaint was filed, Defendants' 48-hour hearings were not designed to obtain the truth.  Rather, they were designed to ratify the opinions of DSS and allow DSS to continue retaining custody of Indian children for a minimum of sixty days.

107.     Judge Thorstenson issued her decision in Ms. Young's case (Exhibit 6) "as a means of clarifying some recurring questions of law that are prevalent in this case." *See id.* at 1.  One recurring question was whether § 1912(d) and § 1912(e) applied to 48-hour hearings.   Consistent with Defendants' policy, practice, and custom, at the time the original complaint was filed, she ruled that they did not. *See* Exhibit 6 at 4 ("Simply stated, § 1912 was not violated in this case because § 1912 does not apply at this stage of the proceedings.").

108.     At the time the original complaint was filed, according to Judge Thorstenson, 48-hour hearings "are ill-suited for making § 1912(d) and (e) findings." *Id*.  However, the following three things, not mentioned in the court's decision, were true.  First, Judge Thorstenson always made § 1912(d) and § 1912(e) findings after each 48-hour hearing *anyway*, as recommended in the Green Book's model Temporary Custody Order, Form 7. (See Exhibit 4.)

109.     Second, the only reason why Defendants' 48-hour hearings were "ill-suited" to make the findings required by § 1912(d) and § 1912(e) is because it was Defendants'

policy, practice, and custom to keep them that way.   No state law prohibited the Defendants from addressing those issues in their 48-hour hearings.

110.     Third, Indian parents and Indian tribes are entitled to at least ten days' notice of a foster care placement proceeding under both state and federal law. *See* SDCL § 26-7A-15.1(3); 25 U.S.C. § 1912(e).  Thus, the appropriate time to make the findings required by §§ 1912(d) and (e) is in a hearing held on or shortly following the tenth day after notice has been received (unless the tribe requests a 10-day extension under § 1912(a)). One solution, then, is for the court to continue the 48-hour hearing until that time.

111.     At the time the original complaint was filed, Defendant Vargo, and former Defendants Malsam-Rysdon and Van Hunnik, never sought to introduce sufficient evidence, and the court never received sufficient evidence, at 48-hour hearings to comply with § 1912(e).  Yet the court rendered § 1912(e) findings against the parents in virtually every case.

112.     At the time the original complaint was filed, nothing prevented the Defendants from holding a meaningful hearing ten days after notice had been received by the parents and tribe and then making the § 1912(d) and § 1912(e) findings.  Instead, Defendants typically delayed such a proceeding for at least sixty days.  This policy, practice, and custom violated ICWA and caused Indian parents and the tribes of which they are members, and caused Plaintiffs Pappan and Young to suffer irreparable injury. Currently the DSS Defendants violate ICWA and the Due Process clause because they have a policy, practice, and custom of retaining the custody of Indian children even when the reason given at the 48-hour hearing for custody has ended whenever they believe an

alternative reason exists, despite the fact that no court authorized removal on that basis. Relief is sought pursuant to 42 U.S.C. § 1983.

## CLAIM III:  DEFENDANTS' COERCED WAIVERS VIOLATED FEDERAL LAW

113.     As discussed above, Indian parents have rights under both the Due Process Clause and ICWA in foster care proceedings.   Unfortunately, for at least the past three years prior to the time the original complaint was filed, former Defendant Davis and other Seventh Circuit judges  pursued a policy, practice, and custom of coercing Indian parents into waiving many of those rights, which is exactly what occurred to Plaintiffs Pappan and Young.

114.     At the time the original complaint was filed, the presiding judge told parents at the outset of each 48-hour hearing that if they agree to "work with" DSS, the court will enter an order that could result in a return of their children by DSS without further court involvement. *See* Exhibit 7 (transcript of proceedings of Plaintiff Lisa Young) at 5.

115.     Enticed by the prospect of an early reunification with their children, most parents agreed to "work with" DSS and waive their rights under state and federal law to adequate notice and a timely hearing.  Perhaps this process resulted in a reunification within weeks for a few families (although the Plaintiffs were unaware of any examples) but it definitely did not have that effect for Indian parents known to the Plaintiffs.

116.     Moreover at the time the original complaint was filed, the court never provided Indian parents with the information they needed to make an informed decision, and the entire process was inherently coercive because the parents had already been deprived of their children.

117.     At the time the original complaint was filed, in nearly all 48-hour hearings, for instance, the following information was not provided to parents prior to their being asked to waive their rights to a prompt and meaningful hearing: (a) the parents were not provided with adequate notice of the allegations against them and were not shown the petition for temporary custody or the ICWA affidavit; (b) the parents were not told that by agreeing to "work with" DSS, this will authorize DSS to retain custody of their children for at least another sixty days, during which time the parents will be allowed to visit their children only when and if DSS permitted them to visit; (c) the parents were not told that if they opt not to "work with" DSS, they may get a hearing more quickly; and (d) the parents were not told that if they decline, DSS has a duty under both state and federal law to work with the parents (and engage in active efforts to reunite the family) *anyway*.

118.     Thus at the time the original complaint was filed, Indian parents who agreed to "work with" DSS placed themselves in a state of suspended animation during which time DSS had full control over their children, had no duty to file a petition that would trigger formal process, and had no deadline for working with the family.   Additionally, even those parents who agreed to "work with" DSS were still saddled with a court order that found as a matter of law that continued custody of the child by the parents "is likely to result in serious emotional or physical damage to the child" and that DSS "has provided reasonable efforts to prevent the removal of the children from the home" even though no evidence was submitted at the 48-hour hearing on those issues. *See* Exhibits 2 and 7 (Temporary Custody Orders for Plaintiffs Pappan and Young, respectively).

119.     At the time the original complaint was filed, the waivers obtained by the Defendants in their 48-hour hearings were invalid because the Defendants failed to provide parents with adequate notice of the facts, of their rights under federal and state law, and of the consequences of their consent. *See In re Esther*, 248 P.3d 863, 876 (N.M. 2011) (holding in circumstances similar to those here that a purported waiver by a parent during an ICWA custody hearing was invalid); *Rivera*, 696 F.2d at 1026 (holding that a parent's waiver of her rights at a custody hearing was invalid because she was not informed "of the legal implications of her decision").

120.      "'[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (internal citation omitted).  This rule applies to parents who are being asked to waive their constitutional rights to a meaningful hearing at a meaningful time following the removal of their children from the home by state officials.

121.     Moreover at the time the original complaint was filed, even when Indian parents agreed to "work with" DSS, DSS rarely worked with Indian parents in any meaningful manner.  The court's inducement was  a cruel hoax.

122.     For instance at the time the original complaint was filed, about the only "work" that DSS performed for Plaintiffs Pappan and Young was to arrange weekly visitation with their children.  DSS made no effort to provide any counseling to the family or information on treatment programs.  DSS did not assist Ms. Young in obtaining housing in a domestic violence shelter, even though she needed it.  DSS did not tell Plaintiffs what they should do, or what needed to be improved, in order to regain custody of their children.

123.     In fact, DSS made matters worse.  To illustrate, DSS instructed Ms. Pappan and Ms. Young not to discuss their cases with their children or explain why the children had been taken away.  This exacerbated the situation immensely and made it impossible for the mothers to address their children's questions and concerns about the future.

124.     In one early visit between Ms. Walking Eagle and her son Tristan (age 3), Tristan began to cry.  The DSS worker told Tristan that if he continued to cry, he would not be allowed to meet with his mother anymore.   Thereafter, Tristan fought back tears whenever he saw his mother.  DSS prohibited frank and emotional exchanges between Ms. Walking Eagle and her son.

125.     When Ms. Young asked her DSS worker if she could visit her children more than once a week, the worker told Ms. Young that she did not have the time to arrange additional meetings, even though additional meetings would help the family.

126.      Ms. Walking Eagle had a two-day trial sixty days after DSS removed her children.   DSS strenuously argued that the children should not be returned to Ms. Walking Eagle.  The court rejected those claims and returned the children to Ms. Walking Eagle.  Had that hearing been held sooner, the children would have been returned sooner.

127.     Plaintiffs Pappan and Young believe that the forced removal of their children caused their children to suffer emotional and psychological harm, including (to varying degrees) separation anxiety, bed-wetting, suicidal tendencies, emotional swings, and fear of being separated from their parents.  For years after her return home, Ms. Pappan's daughter, who was 3 years old at the time she was removed from the family, would wake up in the middle of the night and go to her mother's bedroom just to make sure she was there.

128. At the time the original complaint was filed, former Defendants Malsam-Rysdon and Van Hunnik inadequately trained their staff to work with Indian parents in a meaningful way.  They also failed to commit the staff and resources necessary to insure that Indian families would be reunited at the earliest reasonable opportunity. This is also true of their successors, Defendants Valenti and Fleming.

129. At the time the original complaint was filed, Defendants' policy, practice, and custom of keeping Indian parents in the dark about the allegations against them, their right to a meaningful hearing at a meaningful time, and the consequences of their waivers, and then proceeding to deny those parents of their rights under the Due Process Clause and ICWA after obtaining waivers from them, violated the rights of Indian parents under federal law and caused them to suffer irreparable injury.  Relief is sought pursuant to 42 U.S.C. § 1983.

### CLAIM IV:  FAILURE TO TRAIN AND SUPERVISE DSS STAFF

130. The DSS Defendants have a policy and practice, as evidenced by the facts in the record, of failing to adequately train and supervise their staff to ensure that Indian children placed into DSS custody are returned to their families "immediately [unless continued custody is] necessary to prevent imminent physical damage or harm to the child." *See* 25 U.S.C. § 1922. These failures, which involve actions taken by DSS staff during and after 48-hour hearings, cause plaintiffs to suffer irreparable injury and violate rights secured to plaintiffs by the Due Process Clause of the Fourteenth Amendment and by the Indian Child Welfare Act ("ICWA"). Relief is sought pursuant to 42 U.S.C. § 1983.

## CLAIM V:  FAILURE TO END PLACEMENT WHEN THE REASONS FOR PLACEMENT HAVE ENDED

131.     The DSS Defendants have a policy and practice, as evidenced by the facts in the record, of failing to end the out-of-home placement of Indian children when the reasons given at the 48-hour hearing for such placement have ended, thereby violating rights secured to plaintiffs by the Due Process Clause of the Fourteenth Amendment and by ICWA and causing plaintiffs to suffer irreparable injury. Relief is sought pursuant to 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court will:

1.  Assume jurisdiction over this matter;

2.  Certify this action as a class action pursuant to F.R.Civ.P. Rule 23(a), (b)(2), with the class consisting of all Indian parents and custodians who are members of federally recognized Indian tribes who reside with their Indian children in Pennington County, South Dakota;

3.  Issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that declares as a matter of law that (a) Defendants' policy, practice, and custom of refusing and failing to provide Indian families and Indian tribes with adequate notice and a meaningful hearing at a meaningful time following the removal of Indian children from their homes by state officials violates the Due Process Clause, (b) Defendants' policy, practice, and custom of refusing and failing to provide Indian families and Indian tribes with adequate notice and a meaningful hearing at a meaningful time following the removal of Indian children from their homes by state officials violates the Indian Child Welfare Act, and (c) Defendants' policy, practice, and custom of coercing Indian parents into waiving their rights to

adequate notice and a meaningful hearing at a meaningful time violates the Due Process Clause and the Indian Child Welfare Act;  (d) DSS Defendants' policy and practice of failing to adequately train and supervise their staff as set forth in paragraph 130 above violates the Due Process Clause and ICWA; and (e) DSS Defendants' policy and practice of failing to end the out-of-home placement of Indian children when the reasons given at the 48-hour hearing for such placement have ended violates the Due Process Clause and ICWA.

4.  Issue preliminary and permanent injunctive relief pursuant to F.R.Civ.P. Rule 65, enjoining the Defendants[1] and all persons in concert with them, and their successors in office, from (a) failing and refusing to provide Indian parents and Indian tribes with adequate notice and a meaningful hearing at a meaningful time following the removal of Indian children from their homes by state officials in a manner consistent with the Due Process Clause, (b) failing and refusing to provide Indian parents and Indian tribes with adequate notice and a meaningful hearing at a meaningful time following the removal of Indian children from their homes by state officials in a manner consistent with the Indian Child Welfare Act, and (c) from improperly coercing Indian parents into waiving their rights to adequate notice and a meaningful hearing at a meaningful time.  (d) with respect to the DSS Defendants, from failing or refusing to adequately train and supervise their staff as set forth in paragraph 130 above; and (e) with respect to the DSS Defendants, from failing or refusing to end the out-of-home placement of Indian children when the reasons given at the 48-hour hearing for such placement have ended.

---

[1] Plaintiffs are aware that the Federal Courts Improvement Act of 1996, now codified as part of 42 U.S.C. § 1983, prohibits the issuance of injunctive relief against judicial officers such as Defendant Davis. Therefore, as to him, this Court may grant only declaratory relief.

     5.   Grant plaintiffs their costs and attorneys' fees in this matter, and such other and further relief as to the Court may seem just and proper.

/s/ Stephen L. Pevar
STEPHEN L. PEVAR
American Civil Liberties Union Foundation
765 Asylum Avenue
Hartford, Connecticut 06105
(860) 570-9830

DANA L. HANNA
Hanna Law Office, P.C.
629 Quincy
P.O. Box 3080
Rapid City, South Dakota 57709
(605) 791-1832

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

     I hereby certify that on January 31, 2017, I filed the foregoing Amended Complaint with the Clerk of Court using the CM/ECF system, which sent a notice of electronic filing to the following counsel of record:

Jeffrey Hurd          jhurd@bangsmccullen.com
Robert L. Morris      bobmorris@westriverlaw.com
J. Crisman Palmer    cpalmer@gpnalaw.com

/s/ Stephen L. Pevar
Stephen L. Pevar